1

2

3

4

5

6

7

8 # UNITED STATES DISTRICT COURT

9 ## EASTERN DISTRICT OF CALIFORNIA

10

11 PERVAIZ A. CHAUDHRY, M.D., et al.,     Case No. 1:16-cv-01243-SAB

12            Plaintiffs,     ORDER RE MOTIONS *IN LIMINE*

13        v.     (ECF Nos. 90, 91, 92, 93)

14 DR. KAREN SMITH,

15           Defendant.

16

17 ## I.

18 ## BACKGROUND

19      Pervaiz A. Chaudhry, M.D., and Valley Cardiac Surgery Medical Group ("Plaintiffs')

20 filed this civil rights action pursuant to 42 U.S.C. § 1983 in Fresno County Superior Court on

21 June 17, 2016. (Compl., ECF No. 1 at 10-30.[1])  Plaintiff Chaudhry, a cardiac surgeon, performed

22 cardiac surgery on a patient who went into cardiac arrest and suffered hypoxic brain injury.  An

23 anonymous complaint was lodged with the California Department of Public Health ("CDPH")

24 alleging that Plaintiff Chaudhry left the operating room while the patient's chest was still open

25 and left the hospital before the surgery was completed.  Plaintiffs allege that their due process

26 rights were violated due the investigation and subsequent findings on the complaint.

27

28 [1] All references to pagination of specific documents pertain to those as indicated on the upper right corners via the CM/ECF electronic court docketing system.

On August 19, 2016, Defendants Karen Smith,[2] Steven Lopez, Eric Creer, Shirley Campbell, and Deidre Kappmeyer removed the action to the Eastern District of California. (ECF No. 1.) Following summary judgment, this action is proceeding against Dr. Karen Smith in her official capacity, Steven Lopez in his individual capacity, and Shirley Campbell in her individual capacity ("Defendants") on allegations of violations of due process.[3] (ECF Nos. 56, 60). The matter is set for trial on May 11, 2020 before the undersigned. (ECF No. 95.)

Currently before the Court are the parties' motions *in limine*, filed January 17, 2020. (ECF Nos. 90, 91.) Oppositions to the motions were filed on January 31, 2020. (ECF No. 92, 93.) A hearing on the motion was held on February 7, 2020. Counsel Thornton Davidson and Ty Kharazi appeared for Plaintiffs and counsel Diana Esquivel appeared for Defendants. Having considered the moving and opposition papers, the declarations and exhibits attached thereto, arguments presented at the February 7, 2020 hearing, as well as the Court's file, the Court issues the following order.

## II.

## LEGAL STANDARD

"A motion *in limine* is a procedural mechanism to limit in advance testimony or evidence in a particular area." United States v. Heller, 551 F.3d 1108, 1111 (9th Cir. 2009). A party may use a motion *in limine* to exclude inadmissible or prejudicial evidence before it is actually introduced at trial. See Luce v. United States, 469 U.S. 38, 40 n.2 (1984). "[A] motion *in limine* is an important tool available to the trial judge to ensure the expeditious and evenhanded management of the trial proceedings." Jonasson v. Lutheran Child and Family Services, 115 F.3d 436,440 (7th Cir. 1997). A motion *in limine* allows the parties to resolve evidentiary disputes before trial and avoids potentially prejudicial evidence being presented in front of the jury, thereby relieving the trial judge from the formidable task of neutralizing the taint of prejudicial evidence. Brodit v. Cambra, 350 F.3d 985, 1004-05 (9th Cir. 2003).

Judges have broad discretion in ruling on a motion *in limine*. Jenkins v. Chrysler Motors

---

[2] Karen Smith was named as a defendant for the purposes of obtaining injunctive and declaratory relief.

[3] Defendant Kappmeyer has been terminated from this action at the stipulation of the parties. (ECF Nos. 59, 60.)

1  Corp., 316 F.3d 663, 664 (7th Cir. 2002) ); see also United States v. Torres, 794 F.3d 1053, 1059

2  (9th Cir. 2015) (motion *in limine* rulings are reviewed for abuse of discretion).  Evidence should

3  not be excluded on a motion *in limine* unless it is inadmissible on all potential grounds.

4  McConnell v. Wal-Mart Stores, Inc., 995 F.Supp.2d 1164, 1167 (D. Nev. 2014); United States v.

5  Hitesman, No. 14-CR-00010-LHK-1, 2016 WL 3523854, at *2 (N.D. Cal. June 28, 2016).  Unless

6  this high standard is met, ruling on the motion *in limine* should be denied until trial so that the

7  evidence can be considered in its proper context.  McConnell, 995 F.Supp.2d at 1167; Hitesman,

8  2016 WL 3523854, at *2; see also Jonasson, 115 F.3d at 440 (Some evidentiary issues are not

9  accurately and efficiently evaluated by the trial judge in a motion *in limine* and it is necessary to

10  defer ruling until during trial).

11  ### III.

12  ### DISCUSSION

13  Plaintiffs bring twelve motions *in limine*: 1) exclude any mention of the results of the

14  lawsuit in Arteaga v. Fresno Community Regional Medical Center (hereafter "Perez"),[4] other than

15  approved deposition testimony; 2) exclude any deposition testimony from Perez unless the parties

16  have met and agreed upon the portion to be read; 3) allow Plaintiffs to show negative print and

17  television news coverage of Plaintiff Chaudhry; 4) exclude Defendants' rebuttal witnesses; 5)

18  exclude any mention of Plaintiff Chaudhry's prior alcohol use; 6) exclude any evidence that

19  Plaintiff Chaudhry left the operating room while Mr. Perez was unstable; 7) exclude evidence of

20  other lawsuits filed involving Plaintiff Chaudhry or his medical practice; 8) exclude all evidence

21  related to other non-medical lawsuits involving Dr. Chaudhry or his medical practice; 9) exclude

22  Defendants from stating that the closure of Mr. Perez by Physicians Assistant ("PA") Bella

23  Albakova was not within the standard and accepted medical care; 10) permit Plaintiffs to inquire

24  into the identity of the persons who refused to modify the "incorrect" CDPH 2567; 11) allow

25  Plaintiffs' percipient witnesses to testify; and 12) preclude any evidence that Plaintiff Chaudhry

26

27  ---

[4] The family of Mr. Perez filed a lawsuit, Arteaga v. Fresno Community Regional Medical Center, No.
13CECG03906 (Fresno County Superior Court), arising from the April 2, 2012 surgery Plaintiff Chaudhry

28  performed.  Plaintiffs refer to the lawsuit as the Alvarez suit and Defendants refer to it as the Perez lawsuit as the
plaintiffs there have various or different last names.  The Court shall refer to the suit by the patient's last name, Perez.

and PA Albakova had a personal relationship or that Plaintiff Chaudhry was involved in an extra-marital affair.

Defendants bring seven motions *in limine*: 1) exclude evidence of the revocation of Defendant Lopez' medical license and his prior convictions; 2) exclude communications between Plaintiffs' attorneys and CDPH staff concerning amendment of the report; 3) exclude testimony of non-retained experts; 4) exclude testimony from Plaintiff Chaudhry and his lay witnesses regarding his economic loss and any causal connection between the report and the reduction in revenue; 5) exclude media, news, and internet comments about Plaintiffs; 6) exclude any document that Plaintiffs have not timely disclosed; and 7) preclude Plaintiffs from relitigating the negligence cause of action tried and determined in <u>Perez</u>.

### A.   <u>Perez</u> Lawsuit

The parties bring numerous motions *in limine* pertaining to the state lawsuit in which Plaintiff Chaudhry was found liable based on his treatment of Mr. Perez.  These motions seek to either allow or preclude evidence based on its relevance, unfair prejudice, or confusion to the jury. The Federal Rules of Civil Procedure provide that generally relevant evidence is admissible at trial.  Fed. R. Evid. 402.  "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."  Fed. R. Evid. 401.  Relevant evidence can be excluded "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403.

### 1.   Motion to exclude reference to the Perez lawsuit

Plaintiffs' first motion *in limine* seeks to exclude any references to the <u>Perez</u> lawsuit, other than approved deposition testimony.  Plaintiffs contend that permitting any reference, other than the approved deposition testimony, would be extremely confusing to the jury and highly prejudicial to Plaintiffs.  Plaintiffs contend that the prior lawsuit was fundamentally different as that jury was asked to determine whether Plaintiff Chaudhry committed malpractice while this lawsuit is determining whether the defendants conducted a proper investigation and unjustly

deprived Plaintiff Chaudhry of his civil rights.  Plaintiffs also seek to exclude Mr. Perez's wife and son as witnesses in this action because their testimony is irrelevant to the issues in this case and their testimony would be highly prejudicial concerning their relative's case.

Defendants oppose the motion on the ground that certain information regarding Perez is relevant and its probative value outweighs any prejudice to Plaintiffs.  For example, Defendants argue that although Plaintiffs seek to exclude the testimony of Mr. Perez's wife and son such testimony is relevant as to how the family found out about Plaintiff Chaudhry's conduct in the operating room and why they filed their lawsuit.  Defendants state that Plaintiffs intend to argue that the lawsuit was filed due to the State 2567 report, but the family has testified that they were informed of the conduct from an anonymous caller which led to the filing of the lawsuit.  Further, Defendants argue that the fact that the jury returned a 60-million-dollar verdict against Plaintiff Chaudhry is relevant to the cause of his emotional distress and any aggravation of his cluster headaches.  Defendants agree that much of the evidence from Perez is not relevant and should be excluded, but contend that a wholesale exclusion of evidence is not permissible.  Defendants argue that ruling on evidence from the Perez lawsuit should be deferred until during trial when the Court can determine whether it is relevant to an issue that the jury must decide.

Rule 404(b) provides that evidence of other acts is admissible for a purpose other than to prove character, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."  Fed. R. Evid. 404(b)(2).  Generally speaking, evidence of other lawsuits against a party is admissible where relevant and offered for a proper purpose under Rule 404(b).  Jackson v. Fed. Express, No. CV1001760MMMCWX, 2011 WL 13268074, at *2 (C.D. Cal. June 13, 2011); see also Engquist v. Oregon Dep't of Agric., 478 F.3d 985, 1009 (9th Cir. 2007), aff'd sub nom. Engquist v. Oregon Dep't of Agr., 553 U.S. 591 (2008) ("A state court judgment is relevant evidence and therefore admissible in a later federal suit so long as the judgment has some tendency to prove a fact in issue.").

Plaintiffs rely on Engquist to argue that the Court should exclude any mention of the Perez case other than the deposition testimony agreed to by the parties citing the following excerpt:

///

> Commentators agree that most courts forbid the mention of verdicts or damage amounts obtained in former or related cases. See 75A AM. JUR.2d Trial § 628; D.C. Barrett, Propriety and prejudicial effect of reference by counsel in civil case to result of former trial of same case, or amount of verdict therein, 15 A.L.R.3d 1101 (summarizing cases). Moreover, in a case similar to the one at bench, the Third Circuit "disapprove[d]" of the introduction of a prior verdict against the same defendant, because "[a] jury is likely to give a prior verdict against the same defendant more weight than it warrants." Coleman Motor Co. v. Chrysler Corp., 525 F.2d 1338, 1351 (3d Cir. 1975). The court specifically noted that "admission of a prior verdict creates the possibility that the jury will defer to the earlier result." Id.

Engquist, 478 F.3d at 1009-10. The Court finds Plaintiffs reliance on Engquist to be misplaced for several reasons.

First, the Engquist court went on to state, "[t]his conclusion runs counter to our conclusion in [United States v. Boulware, 384 F.3d 794 (9th Cir. 2004), cert. denied, 546 U.S. 814 (2005)] that a prior state court judgment was admissible under Rule 403 balancing." Engquist, 478 F.3d at 1010. In Boulware, the state court judgment could be used to rebut the government's argument that the defendant owed the money that had been given to his girlfriend. Id. Under such circumstances, the trial judge could easily have controlled any danger that the jury would give undue weight to the judgment and controlled any waste of time or confusion of the issues. Id. Therefore, there are instances where a prior case, including the verdict or damages, are relevant and admissible.

Second, Plaintiffs are not solely seeking to exclude the verdict and amount of damages awarded, but any mention of the case other than deposition testimony agreed upon by the parties. While the issue that was decided by Perez is different from that to be decided here, Defendants argue that the verdict and award in Perez are relevant to the cause of Plaintiff Chaudhry's emotional distress and any aggravation of his cluster headaches and to show that these damages were not caused by the report that was published. Additionally, if Plaintiffs present evidence that the Perez family filed their lawsuit because of the report, the testimony of the Perez family would be relevant to show why they filed the action. Depending on the testimony presented at trial, the Perez lawsuit may be relevant to Plaintiffs' damages in this action.

Plaintiffs' have not shown that the Perez lawsuit is inadmissible in this matter on all potential grounds. The Court shall address specific objections to evidence from the Perez case as

it arises during the trial of this matter so that the evidence can be considered in its proper context. Hitesman, 2016 WL 3523854, at *2; Jonasson, 115 F.3d at 440.

Plaintiffs' motion *in limine* no. 1 to exclude any references to Perez is denied.

2.  Deposition testimony from Perez unless the parties have met and agreed upon the portion to be read

Plaintiffs' second motion *in limine* seeks an order for the parties to meet and confer before trial to agree on the portions of the depositions to be read to the jury. Defendants counter that this motion is contrary to the stipulation of the parties that the depositions taken in the Perez case of Albakova, Bhatt, Campbell, Chaudhry, Davis, Dhillon, Yussif, McComb, and Martin will be treated as though they were depositions taken in this action. Defendants argue that the pretrial order sets forth the procedure for the use of deposition testimony and the admissibility of such testimony should be determined under the Federal Rules of Evidence.

Here, the parties have stipulated that certain depositions taken in the Perez case shall be treated as though they were taken in this action. (Pretrial Order 22, ECF No. 88.) The Court will not require the parties to meet and confer on the specific deposition testimony to be read at trial. The parties are directed to pages 40 to 41 of the pretrial order filed December 4, 2019 for the requirements of designation and the counter designation of deposition testimony to be used at trial. Plaintiffs' motion *in limine* no. 2 to require the parties to meet and confer over the deposition testimony to be offered at trial is denied.

**B.      Negative Print and Television News Coverage of Plaintiff Chaudhry**

Contrary to other motions brought by Plaintiffs to exclude evidence of the lawsuits filed against Plaintiff Chaudhry, Plaintiffs' third motion *in limine* seeks to admit negative news media coverage regarding the State 2567 Report, the Perez lawsuit and other lawsuits filed against Plaintiff Chaudhry. Plaintiffs seek to show two television news reports and seven print articles to the jury arguing that it is essential that they be able to admit this evidence to demonstrate the stigmatizing effect of the report. At issue here are nine items listed in Plaintiffs' evidence list as numbers 22 through 30.

22.      Video of Nancy Grace story;
23.      Video of ABC Local News;

24. Article from ABC 30, titled "Fresno family says CRMC is covering up malpractice", dated January 8, 2014;
25. Article from ABC 30, Prominent Fresno surgeon facing lawsuits defends himself, dated August 29, 2014;
26. Article from Litverse.com, 10 Nightmarish breaches of trust by health care professionals, dated August 23, 2015;
27. Article from Daily Mail, A patient has been left in a vegetative state after his doctor walked out in the middle of his open-heart surgery to attend a lunch, a lawsuit has claimed, dated January 15, 2014;
28. Article from the Fresno Bee, Accusations mount against Fresno doctor accused of leaving surgery, dated March 1, 2014;
29. Article from the Huffington Post, Dr. Pervaiz Chaudhry Allegedly left surgery to have lunch, leaving patient brain damaged, dated January 15, 2014;
30. Article from the New York Daily News, Patient brain-damaged after doctor goes to lunch: Suit, dated January 16, 2014[.]

(Pretrial Order 33, ECF No. 88.)

Defendants counter that this evidence is inadmissible hearsay, is irrelevant, and contains sensational and inflammatory statements that were not made by any party and should be excluded under Rule 403. Defendants argue that neither of the television reports mention the State 2567 report nor do the reports attribute any statements to the defendants. Defendants contend that the stigmatizing statements contained in the media reports came from third parties and not the State 2567 report.

Defendants' fifth motion *in limine* seeks to preclude Plaintiffs from offering news articles, media reports and internet comments made about Plaintiff Chaudhry after the publication of the State 2567 report. Defendants contend that the media reports and comments are inadmissible hearsay for which no hearsay exception exists and some of the reports are too remote in time to be considered the cause of Plaintiffs' harm. Further, Defendants argue that the reports do not contain any statements made by Defendants but are the reporter's interpretation of the report or statements made by third parties that cannot be attributed to the defendants. Defendants also contend that the stigmatizing statements did not come from the State 2567 report, but from the Perez family and their lawsuit against Plaintiff Chaudhry.

Plaintiffs counter that evidence of the television and print media reports are essential to their claim and would be used to prove that the contents of the State 2567 report were disseminated to the public with the likely consequence that Plaintiff Chaudhry would be fired which is exactly what happened. Further, Plaintiffs contend that the reports are not obviously

prejudicial to either party because the jury could draw a negative opinion of Plaintiff Chaudhry from the reports or could find that the reports damaged his reputation unfairly.  Plaintiffs state they are willing to take the calculated risk which offsets any prejudicial impact.

       1.    <u>Legal Standard for Stigma-Plus Claim</u>

"The procedural due process rights of the Fourteenth Amendment apply only when there is a deprivation of a constitutionally protected liberty or property interest."  <u>WMX Techs., Inc. v. Miller ("WMX II")</u>, 197 F.3d 367, 373 (9th Cir. 1999).  The Supreme Court has made it clear that that reputation alone is not an interest protected by the constitution.  <u>WMX II</u>, 197 F.3d at 373; <u>see</u> <u>Paul v. Davis</u>, 424 U.S. 693, 706 (1976) ("the Court has never held that the mere defamation of an individual, whether by branding him disloyal or otherwise, was sufficient to invoke the guarantees of procedural due process absent an accompanying loss of government employment"). "[R]eputational harm alone does not suffice for a constitutional claim."  <u>Miller v. California</u>, 355 F.3d 1172, 1178 (9th Cir. 2004).  Absent a change in status, "any harm or injury to that interest . . . inflicted by an officer of the State, does not result in a deprivation of any 'liberty' or 'property' recognized by state or federal law."  <u>Paul</u>, 424 U.S at 712.  Courts refer to this as the "stigma-plus" test.

To prove a stigma-plus claim under § 1983, the plaintiff "must show that the stigma was accompanied by some additional deprivation of liberty or property."  <u>Miller</u>, 355 F.3d at 1178. Under the "stigma-plus" test, Plaintiffs must demonstrate the loss of a recognizable property or liberty interest in conjunction with the allegation that they suffered injury to reputation.  <u>Miller</u>, 355 F.3d at 1179; <u>Cooper v. Dupnik</u>, 924 F.2d 1520, 1532 (9th Cir. 1991), rev'd on other grounds, 963 F.2d 1220, 1235 n.6 (9th Cir. 1992)).  A plaintiff can meet this test by showing that "injury to reputation was inflicted in connection with a federally protected right" or that "injury to reputation caused the denial of a federally protected right."  <u>Herb Hallman Chevrolet, Inc. v. Nash–Holmes</u>, 169 F.3d 636, 645 (9th Cir. 1999); <u>Cooper</u>, 924 F.2d at 1532-33.

Additionally, the "stigma-plus" test requires that the defamation be accompanied by an injury **directly caused by the state**, rather than an injury caused by the act of some third party in reaction to the State's defamatory statements.  <u>Mazzeo v. Gibbons</u>, 649 F.Supp.2d 1182, 1197 (D.

Nev. 2009); <u>Douglas v. Oregonian Pub. Co.</u>, 465 F. App'x 714, 715 (9th Cir. 2012) (unpublished); <u>Ooley v. Citrus Heights Police Dep't</u>, 603 F. App'x 628, 629 (9th Cir. 2015) (unpublished). Plaintiff must also prove that he did not receive due process. <u>Ulrich v. City & Cty. of San Francisco</u>, 308 F.3d 968, 982 (9th Cir. 2002); <u>Wisconsin v. Constantineau</u>, 400 U.S. 433, 436 (1971). To prevail on their stigma-plus claim, Plaintiffs must prove that the defendants' statements were substantially false. <u>Campanelli v. Bockrath</u>, 100 F.3d 1476, 1484 (9th Cir. 1996).

2.  <u>Plaintiffs' Motion to Admit Media Reports</u>

**a.  Proof of publication**

Relying on <u>Baldwin v. Cutting</u>, No. 3:16-CV-903-L-KSC, 2018 WL 6523040, at *2 (S.D. Cal. Dec. 12, 2018), Plaintiffs argue that the media reports are essential to prove that there was significant public disclosure of the stigmatizing statements in the State 2567 report, but Defendants do not dispute that there was public disclosure of the State 2567 report or that it was generally known that the statements were about Plaintiff Chaudhry.[5] Defendants dispute that the State 2567 report contained stigmatizing or materially false statements and that Plaintiffs suffered a deprivation of a property or liberty interest as a result of anything that Defendants did or failed to do.

In <u>Baldwin</u>, the plaintiff, a border patrol agent, was interviewed during an investigation into a leak of a different investigation with a relative of one of his friends. <u>Baldwin</u>, 2018 WL 6523040, at *1. The friend's phone was tapped and messages from the plaintiff were intercepted which were the subject of his interview. <u>Id.</u> His supervisors were provided with a report that he was uncooperative and not forthcoming during the interview. <u>Id.</u> As a result of the report, he was transferred to another border patrol station with downgraded duties and was no longer able to be assigned to other task forces at the investigating agencies request because the agency no longer considered him trustworthy. <u>Id.</u> at *2. He filed a suit alleging first amendment and stigma-plus claims based upon the agency report alleging that the allegations against him were unfounded and

_____

[5] Stigmatizing statements need not name the plaintiff to be actionable, so long as the surrounding circumstances make clear that the statement makes particular reference to the individual. <u>Tibbetts v. Kulongoski</u>, 567 F.3d 529, 537 (9th Cir. 2009).

that there were errors in collecting evidence during the investigation.  Id.

In his stigma-plus claim, the plaintiff alleged that his rights had been violated by providing a false report to his employer which led to the impairment of his reputation for honesty and morality.  Baldwin, 2018 WL 6523040, at *1.  The defendants filed a motion to dismiss in which the court found, as relevant here, that the plaintiff had not alleged that the stigmatizing charge was publicly disclosed because the disclosure was within or between government agencies and was not a public disclosure.  Id. at *4.

Plaintiffs' reliance on Baldwin is misplaced because here the State 2567 report was publicly disclosed when it was published to the DHPS website.  See https://www.cdph.ca.gov/Programs/CHCQ/LCP/Pages/Hospital-Administrative-Penalties-by-Year.aspx#2013, Community Regional Medical Center (last visited 2/13/20).  The public disclosure of the report is not a disputed issue in this case.

Plaintiffs argued in their opposition and at the February 7, 2020 hearing that these media reports and the lawsuits are all relevant to demonstrate the "domino effect" of the State 2567 report.  Circuits are split and the Ninth Circuit has not directly decided whether the "stigma" and "plus" must be committed by the same government actor.  Eberhard v. California Highway Patrol, 73 F.Supp.3d 1122, 1130 (N.D. Cal. 2014).  But District Judge O'Neill found that "the Ninth Circuit has recognized that in the context of § 1983 claims, '[t]he requisite causal connection can be established not only by some kind of direct personal participation in the deprivation but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury.' "  (Memo. Decision and Order Re Defs.' Mot. to Dismiss 12, ECF No. 12.)  Therefore, Judge O'Neill found that the allegation that Plaintiff was removed from his position at CRMC due to the publication of the State 2567 report was sufficient to state a stigma-plus claim.[6]  (Id.)  Under the "law of the case" doctrine, "a court is

---

[6] In dicta in Cooper, the Ninth Circuit stated that the position that the stigma and plus must be committed by the same actor makes better law and is truer to Paul. 924 F.2d at 1534.  See also Ebergard, 73 F.Supp.3d at 1131-32 (the court determined "that the 'stigma' and 'plus' must be committed by the same state actor to state a due process claim with respect to claims against individual government officials.  Permitting a 'stigma-plus' claim solely where (as the Second Circuit would allow) the 'stigma' and the 'plus' merely appear to a reasonable observer to be connected to an injury would result in a government actor being liable under Section 1983 solely because of the actions of other government actors, even when she did not herself participate in those actions.  That casts too broad a net.  Requiring a

11

generally precluded from reconsidering an issue that has already been decided by the same court, or a higher court in the identical case." United States v. Alexander, 106 F.3d 874, 876 (9th Cir. 1997) (quoting Thomas v. Bible, 983 F.2d 152, 154 (9th Cir.) (cert. denied 508 U.S. 951 (1993).) Accordingly, evidence that would tend to prove or disprove that CRMC removed Plaintiff from his position because of the State 2567 report is relevant in this matter.

Courts recognize that termination of an employee from public employment caused by defamatory statements are sufficient to meet the plus component of the stigma-plus test. Patterson v. City of Utica, 370 F.3d 322, 330 (2d Cir. 2004); Segal v. City of New York, 459 F.3d 207, 212 (2d Cir. 2006); Hill v. Borough of Kutztown, 455 F.3d 225, 238 (3d Cir. 2006); see also Valmonte v. Bane, 18 F.3d 992, 1002 (2d Cir. 1994) (finding plus where defamatory publication created a statutory impediment to employment). Not all circuits require the stigma and plus to be committed by the same actor. Velez v. Levy, 401 F.3d 75, 89 (2d Cir. 2005).

That termination from employment has been found to support a stigma-plus claim does not mean that all harm that results after the publishing of a defamatory statement is sufficient to support a stigma-plus claim. Specifically, the harm must be inflicted in connection with a federally protected right or the injury to reputation needs to have caused the denial of a federally protected right. Herb Hallman Chevrolet, Inc, 169 F.3d at 645; Cooper, 924 F.2d at 1532-33. Plaintiffs here seem to be alleging injury due to malpractice actions filed against them in state court. However, the filing of a civil action against Plaintiffs does not implicate any federal or state rights. While the First Amendment provides the right for access to the court, there is no federal or state right not to be sued. The filing of lawsuits by third parties against Plaintiffs does not meet the "plus" in the stigma-plus test.

Further, the injury must be **directly caused by the state**, rather than an injury caused by the act of some third party in reaction to the State's defamatory statements. Mazzeo, 649 F.Supp.2d at 1197; Douglas, 465 F. App'x at 715; Ooley, 603 F. App'x at 629; WMX Techs., Inc. v. Miller ("WMX I"), 80 F.3d 1315, 1320 (9th Cir. 1996), on reh'g en banc, 104 F.3d 1133 (9th

---

closer degree of coincidence is also more consistent with Iqbal's teaching that "'a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution. Iqbal, 556 U.S. at 676, 129 S.Ct. 1937.").

Cir. 1997).  To the extent that Plaintiff is attempting to show that his reputation was damaged by the media reports of the lawsuits that were filed after the State 2567 report was issued and the reaction of third parties to these lawsuits, the "plus" cannot be based on the voluntary actions of third parties.  URI Student Senate v. Town of Narragansett, 707 F.Supp.2d 282, 298 (D.R.I. 2010), aff'd, 631 F.3d 1 (1st Cir. 2011) (even if catalyzed by government action, harm at the hands of third parties cannot serve as "plus" factors); WMX II, 197 F.3d at 375 ("Damage to a property interest must arise from affirmative conduct beyond the defamatory statements themselves.  Affirmative conduct includes revoking a right or changing a status held by the plaintiff or taking direct action to prevent continued patronage of the business."); Alvarez v. City of San Bernardino, 414 F. App'x 964, 966 (9th Cir. 2011) ("Although patrons may be less likely to patronize a company because of the defamation, this is a result of the damage to the business's reputation, not a deprivation of goodwill.  Defendants did not deprive Plaintiffs of a right or status, nor did they take action to prevent either banks or other cities from doing business with Plaintiffs.  The defamatory statements were no more than damage to business reputation, which is not a cognizable § 1983 claim.").  Defendants here did not direct the third parties to file the lawsuits nor did these lawsuits deprive Plaintiffs of a right or status.  Lawsuits filed by third parties cannot form the basis of Plaintiffs' stigma-plus claim.

At the February 7, 2020 hearing, Plaintiff argued that the report and the alleged defamatory statements were used during the Perez lawsuit.  However, the verdict in the Perez action was the result of the jury's finding that Plaintiff Chaudhry acted negligently in treating Mr. Perez and was not directly caused by the findings the defendants made in the report.

The Court rejects Plaintiffs' argument that the lawsuits and media reports are relevant to the stigma-plus claim because they show the "domino effect" of the statements.  If such were the law, then any defamatory statement that resulted in negative publicity would be sufficient to state a stigma-plus claim.  "The Due Process Clause does not, by its own force, extend individuals a right to be free of injury wherever a state is characterized as the tortfeasor.  The Fourteenth Amendment is not a 'font of tort law to be superimposed upon whatever systems may already be administered by the States.' " WMX I, 80 F.3d at 1319 (citations omitted) (refusing to extend

constitutional protection to a possible and indirect impairment of business goodwill).

**b.    Termination of Employment**

Plaintiffs argue that "it is essential that they be able to argue to the jury that significant public disclosure of the stigmatizing statements in Defendants' State 2567 report occurred and that disclosure is sufficient to meet the requirements of the 'stigma-plus' test as a factual matter." (ECF No. 90 at 5.)   In their opposition to Defendants' motion to exclude the media reports, Plaintiffs argue the media reports "would be shown to the jury simply to prove that the contents of the State 2567 report were disseminated to the public with the likely consequence that Dr. Chaudhry would be fired by CRMC, which is precisely what happened." (ECF No. 92 at 9.)

There must be some temporal nexus between the stigmatizing statements and the deprivation, and the statements cannot be too remote in time to be considered the cause of the plaintiff's harm. Campanelli, 100 F.3d at 1483 (seven to nine days not too remote; Tibbetts v. Kulongoski, 567 F.3d 529, 538 (9th Cir. 2009) (sixteen months too remote).   Defendants argue that, since the media reports were published months to years after the report issued, Plaintiffs cannot establish a temporal nexus between the stigmatizing statements and the deprivation alleged.   Plaintiffs seek to admit the media reports to show dissemination of the statements in the State 2567 report which was issued on February 14, 2013.  (ECF No. 93-2.)   The media reports sought to be admitted were published from February 14, 2013 through August 23, 2015.

Plaintiffs argue that evidence of the television and print media reports would be used to prove that the contents of the State 2567 report were disseminated to the public with the likely consequence that Plaintiff Chaudhry would be fired.   Based on the allegations in the complaint. Plaintiff Chaudhry was removed from his position as medical director at CRMC on July 27, 2012, prior to the publication of the State 2567 report and prior to the publication of the media reports. (Compl. ¶ 28.)   The Court finds that Plaintiffs have not demonstrated that the media reports are relevant to the issue of whether Plaintiff Chaudhry was fired from his position at CRMC due to the publication of the State 2567 report.

**c.    Proof of Damages**

While somewhat unclear, it appears that Plaintiffs may be seeking to admit the media

reports for the purpose of showing that the state report was the cause of his economic loss. "Most defamation plaintiffs attempt to show some sort of special damage and out-of-pocket loss which flows from the injury to their reputation. But so long as such damage flows from injury caused by the defendant to a plaintiff's reputation, it may be recoverable under state tort law but it is not recoverable in a [federal] action." Siegert v. Gilley, 500 U.S. 226, 234 (1991). To the extent that third parties brought suits based upon Plaintiff Chaudhry's alleged malpractice, his practice declined because patients did not seek him out, or he lost contracts due to negative publicity such damages would not be directly caused by the defendants. The lawsuits were filed based on Plaintiff Chaudhry's treatment of the specific patient even if the individual discovered the malpractice based on the state report. Ooley, 603 F. App'x at 629 ("the reactions of third parties to remarks made by the government do not constitute state action"); WMX I, 80 F.3d at 1319 (defamatory remarks made to the public generally which allegedly injured the plaintiffs' business reputation do not support a stigma-plus claim). Plaintiffs have not demonstrated that the media reports would be admissible as proof of damages in this action.

### 3. Defendants Motion to Exclude Media Reports

#### a. **Hearsay**

Defendants move to exclude the media reports on the ground that they are inadmissible hearsay for which no exception exists. Plaintiffs argue that the media reports are not offered for the truth of the matter asserted but to show that the defamatory statements were published and are therefore not hearsay.

"Hearsay" is "a statement that (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). "Hearsay is not admissible unless any of the following provides otherwise:• a federal statute; • these rules; or • other rules prescribed by the Supreme Court." Fed. R. Evid. 802. Newspaper reports are hearsay when offered for the truth of the matter asserted. See Larez v. City of Los Angeles, 946 F.2d 630, 642 (9th Cir. 1991) (media articles have been held inadmissible hearsay as to their content).

Plaintiffs contend that the media reports are not offered for the truth of the matters

asserted within but to show that the statements were public. To the extent that Plaintiffs seek to admit the media reports to show that the State 2567 report was made public, the media reports would not be hearsay.

**b.    Content of Media Reports**

As to the reports themselves, the Court agrees with Defendants that the media reports contain statements made regarding the CDPH investigation that are not attributable to Defendants but are the interpretation of the reporter. For example, the article from Litverse.com, "10 Nightmarish breaches of trust by health care professionals," dated August 23, 2015, discusses that Plaintiff Chaudhry was one of the top five heart surgeons in California based on the total number of surgeries performed and he had a below average patient survival rate for his state which might be the result of his alleged inclination to abandon patients during operations. (ECF No. 93-1 at 7-8.) The article states:

> A number of lawsuits accuse Chaudry of ducking out of the operating room without completing heart surgeries. In one incident, his hospital was fined $75,000 after he left a physician's assistant to close up a patient's chest while he attended a luncheon. The patient, 72-year-old Silvino Perez, suffered a myocardial infarction, and the resulting physical trauma left him in a persistent vegetative state. Chaudhry has denied these and other charges levied against him, but an investigation by California's State Department of Health found that the heart doctor had recklessly endangered Perez. The outcomes of other claims are currently unknown.

(Id. at 7.)

Plaintiffs argue that this publication is admissible because it states that the CDPH found that the heart doctor recklessly endangered Perez. However, there is no such statement in the State 2567 report, (see State 2567 report, ECF No. 93-2), this is the interpretation of the writer of the article and not a statement that can be attributed to Defendants.

The January 15, 2014 Huffington Post article entitled "Dr. Pervaiz Chaudhry Allegedly left surgery to have lunch, leaving patient brain damaged" contains no reference to the report or any statements by the CDPH. (ECF No. 93-1 at 18-19.)

Based on review of the media reports, the Court finds that they largely contain inflammatory statements by third parties and only a few of the reports actually reference the State 2567 report. Those media reports that do reference the State 2567 report only contain a few

sentences generally stating that the investigation was instigated by an anonymous report, the action taken against Defendant Chaudhry by CRMC following their investigation, or the penalty imposed against CRMC by the CDPH which are not defamatory statements. There are three media reports that reference the actual findings in the State 2567 report.

On January 16, 2014, the New York Daily News posted a report entitled, "Patient brain-damaged after doctor leaves him mid-surgery to attend lunch: Suit". (ECF No. 93-1 at 20-21.)

A California grandfather was left brain damaged after a cardiologist allegedly left a gaping hole in his chest following open heart surgery so that he could attend a luncheon.

Dr. Pervaiz Chaudhry, of Valley Cardiac Surgery in Fresno, Calif., apparently relied on an unqualified assistant to stitch up 72-year-old Silvino Perez's chest on April 2, 2012, according to the State Department of Health.

The patient's heart stopped as oxygen escaped his body and he was placed on life support, reported local station KFSN-TV. Perez, who loves gardening and his grandchildren, has been in a vegetative state since that surgical slip-up two years ago.

"I just want people to know what kind of doctor he is," his stepson, Cristobal Arteaga, told ABC News. "You go in there and you trust this individual with your life ... The fact that he would do this to an individual — one individual — is too much."

Perez's wife, Maria A. Arteaga Alvarez, and Cristobal Arteaga, filed a lawsuit Dec. 23, claiming they learned of the alleged operating room absence from an anonymous caller on Oct. 26, reported the Merced Sun-Star.

The daily paper said that state investigators, similarly, were tipped off by an anonymous call on April 11, 2012. They launched an investigation and discovered that the doctor violated hospital rules and regulations that prohibit the primary surgeon to leave an operating room before the patient is returned to stable condition.

After the incident, Chaudhry reportedly raced back to the operating room to manually massage Perez's heart — but the damage was already done.

Bruce Eliason, COO of Valley Cardiac Surgery, said that the medical group has not been serves [sic] the lawsuit but has seen the news reports and understands the allegations being made against Chaudhry.

"This assertion, apparently made anonymously to the patient's family, is unequivocally false, and it will be proven to be so," Eliason said in a statement.

The plaintiffs are seeking unspecified damages.

(Id.)

On January 8, 2014, ABC 30 posted a report entitled "Fresno family says CRMC is

17

covering up malpractice." (ECF No. 93-1 at 1.)

> The State Department of Health handed out a big penalty to the hospital for the decisions they say put 72-year-old Silvino Perez in danger.
>
> Family members sued both hospital and the Valley heart surgeon for putting Silvino Perez on life support. The family believes what happened during Perez's surgery could have been prevented and they want to make sure no one else gets hurt.
>
> Perez loved gardening and adored his grandkids. His son said all that changed because of a surgeon and Community Regional Medical Center.
>
> "My God, I can't put it into words. Can you imagine?" Cristobal Arteaga said.
>
> A civil lawsuit filed April 2012 details how Perez went into a Downtown Fresno hospital for open heart surgery. State investigators believe the hospital and Dr. Pervaiz Chaudhry put him in immediate jeopardy. But the state and his son were only alerted after an anonymous call from a nurse who was in the operating room at the time.
>
> "He basically told me the reason my dad was in the condition he was in, was the doctor had walked out in the middle of an operation to attend a luncheon," said Arteaga.
>
> The State Department of Health believes the doctor left the room and told a physician's assistant to finish the operation. But investigators found he never closed up the patient's chest before he did. The complications sent the elderly man into a vegetative state.
>
> "It's a betrayal. They are covering something up. The nurse went on to say the only reason they have this guy on is he brings so much money into the hospital. That's the only reason they haven't done anything yet," Arteaga said.
>
> Action News interviewed Dr. Chaudhry in 2011 before the incident. At the time CRMC praised him for his cutting edge work in cardiac medicine. When we tried to reach Dr. Chaudhry at home, he was not available.
>
> In a statement a spokesperson for the hospital said, "While we can't comment on any ongoing litigation we have instituted improved safeguards with action plans that have been approved by the state. Community continually trains and searches for ways we can improve our patient care and safety."
>
> The Perez family lawyer said Medicare currently pays for Silvino Perez's ongoing treatment.
>
> Meanwhile the hospital has confirmed Dr. Chaudhry still works at Community Regional Medical Center.

(Id.)

A Fresno Bee article published March 2, 2014, entitled "Accusations mount against Fresno doctor accused of leaving surgery" states,

A Fresno heart surgeon who two years ago allegedly left an open-heart surgery at Community Regional Medical Center before a patient was stable now is at the center of two lawsuits that allege he walked out of more than one operating room before procedures were complete -- and that hospital officials knew about it.

According to a wrongful termination lawsuit filed last month in Fresno County Superior Court, Dr. Pervaiz Chaudhry ignored a Fresno Heart Surgical Hospital manager's plea to return to an operating room. The suit claims Chaudhry threatened he could get people fired and would stop doing surgeries at the hospital, which would result in a loss of "significant revenue."

The lawsuit brought by former manager Valerie Villalobos alleges she was among employees targeted for a layoff that was "aimed at removing any persons that would interfere with Dr. Chaudhry continuing to bring an unusually high number of patients and corresponding revenue to Fresno Heart." Villalobos was rehired after the layoff but later resigned, citing a hostile work environment and concerns about potential retaliation.

The alleged Fresno Heart incident occurred weeks before Chaudhry allegedly left a physician assistant to close the chest of Silvino Perez at Community Regional on April 2, 2012, according to a lawsuit filed by Perez's wife and stepson. When bleeding occurred, the Sanger man went into cardiac arrest. Perez, 72, has been in a vegetative state in a Fresno nursing home ever since.

In December, Perez's wife and stepson sued Chaudhry, Community Regional Medical Center and Valley Cardiac Surgery, the doctor's medical group, for unspecified damages.

In an amended complaint filed Feb. 13, the family alleges the hospital knew or should have known that the doctor routinely "cut corners" in the course of surgery, including leaving the operating room while patients were under anesthesia and leaving chest closures to a physician assistant without a medical doctor to supervise.

In California, physician assistants attend a specialized program associated with a medical school and receive an academic degree or certificate. To practice, they must pass a national examination before receiving a license from the Physician Assistant Board. State regulations say they can act as first or second assistants during surgery, but surgical procedures requiring other than local anesthesia may be performed only in the personal presence of an approved supervising physician.

Chaudhry has not responded to numerous interview requests by The Bee, but his medical group spokesman said the allegations are baseless. His attorney denied the allegations in the Perez lawsuit and declined to comment on the Villalobos suit because Chaudhry is not a named defendant. The hospital said it could not comment on ongoing litigation, but stands by its cardiac surgery program.

The latest allegations raise questions about whether Community Medical Centers, which operates Fresno Heart Surgical and Community Regional Medical Center, took action on complaints against Chaudhry before the Community Regional incident, or, as lawyers assert, stepped aside and gave him latitude because cardiac surgeries are one of the biggest revenue sources for hospitals.

Busy surgeon

What's certain is that Chaudhry, 53, is one of the busiest cardiac surgeons in California.

According to the Office of Statewide Health Planning and Development, he performed 345 bypass surgeries in 2009-10, making him "one of the top five" heart surgeons in total surgeries.

The report, the latest available, also showed that Chaudhry was listed as one of seven doctors statewide whose patient death rate was worse than the state average. The state took overall patient health into consideration in calculating the rates. Chaudhry's death rate was 3.62. The statewide rate was 2.0.

At the time of the report's release in April 2013, Chaudhry disputed the accuracy of the state data. Plus, he said, he operated on high-risk patients. When other doctors could not do anything for a patient, "that's when they call me," he said then.

On Thursday, Bruce Eliason, chief operating officer for Chaudhry's medical group, said Chaudhry's death rate for bypass surgeries was 1.6 in 2013, which is comparable to the national average of over 2%.

Chaudhry is a money-maker for the hospital, said attorney Jeff Mitchell, who represents Maria Arteaga Alvarez and Cristobal Arteaga, the wife and stepson of Perez, the Community Regional patient.

However, Perez's surgery did prompt the hospital to suspend Chaudhry for 14 days, Perez's family alleges.

Perez's case was investigated last year by the state Department of Public Health, which levied a $75,000 fine against Community Regional, Mitchell said. The state does not name patients and doctors in investigations, but Mitchell has said Perez's case led to the fine.

According to the state report, health authorities learned from an anonymous complaint on April 11, 2012, about the allegation that a surgeon had left the operating room before closing the patient's chest.

The incident occurred April 2, 2012 -- the same day as Perez's surgery. An "operative report" among documents from the state investigation that were obtained by The Bee through a Public Records Act request cites April 2, 2012, as the date of the surgery and names Chaudhry as the physician.

In a separate narrative of the state's investigation, which does not name the surgeon or others interviewed, the cardiac surgeon said he allowed the physician assistant to close the chest with wires but was "always there when she did this, until this time."

Community Regional, in a written response to the state's investigation, said that an investigation was authorized on April 2, 2012, by the president of the hospital's medical staff and the chair of surgery. On Aug. 15, 2012, a doctors' committee met to review the findings of the investigation.

The committee sent the case to an outside expert with cardiovascular surgery experience for review. The committee's actions included suspending the surgeon, who was not named, from the medical staff for 14 days and ordering the surgeon

to undergo additional training.

All surgeries under the care of the physician also were monitored from April 3, 2012, through June 1, 2012, to ensure his "compliance with surgeon attendance during surgery." And beginning on Aug. 15, 2012, cases were randomly selected and reviewed, and monitoring continued through November 2012, the hospital response said.

Mitchell, attorney for the Perez family, said the hospital was compelled to take corrective action by the state.

Chaudhry has no suspension or disciplinary action against his license, according to the California Medical Board. Doctor peer review committees are not required to report suspensions of 14 days or fewer.

Chaudhry continues to perform surgeries at Community Regional and Fresno Heart, said Mary Lisa Russell, a Community Medical Centers spokeswoman.

On Friday, Russell said Community had not received the amended complaint to the Perez lawsuit that alleges the hospital was aware of Chaudhry routinely leaving the operating room. Russell would not comment on the allegations.

But to the extent that the legal complaints raise quality issues, she said, "it should be pointed out that we monitor and benchmark our programs against the highest standards, and recently received notice from the Society of Thoracic Surgeons National Adult Cardiac Surgery Database that Community Regional's cardiac surgery performance ranked in the top 15% of hospitals nationally."

The Perez lawsuit also alleges that hospital and medical staff knew that Chaudhry has a substance abuse problem, which includes alcohol, "sufficient to impair medical judgment and surgical acumen."

Chaudhry's lawyer, Andrew Weiss of Fresno, said Feb. 20 that he had not seen the amended complaint, but the allegations against the doctor are false. "We deny that Dr. Chaudhry has any kind of substance-abuse problem," he said.

Chaudhry did not leave surgeries before they were complete, Weiss said. And the allegation that he left the operating room with Perez's chest still open "is not true," he said.

Eliason of Valley Cardiac Surgery said in emails last month that allegations in the Perez lawsuit are "baseless and unsubstantiated."

As to the lawsuit alleging a substance-abuse problem, Eliason said, "we can state unequivocally that the unsubstantiated allegations of substance abuse are completely false and without any basis in fact."

The medical care provided by Valley Cardiac Surgery and Chaudhry at Community Regional have been recognized by the Society of Thoracic Surgeons as among the best in California, Eliason said. "This recognition comes after years of practice and consistent success for our patients, and has resulted in a higher than national average of successful outcomes for extremely complicated, high-risk heart surgery."

Complaints surface

Allegations of misconduct involving Chaudhry began to surface in late 2011 at Fresno Heart, according to Villalobos' wrongful termination lawsuit.

She began receiving complaints from nursing staff and others about Chaudhry, including how he would routinely leave the operating room before heart surgeries were completed and would leave the hospital premises before patients were stabilized in the post-anesthesia care unit, the lawsuit says. Villalobos, 53, was director of cardiology, surgery and outpatient services and managed the surgical staff.

Among the complaints cited in the lawsuit:

Chaudhry made discriminatory comments to a homosexual staff member, telling her "she was not wanted in the operating room because she wasn't 'a real woman.' "

He threatened staff members that if they "reported him for any malfeasance, he would find out their identity and they would be fired."

The lawsuit also says Chaudhry sometimes failed to respond to pages in a timely fashion when his patients required immediate attention. On at least one occasion, a patient with no heart rhythm "flat-lined" for 40 minutes before Chaudhry responded and returned to the bedside, the lawsuit says. He began "futile lifesaving efforts in order to conceal" his neglect and the patient's death, and "blamed subordinate nursing staff for the demise of his patient, despite his 40-minute delay in returning to the patient's bedside," the lawsuit says.

Villalobos encouraged nurses and staff to report complaints through the hospital's confidential reporting system, the lawsuit says, but she had reason to believe that on at least one occasion Chaudhry learned the identity of a complainant.

According to the lawsuit, Villalobos had a personal run-in with Chaudhry around February 2012 when she learned from a physician that a doctor was not present in an operating room and the operation was still in progress. It was Chaudhry's operating room, the lawsuit says. Villalobos found him at hospital elevators.

When Villalobos asked Chaudhry to return to the operating room, he refused, the lawsuit says, and when Villalobos persisted, he threatened: "Don't you know I can wipe you all out? I can have you all fired, including your stupid doctors."

According to the lawsuit, Chaudhry also threatened to stop scheduling surgeries at the hospital and told Villalobos "to inform the CEO of Fresno Heart, Wanda Holderman, that it was all plaintiff's fault that he would not be performing further surgeries there and the hospital would therefore lose significant revenue." Holderman's assistant referred calls seeking comment to Community Medical Centers' communications department.

The incident was reported, the lawsuit says. But approximately two weeks later Chaudhry allegedly left an operating room at Community Regional before Perez's surgery was completed.

Villalobos believes that Chaudhry "continued to leave the operating room before cardiac surgeries were completed, despite the reporting of this conduct to Fresno Heart and Community Medical Centers," the lawsuit says.

Villalobos' lawyer, Maureen Harrington of San Francisco, said that the issue was raised at Fresno Heart "up to the corporate level."

Weiss said it would be inappropriate for him to provide a comment about the Villalobos lawsuit because Chaudhry, his client, is not a defendant. But, he said, "I would make the general observation that allegations in a complaint are just that, mere allegations, and are not proof of anything. Oftentimes, they are intentionally exaggerated and phrased in inflammatory terms to support a particular type of recovery sought, and ultimately prove to be untrue and without any basis in fact."

Cristobal Arteaga, the stepson of Silvino Perez, said he had been unaware of Villalobos' allegation that Chaudhry left a surgery at Fresno Heart before his stepfather's surgery at Community Regional.

"I'm so happy she's coming out and making this public," he said. "Ultimately, it's to everybody's benefit that this doctor be exposed."

Hospital layoffs

Villalobos was laid off on June 14, 2013. The lawsuit alleges the layoff was in retaliation for her participation in reporting Chaudhry's harassment of employees, lapses in patient care and his creation of a hostile work environment, and her insistence that the lapses be corrected by the hospital.

The lawsuit says Villalobos was targeted for a layoff that was "aimed at removing any persons that would interfere with Dr. Chaudhry continuing to bring an unusually high number of patients and corresponding revenue to Fresno Heart."

In late August 2013, The Bee reported that 25 employees had been laid off at Fresno Heart. Holderman, the hospital's CEO, said the layoffs included some management jobs. She said the layoffs were necessary to lower costs in the face of declining revenues "and pending legislation that would negatively impact hospitals, especially ones of our size."

The hospital also was re-evaluating merit and other pay increases, delaying or not filling certain jobs, reducing some services and decreasing other operational costs by centralizing some administrative functions, she said.

Villalobos, a longtime Fresno Heart employee who had been on medical leave after being diagnosed with Stage IV breast cancer, contested the layoff and got her job back. But the lawsuit says she "had no choice" but to resign on Aug. 6, 2013, to escape a hostile workplace.

She declined to comment on the suit and referred questions to Harrington.

For a long time, Villalobos "believed the hospital would do the right thing in relation to the issues related to Dr. Chaudhry," Harrington said. "But she came to the realization that that wasn't going to happen, and she didn't have any choice other than to resign her position because things weren't going to change."

The suit alleges that Villalobos' resignation was a "necessary resignation," sparked by concern about retaliation she might suffer after returning to work.

In February, she filed a complaint with the California Department of Fair

Employment and Housing for discrimination and received a right-to-sue letter on Feb. 13, the lawsuit says.

Villalobos has suffered financial loss and severe emotional and physical distress, the lawsuit says.

She is suing Fresno Heart for wrongful termination, discrimination, retaliation, unpaid wages, declaratory relief and fraud. She is asking for unspecified damages, including punitive damages.

Community received the Villalobos lawsuit on Thursday.

Officials said they could not comment on personnel matters, but Community is not responsible for physician oversight, said John Zelezny, Community Medical Centers senior vice president of communications. Doctors are self-governing "and have the responsibility to monitor and enforce rules of conduct and oversee medical quality of their staff members' practices," he said.

Actions taken by doctor committees, called "peer review actions," are confidential, Zelezny said. The hospital can only become involved if there is evidence that the medical staff is not fulfilling its duties, he said. "Community Medical Centers has a very active and committed medical staff that carries out its responsibilities in an appropriate way," he said.

Harrington said she disagrees. "The hospital is responsible for the working environment of all its employees, and doctors are obviously part of that working environment."

(ECF No. 93-1 at 14-17.)

4.    Media reports are excluded under Rule 403

To the extent that these three media reports are relevant in this action, the Court finds that they should be excluded under Rule 403 of the Federal Rules of Evidence on the basis that they would confuse the jury, waste time at trial, and the media reports are substantially more prejudicial than probative.

Defendants argue that the media reports contain highly sensational and inflammatory statements about Plaintiff Chaudhry that were not made by nor can they be attributed to the defendants. In reviewing the media reports, the Court agrees. The media reports largely include statements from the lawsuits and the individuals involved in the suits about Plaintiff Chaudhry. If the media reports were shown to the jury, the defendants would be entitled to present evidence to explain the statements contained within and the lawsuits that were filed against Plaintiff Chaudhry. Plaintiffs conceded at the February 7, 2020 hearing that if the media reports are admitted the result would be mini-trials regarding the statements included within the reports. This

would result in a waste of the jury's time.

Further, admission of the reports is likely to confuse the jury. The media articles largely contain the statements of third parties that cannot be attributed to defendants. If the reports are placed in evidence at trial, there is a likelihood that the jury would attribute these statements to the defendants. The Defendants would have to parse out the statements made within the report to explain to the jury why they cannot be held liable for the third-party hearsay statements included within.

The Court finds that admitting the media reports would create a risk of confusion of the jury and would result in a waste of time. These risks substantially outweigh the probative value of the limited references to the State 2567 report that are included within the media reports. Plaintiffs' motion *in limine* no. 3 to admit the negative media reports is denied; and Defendants' motion *in limine* no. 5 to exclude the negative media reports is granted.

**C.      Witness Testimony**

The parties bring motions to allow or exclude specific witnesses expected to testify during the trial of this matter. A witness may testify to a matter where they have personal knowledge of the matter. Fed. R. Evid. 602. A lay witness may offer testimony in the form of an opinion where it is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. 701.

An expert witness is defined as:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b) the testimony is based on sufficient facts or data;
(c) the testimony is the product of reliable principles and methods; and
(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

1.      Defendants' rebuttal witnesses

Plaintiffs' fourth motion *in limine* seeks to exclude Defendants from presenting evidence

from Kristoffer Hall and Dr. Edmunds. Plaintiffs argue that since they did not disclose any experts, Defendants cannot present rebuttal experts. Defendants counter that Plaintiffs designated four non-retained experts and Defendants' disclosed their rebuttal experts as required by Rule 26(a)(2)(D).

Federal Rule of Civil Procedure 26(a)(2)(D) provides that a party must make its expert witnesses disclosures at the times and in the sequences that the court orders. Absent other direction from the court, the opposing party is required to disclose a rebuttal expert within thirty days after receiving another party's disclosure. Fed. R. Civ. P. 26(a)(2)(D)(ii). Rule 37(c)(1) gives teeth to these requirements by forbidding the use at trial of any information required to be disclosed by Rule 26(a) that is not properly disclosed. Yeti by Molly, Ltd. v. Deckers Outdoor Corp., 259 F.3d 1101, 1106 (9th Cir. 2001). Rule 37(c) does provide that a party may be excused from the failure to disclose where the failure was substantially justified or is harmless. Fed. R. Civ. P. 37(c)(1).

Here, Plaintiffs only argue that, since they did not designate an expert and their witnesses will only be testifying from their personal knowledge, rebuttal experts are not permitted. Contrary to Plaintiffs contention, they did designate four non-retained experts to testify at trial of this matter. (See Plaintiffs' Non-Retained Expert Witness Disclosure, ECF No. 91-4.) The Federal Rules of Evidence provide for the testimony of two types of expert witnesses: those who are retained and those who are not retained. Cantu v. United States, No. CV 14-00219 MMM (JCGx), 2015 WL 12743881, at *3 (C.D. Cal. Apr. 6, 2015). Plaintiffs present no authority to support their argument that Defendants are not entitled to present an expert witness to rebut their non-retained experts' testimony. The Rules provide that "[a] party need not disclose an expert within the deadline for initial expert reports, and can instead disclose an expert as a 'rebuttal expert,' when the expert's testimony is 'intended solely to contradict or rebut evidence on the same subject matter identified by an initial expert witness.' " People v. Kinder Morgan Energy Partners, L.P., 159 F.Supp.3d 1182, 1191 (S.D. Cal. 2016) (citations omitted). Defendants are entitled to present expert witnesses to rebut the testimony of Plaintiffs' non-retained experts.

Plaintiffs do not argue that Defendants' rebuttal expert disclose was untimely or improper

in any other respect.  Accordingly, Plaintiffs' motion *in limine* no. 4 is denied.  To the extent that Plaintiffs argued at the February 7, 2020 hearing that the testimony of Defendants' rebuttal experts is beyond the scope of the testimony to be presented at trial, this is an issue that cannot be decided until Plaintiffs' witnesses testify.

2.  Testimony of Plaintiffs' percipient witnesses

Plaintiffs' eleventh motion *in limine* seeks to allow Plaintiff Chaudhry, Mr. Engelbert, and Dr. Chaudhry's doctors to testify regarding their percipient knowledge.

Defendants counter that Plaintiff Chaudhry's testimony regarding what occurred during the surgery is irrelevant in this action.  This is not a medical malpractice action and the only testimony that is relevant is when Plaintiff Chaudhry left the operating room and Mr. Perez's status at the time that Plaintiff Chaudhry left.  Defendants contend that no witness should be allowed to provide extensive technical testimony regarding Mr. Perez's operation.

Defendants contend that Mr. Englebert's testimony should only be permitted as to the preparation of Plaintiffs' 2016 tax returns.  Defendants argue that without a causal connection between Defendants' conduct and Plaintiffs' decreasing revenue, his testimony is irrelevant in this action.  Similarly, Defendants argue that Plaintiffs' medical providers can only testify to their personal knowledge and without a causal connection between Defendants' conduct and Plaintiff Chaudhry's cluster headaches their testimony is irrelevant.

Plaintiffs have not set forth any specific testimony that is sought to be allowed by this motion.  Until such testimony is offered and an objection to the specific testimony is proffered, the Court is unable to determine the admissibility of the testimony at issue.  Hitesman, 2016 WL 3523854, at *2; Jonasson, 115 F.3d at 440.  Plaintiffs' motion *in limine* no. 11 is denied.

3.  Testimony of non-retained experts

Defendants' third motion *in limine*  seeks to preclude Mr. Engelbert and the three doctors who treated Plaintiff Chaudhry from testifying or to limit their testimony to matters within their personal knowledge.

**a.  Testimony of Mr. Engelbert regarding Plaintiffs' financial losses**

Defendants contend that Plaintiffs disclosed that Mr. Engelbert provided financial services

to them and they expect him to testify as to Plaintiffs' economic damage following the publication of the report, Plaintiffs' lost income and profits, the financial impact of the malpractice cases filed against Plaintiff Chaudhry, lost contracts, and his removal from his position as medical director. However, Defendants argue that Mr. Engelbert, who is an enrolled agent and not an accountant, business valuation expert or economist, is not qualified to opine on any of these subject matters. Additionally, Defendants contend that Mr. Engelbert only provided tax services to Plaintiffs in 2016 and he has no personal knowledge as to Plaintiffs' financial status and tax filings before 2016.

Plaintiffs counter that Mr. Engelbert, as a lay witness, can present testimony beyond his preparation of Plaintiffs' 2016 tax returns. Plaintiffs contend that Mr. Engelbert reviewed Plaintiffs' 2014 and 2015 tax information to address tax carryovers and to ensure the consistency and completeness of his tax preparations. Plaintiffs expect Mr. Engelbert to offer his observations of the decline in income between the different tax years. At the February 7, 2020 hearing, Plaintiffs agreed that Mr. Engelbert cannot testify as to the cause of Plaintiffs' economic decline. Plaintiffs state that Plaintiff Chaudhry will be able to testify regarding his observations and knowledge based upon his many years of medical practice and that he is not precluded from projecting what he or his practice would have earned and what caused their economic losses.

Defendants' motion *in limine* as to Mr. Engelbert is granted in part. Plaintiffs have not shown that Mr. Engelbert, as an enrolled agent, is qualified to offer testimony regarding the cause of any loss of revenue or the impact of any event on Plaintiffs' financial situation. Mr. Engelbert's testimony shall be limited to his knowledge obtained in the preparation of Plaintiffs' tax returns.[7]

At the February 7, 2020 hearing, Plaintiffs stated that Mr. Engelbert will only be testifying to his personal knowledge gained in preparation of Plaintiffs' tax returns. Defendants moved to exclude this evidence arguing that it is cumulative if Plaintiff's tax returns are admitted into

_____

[7] The Court's ruling does not mean that Mr. Engelbert can testify as to causation based upon knowledge that was unnecessary for the preparation of the tax returns. For example, Mr. Engelbert cannot testify that Plaintiff Chaudhry informed him that his business revenues decreased after the State 2567 report was issued. This would be hearsay and unnecessary to the preparation of Plaintiffs' tax returns. Mr. Engelbert is limited to testimony regarding the preparation of the tax returns themselves.

evidence at trial.  The issue of whether Mr. Engelbert's testimony is cumulative will need to be addressed based on the testimony presented at trial.  If Defendants believe that Mr. Engelbert's testimony is cumulative after hearing the evidence submitted during the trial of this matter, they may raise an objection at that time.

### b. Testimony of Drs. Mehdi, Raskin, and Huang

Defendants seek to exclude the testimony of Dr. Mehdi who treated Plaintiff Chaudhry for his headaches beginning in 2012, Dr. Ruskin who treated Plaintiff twice in 2016, and Dr. Huang who saw Plaintiff Chaudhry one time for his headaches.  Defendants argue that none of these treating physicians opined while treating Plaintiff Chaudhry that his headaches were caused by Defendants or the published reports.  Defendants contend that without a diagnosis connecting his headaches to the defendants their testimony is irrelevant.  Further Defendants argue that none of these doctors can opine at trial regarding a nexus between Plaintiff Chaudhry's headaches and Defendants' conduct because that is beyond the scope of treatment provided and for which Rule 26 reports were required.

Plaintiffs counter that Drs. Mehdi, Raskin, and Huang are expected to testify as to their treatment of Plaintiff Chaudhry before and after the publication of the State 2567 report and the loss of his medical privileges.  They will testify as to his generally excellent health prior to the report and the subsequent disabling cluster headaches subsequent to the report and its effects on his ability to practice medicine.

It is undisputed that Drs. Mehdi, Raskin, and Huang did not provide an expert report and therefore are limited to testimony as a treating physician.  Generally, treating physicians are excused from the requirement that they provide a written expert report.  Goodman v. Staples The Office Superstore, LLC, 644 F.3d 817, 819 (9th Cir. 2011).  "As a treating physician, [the doctor] may describe what she has seen, describe and explain her diagnosis and the treatment she prescribed . . . without running afoul of the constraints of Rules 26 and 37 of the Federal Rules of Civil Procedure."  Bynum v. MVM, Inc., 241 F.R.D. 52, 54 (D.D.C. 2007) (quoting Riddick v. Washington Hospital Center, 183 F.R.D. 327, 330 (D.D.C.1998)).  The Ninth Circuit has held that "a treating physician is only exempt from Rule 26(a)(2)(B)'s written report requirement to the

extent that his opinions were formed during the course of treatment." Goodman, 644 F.3d at 826.

A treating physician may testify within a permissive core on issues pertaining to treatment, without providing an expert report, based on what he or she learned through actual treatment and from the plaintiff's records up to and including that treatment." Fielden v. CSX Transp., Inc., 482 F.3d 866, 871 (6th Cir. 2007), as amended on denial of reh'g and reh'g en banc (July 2, 2007); see also Goodman, 644 F.3d at 819 (a treating physician may testify to and opine on what they saw and did without the necessity of the proponent of the testimony furnishing a written expert report).

Since expert reports were not provided by Drs. Mehdi, Raskin, and Huang, the scope of these witnesses' testimony is limited to information learned from and opinions developed during their actual treatment and they may not offer forward-looking speculation or any other conclusion reached with the benefit of hindsight. To the extent Plaintiffs may attempt to elicit testimony from the physicians that strays beyond the scope of their course of treatment, and delves into opinions developed at a later time or upon a hypothetical set of facts, the Court will provisionally grant the motion in that regard. Such would be inadmissible opinion testimony, given a Rule 26(a)(2)(B) report was required. Defendants' motion *in limine* no. 3 is granted in part and Plaintiffs' physicians may offer testimony regarding the treatment and opinions that were developed during their actual treatment of Plaintiff Chaudhry.

> 4. Testimony from Plaintiff Chaudhry and his lay witnesses regarding his economic loss and any causal connection between the report and the reduction in revenue

Defendants' fourth motion *in limine* seeks to preclude Plaintiff Chaudhry or other lay witnesses, such as his prior attorneys, from testifying regarding Plaintiffs' economic loss and any causal connection between the report and a reduction in revenue. Defendants argue that Plaintiff Chaudhry can offer testimony about his personal experiences and knowledge following the publication, such as his increased malpractice insurance costs, removal from various positions and boards, and loss of contracts, but he cannot place a value on his practice, project what he or his practice would have earned, or offer other opinions about his and his practice's economic loss. Similarly, Defendants argue that Plaintiffs' attorneys are similarly not qualified to opine about the

cause of the financial demise, whether the Perez family or others would have sued but for the report and what Plaintiffs' future income would have been but for the report.

Plaintiffs argue that Defendants view is entirely too restrictive of the testimony that would be permissible to establish Plaintiffs' economic loss.

Plaintiffs' do not address the motion to the extent that it seeks to preclude Plaintiffs prior attorneys from providing testimony regarding his economic loss and any casual connection to the State 2567 report. Plaintiffs' have offered no argument that their prior attorneys are qualified to opine regarding such issues. Accordingly, the Court grants the motion to the extent that it seeks to preclude Plaintiffs' prior attorneys from testifying regarding their economic loss or the cause of such loss.

"An owner, because of his ownership, is presumed to have knowledge of the property and may testify as to its value." Fourth Inv. LP v. United States, No. 08-CV-110-BTM BLM, 2011 WL 227564, at *1 (S.D. Cal. Jan. 21, 2011) (quoting United States v. 10,031.98 Acres of Land, 850 F.2d 634, 636 (10th Cir. 1988)). Further, as Plaintiffs point out, the Advisory Notes to 2000 amendments of Rule 701 of the Federal Rules of Evidence state,

> For example, most courts have permitted the owner or officer of a business to testify to the value or projected profits of the business, without the necessity of qualifying the witness as an accountant, appraiser, or similar expert. See, e.g., Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153 (3d Cir. 1993) (no abuse of discretion in permitting the plaintiff's owner to give lay opinion testimony as to damages, as it was based on his knowledge and participation in the day-to-day affairs of the business). Such opinion testimony is admitted not because of experience, training or specialized knowledge within the realm of an expert, but because of the particularized knowledge that the witness has by virtue of his or her position in the business.

Based upon his partnership in the surgical practice, Plaintiff Chaudhry may testify to the value of his business, losses and projected losses that are within his personal knowledge. See Nevada Rest. Serv., Inc. v. City of Las Vegas, No. 2:15-CV-02240-GMN-GWF, 2018 WL 3973402, at *4 (D. Nev. Aug. 20, 2018) (chief financial officer has personal knowledge to testify to the affect that the reduction in gaming machines had on the plaintiff's business). But such testimony may not stray into an area that would require scientific, technical, or other specialized

knowledge that would fall within the scope of Rule 702. Defendants' motion *in limine* no. 4 is denied as to Plaintiff Chaudhry's testimony regarding business valuation based upon his personal involvement in the partnership.

     5.    Communications between Plaintiffs' attorneys and DPH staff concerning amendment of the report

Defendants' second motion *in limine* seeks to preclude evidence of Plaintiffs' prior attorney's communication with CDPH attorney Tze Ming U and others to have the State 2567 report amended after it was published. Defendants contend that this evidence is irrelevant, will confuse the jury and waste time. Defendants argue that neither Defendants Lopez nor Campbell were involved in the decision to amend or not amend the State 2567 report. Defendants state that Plaintiffs and their attorneys' efforts to correct the State 2567 report does not tend to prove or disprove that the report was false or that it caused Plaintiffs' harm. Defendants contend that to the extent Plaintiffs argue it is relevant to punitive damages, Plaintiffs have no evidence that they requested Defendants Lopez or Campbell to amend the report and without some causal connection to these defendants this evidence is irrelevant.

Plaintiffs counter that they have no idea who made the decision not to amend the report or if the defendants made recommendations or comments or otherwise participated in the decision not to amend the report. Plaintiffs argue that the defendants should not be allowed to claim attorney-client privilege to hide the information regarding who made the decision not to amend the report. Plaintiffs contend that the communications with Mr. U are important because 1) the decision not to amend the State 2567 report is relevant to the issue of punitive damages; 2) there was a ripple effect caused by the defendants knowing refusal to amend the report; and 3) Plaintiffs presented contrary facts and evidence and CDPH, with or without the involvement of the defendants, refused to amend the report.

Relatedly, Plaintiffs' tenth motion *in limine* seeks to permit inquiry at trial as to the individuals who made the decision not to alter the State 2567 report and to prohibit Mr. U from asserting attorney client privilege regarding the identity of the individual who made the final decision regarding the report.

Defendants contend that the communication between Plaintiffs' attorneys and Mr. U is not relevant in this matter and argue Plaintiffs present no evidence or argument that Defendants Campbell or Lopez were involved in the communications regarding amending the State 2567 report. Further, the communications have no tendency to prove or disprove that any defendant knew that the State 2567 report contained inaccurate information prior to it being published. Defendants argue that without some nexus between the defendants and the communications, such communications are irrelevant, unduly prejudicial, and will confuse the jury and waste time.

Defendants also contend that Plaintiffs' argument that the attorney client privilege was waived is incorrect because the privilege belongs to the client not the attorney and Plaintiffs have submitted no evidence that the CDPH waived or intended to waive attorney client privilege. Defendants also argue that any statements made by Mr. U are hearsay because neither he or CDPH are parties to this action so the party admission exception does not apply.

### a. Relevance

Defendants argue that the communication between Mr. U and Plaintiffs' attorneys are not relevant in this action. Plaintiffs allege that the failure to amend the report is relevant to punitive damages. Defendants argue that there is no evidence that Defendants Lopez or Campbell made the decision not to amend the report so there is no evidence to establish a causal connection between the defendants and Plaintiffs' attorneys.

Plaintiffs argue that the failure to amend the report is relevant because CDPH made the decision not to amend the report after being provided with information by Plaintiffs' attorneys that the findings were wrong. Plaintiffs are not seeking damages against Defendant Smith and cannot get punitive damages against Defendant Smith who is sued in her official capacity. "The Eleventh Amendment bars suits for money damages in federal court against a state, its agencies, and state officials acting in their official capacities." Aholelei v. Dept. of Public Safety, 488 F.3d 1144, 1147 (9th Cir. 2007). While "punitive damages are available under section 1983," "state officials sued in their official capacities are immune from punitive damages." David v. Giurbino, 488 F.Supp.2d 1048, 1060 (S.D. Cal. 2007) (citing Mitchell v. Dupnik, 75 F.3d 517, 527 (9th Cir. 1996)). Therefore, whether the decision not to amend the report is relevant here depends on if the

1   decision not to amend the report can be connected to Defendants Lopez or Campbell.

2       Plaintiffs assert that they have no information as to who made the final decision not to
3   amend the report. They argue that they do not have to accept Defendants Lopez and Campbell's
4   statements that they were not involved in the decision to amend the report. Discovery in this
5   matter has closed. In the February 6, 2017 scheduling order, the parties were advised that all non-
6   expert discovery was to be completed on or before the discovery cut-off date. (ECF No. 17 at 2.)
7   Non-expert discovery closed on April 9, 2018. (ECF No. 30.) Expert discovery closed on August
8   20, 2018. (ECF No. 34.) On October 31, 2018, the dispositive motion deadlines were extended
9   and the parties were advised that no further modifications would be granted. (ECF No. 45.)
10  Plaintiffs were provided with the opportunity to conduct discovery on the issue of who made the
11  final decision not to amend the report and Defendants Campbell and Lopez's involvement in the
12  decision. Plaintiffs have asserted that they do not know who made the final decision to amend the
13  report and have not demonstrated that Defendants Campbell or Lopez had any involvement in the
14  decision. Plaintiffs have failed to show that the communications between their attorneys and Mr.
15  U regarding amending the State 2567 report are relevant in this action.

16      The Court finds that Plaintiffs have not demonstrated their attorneys attempts to have the
17  State 2567 report corrected is relevant to the claims proceeding in this action. Defendants'
18  motion *in limine* no. 2 to exclude the communication between Plaintiffs' prior attorneys and Mr.
19  U is granted.

20      Plaintiffs' motion *in limine* no. 10 seeks to permit inquiry at trial as to the individuals who
21  made the decision not to alter the State 2567 report and to prohibit Mr. U from asserting attorney
22  client privilege. The Court finds that Plaintiffs' motion is premature. This motion is more
23  appropriately addressed during the trial of this matter where the evidence can be considered in its
24  proper context. Hitesman, 2016 WL 3523854, at *2; Jonasson, 115 F.3d at 440. Accordingly,
25  Plaintiffs' motion to permit inquiry into the individuals who made the decision not to alter the
26  State 2567 report and to prohibit Mr. U from asserting attorney client privilege is denied.

27      **D.    Plaintiff Chaudhry's Prior Alcohol Use**

28      Plaintiffs' fifth motion *in limine* seeks to exclude evidence of prior alcohol use by Plaintiff

Chaudhry as improper character evidence. Plaintiffs contend that the parties have met and conferred and Defendants have agreed that they will not mention this issue during the proceedings. Defendants do not oppose the motion, but contend that if Plaintiff Chaudhry "opens the door" by discussing what occurred at the lunch meeting on April 2, then inquiry into Plaintiff Chaudhry's alcohol use that day would be proper.

As defendants do not oppose motion *in limine* no. 5, the motion to exclude evidence of Plaintiff Chaudhry's prior alcohol use is granted. To the extent that Plaintiffs bring this motion to ensure that counsel advises the witnesses not to mention prior alcohol use, all parties are expected to advise their witnesses of all issues on which the parties have agreed or the Court has ordered shall not be disclosed during trial.

## E. Evidence that Plaintiff Chaudhry Left the Operating Room While Mr. Perez was Unstable

Plaintiffs' sixth motion *in limine* seeks to preclude Defendants from presenting any evidence that Plaintiff Chaudhry left the operating room while Mr. Perez was unstable. Plaintiffs argue that since the parties have stipulated that Plaintiff Chaudhry left the operating room prior to Mr. Perez developing arrhythmias they have stipulated that his instability did not commence until after Plaintiff Chaudhry had left the hospital.

Defendants counter that Plaintiffs seek to distort the purpose and meaning of the undisputed facts. Defendants did not stipulate that Mr. Perez was stable when Plaintiff Chaudhry left the operating room, and the undisputed facts only address what transpired after Plaintiff Chaudhry left the operating room relative to Mr. Perez' condition. Defendants contend there is no conflict with the presentation of evidence that Mr. Perez was not stable at the time that Plaintiff Chaudhry left the hospital and the undisputed facts. Defendants state that the hospital determined that Mr. Perez was not stable when Plaintiff Chaudhry left the operating room and hospital and Defendants are entitled to argue that it was reasonable for them to rely on the Medical Executive Committee's conclusion.

The Court finds that Defendants' disputed fact of whether Mr. Perez's medical condition was stable when Plaintiff Chaudhry left the operating room does not conflict with the undisputed

fact that the arrhythmias did not develop until after Plaintiff Chaudhry left.  A finding that Mr. Perez was unstable at the time that Plaintiff Chaudhry left the operating room is not precluded by the stipulation that Mr. Perez' arrythmias developed after Plaintiff Chaudhry left the hospital. Defendants contend that Mr. Perez was still bleeding when his chest was closed and this bleeding increased until Mr. Perez went into cardiac arrest due to a tear in his heart that was bleeding profusely.  It is clear that whether Mr. Perez was stable when Plaintiff Chaudhry left the operating room is a disputed fact in this matter.

Further, Plaintiffs argue that Defendants have not designated an expert to opine on this issue.  However, this was the issue that was investigated and Defendants may present testimony based on their personal knowledge of and the conclusions that were developed during the investigation.

Accordingly, Plaintiffs' motion *in limine* no. 6 to preclude any evidence that Plaintiff Chaudhry left the operating room while Mr. Perez was unstable is denied.

**F.    Evidence of Other Lawsuits Filed Involving Plaintiff Chaudhry or His Medical Practice**

1.    Evidence of other malpractice lawsuits

Plaintiffs' seventh motion *in limine* seeks to preclude all evidence related to other lawsuits involving Plaintiff Chaudhry or his medical practice.  Plaintiffs contend that these malpractice lawsuits are either time barred or were settled following the Perez trial.  Plaintiffs argue that this evidence is inadmissible character evidence, hearsay, and the lawsuits have no relevance in this matter.  Further, Plaintiffs contend that the probative value of the evidence is outweighed by the prejudice to Plaintiffs.

Defendants counter that evidence of the other medical malpractice suits filed against Plaintiff Chaudhry are relevant to his damage claim.  Plaintiff is alleging that he suffered damage as a result of the State 2567 report, including that he lost contracts with other major hospitals in Fresno, his annual income substantially decreased following Mr. Perez's surgery, several lawsuits were filed against him, and his medical malpractice insurance became unaffordable.  Defendants contend that they are entitled to present evidence that Plaintiffs' economic damages are not a

result of their conduct but due to other malpractice lawsuits that were filed against Plaintiffs before and after the incident with Mr. Perez and the publishing of the State 2567 report. Defendants argue that they can present this evidence to provide a reasonable alternative to Plaintiff Chaudhry's anticipated testimony regarding the decrease in revenue and the increase in his medical malpractice insurance. Defendants state that they do not intend to introduce testimony as to how the lawsuits were resolved unless Plaintiff opens the door to such testimony. Defendants only intend to inquire into the existence of the lawsuits, when they were filed, whether the lawsuit was for medical malpractice or another cause of action related to the provision of medical care, and whether the case was resolved or is still pending.

The Court finds that the fact that these lawsuits may be relevant to Plaintiffs' damages in this action. To the extent that Plaintiff alleges prejudice if evidence of the lawsuits is admitted, the parties shall include a limiting instruction in their proposed jury instructions addressing the proper use of this evidence. Plaintiffs have not shown that the prior lawsuits are inadmissible in this matter on all potential grounds. Plaintiffs' motion *in limine* no. 7 to preclude all evidence related to other malpractice lawsuits involving Plaintiff Chaudhry or his medical practice is denied.

2. <u>Evidence related to other non-medical lawsuits involving Dr. Chaudhry or his medical practice</u>

Plaintiffs' eighth motion *in limine* seeks to exclude evidence of non-medical lawsuits that were filed against Plaintiff Chaudhry. Specifically, Plaintiffs seek to exclude evidence of an employment related lawsuit filed by James Robillard as irrelevant to the investigation that is the subject of this case and is impermissible character evidence.

Defendants argue that several nonmedical lawsuits were filed against Plaintiff Chaudhry before and after the incident with Mr. Perez. Defendants contend that these lawsuits are relevant to Plaintiff Chaudhry's claim for physical and economic damages. Specifically, Plaintiff Chaudhry claims that he developed cluster headaches due to the emotional distress from the investigation and publishing of the State 2567 report. Defendants argue that the jury is entitled to hear evidence that Plaintiff Chaudhry had other stressors during this time period, including that

there were other pending litigation matters. Since any such testimony will be brief and concise, Defendants state that any potential for prejudice shall be substantially curtailed.

The Court finds that the fact that the lawsuits were filed may be relevant to Plaintiffs' damages in this action. However, the evidence would be limited by Rule 403 as to the allegations in and the nature of the suit. Plaintiffs have not shown that the prior lawsuits are inadmissible in this matter on all potential grounds. Plaintiffs' motion *in limine* no. 8 to preclude all evidence related to other non-medical lawsuits involving Plaintiff Chaudhry or his medical practice is denied.

### G.   Evidence That the Closure of Mr. Perez By Bella Albakova Was Not Within Standard and Accepted Medical Care

Plaintiffs' ninth motion *in limine* seeks to preclude evidence that it was improper for Plaintiff Chaudhry to permit PA Albakova to close Mr. Perez's chest because she was not authorized or qualified to do so. Plaintiffs argue that this is irrelevant given that the only issue is whether Plaintiff Chaudhry left the operating room while Mr. Perez was unstable which has been established by the stipulation of the parties and because Dr. Bhatt was present, assisted PA Albakova, and was fully authorized to close Mr. Perez' chest.

Defendants counter that they have no intention of arguing that having PA Albakova close Mr. Perez was below the standard of medical care or was unacceptable. However, Defendants contend that they can present evidence that allowing PA Albakova to close the chest violated the hospital's by-laws and thus state and federal regulations. Further, Defendants argue that they are entitled to argue that Plaintiff Chaudhry left the operating room while PA Albakova and Dr. Dhillon, neither of whom were qualified to oversee Mr. Perez's surgery, were still suturing the chest. The hospital determined that Plaintiff Chaudhry violated its by-laws by leaving the operating room without designating a qualified cardiac surgeon to take over Mr. Perez's care. The hospital provided this information to Defendants and it was included in the State 2567 report. Defendants state that this information is relevant to their conduct and whether they reasonably relied on the hospital's finding as being true.

To the extent that Plaintiffs seek to preclude evidence that PA Albakova was closing Mr.

1    Perez after Plaintiff Chaudhry left the surgery room, this is a disputed fact that is relevant to the

2    finding in the report that the hospital violated state and federal regulations by Plaintiff Chaudhry

3    leaving the operating room before the patient was stable and with an individual not qualified to be

4    in charge. However, the parties agree that the issue of whether allowing PA Albakova to close

5    Mr. Perez's chest is not relevant to the issues to be decided in this case. Plaintiffs' motion *in*

6    *limine* no. 9 to preclude evidence that allowing PA Albakova to close was not within standard and

7    acceptable medical care is granted.

8          **H.**    **Evidence That Plaintiff Chaudhry and Bella Albakova Had a Personal**
         **Relationship or That Plaintiff Chaudhry Was Involved in an Extra-Marital**
9        **Affair**

10         Plaintiffs' twelfth motion *in limine* seeks to preclude evidence that Plaintiff Chaudhry was

11   involved in a personal relationship with PA Albakova and that he had additional extramarital

12   affairs as irrelevant.

13         Defendants do not oppose the motion to exclude evidence of any extramarital affair by

14   Plaintiff Chaudhry or a romantic relationship between Plaintiff Chaudhry and PA Albakova.

15   However, Defendants state that if Plaintiff attempts to impugn PA Albakova's testimony by

16   portraying her as a woman scorned, then they will be entitled to elicit testimony from Plaintiff

17   Chaudhry and PA Albakova regarding their personal relationship and Plaintiff Chaudhry's extra-

18   marital affairs.

19         Due to Defendants' lack of opposition, the motion *in limine* no. 12 to exclude evidence

20   that Plaintiff Chaudhry was engaged in extra-marital affairs and that he had a relationship with

21   PA Albakova is granted.

22         **I.**    **Revocation of Defendant Lopez's Medical License and Prior Convictions**

23         Defendants contend that Plaintiffs' attorneys have indicated that they intend to introduce

24   evidence that Defendant Lopez had convictions for driving under the influence, public urination,

25   and possession of cocaine which resulted in the revocation of his medical license by the

26   California Medical Board in 1994. Defendants' first motion *in limine* seeks to preclude such

27   evidence on the ground that it is inadmissible, irrelevant and unduly prejudicial.

28         Plaintiffs counter that, while the convictions themselves are not relevant as governed by

Rules 609 and 404, they are significant because they resulted in the revocation of Defendant

Lopez's medical license. Plaintiffs argue that it would confuse the jury if it were to be informed

that Defendant Lopez lost his medical license but was not advised as to why it was revoked.

Plaintiffs set forth four reasons why the convictions are relevant in this matter. First, Plaintiffs

contend that they reveal a troubling lack of judgment by Defendant Lopez regarding matters

concerning the medical profession that could have affected his decision to approve the State 2567

report. Second, Plaintiffs argue that even though Defendant Lopez was not required to hold a

medical license for his positions at CDPH, his testimony will require medical knowledge and

allowing him to testify without the jury considering the revocation of his medical license

represents manifest injustice. Third, Plaintiffs argue that the convictions raise questions about

Defendant Lopez's truthfulness in reporting the license revocation which reflects on his

credibility as a witness. Fourth, Plaintiff contend that Defendant Lopez could have been

motivated by animus toward Plaintiff Chaudhry that resulted from the loss of his medical license

as is evidenced by the "hatchet job" report that was produced regarding Plaintiff Chaudhry.

### 1. Convictions

Defendant Lopez contends that his convictions were misdemeanors or were not punishable

for more than one year and are not admissible under Rule 609 of the Federal Rules of Evidence.

Further, Defendant Lopez argues that even if the convictions were admissible under Rule 609(a),

Plaintiffs did not provide written notice of their intent to introduce evidence of these convictions

as required under Rule 609(b). Defendants also contend that there is no evidence that Defendant

Lopez has a substance abuse problem in 2012 which affected his judgment or cognitive abilities.

The convictions have no probative value on Defendant Lopez's credibility and should be

excluded.

Plaintiffs concede that the convictions are not admissible under Rules 609 or 404. Rule

609 provides that, regardless of the punishment, a crime for which a witness has been convicted

"must be admitted if the court can readily determine that establishing the elements of the crime

required proving--or the witness's admitting--a dishonest act or false statement." Fed. R. Evid.

609(a)(2). A conviction where more than 10 years have passed since the conviction or release

from confinement is only admissible where "(1) its probative value, supported by specific facts and circumstances, substantially outweighs its prejudicial effect; and (2) the proponent gives an adverse party reasonable written notice of the intent to use it so that the party has a fair opportunity to contest its use." Fed. R. Evid. 609(b).

Plaintiffs argue that these convictions reveal a troubling lack of judgment by Defendant Lopez regarding matters concerning the medical profession that could have affected his decision to approve the State 2567 report. Yet the convictions at issue are more than 20 years old, Plaintiffs concede that they do not prove a dishonest act or false statement, and to the extent any of the convictions would fall within section 609(b) and there could be probative value in this action, Plaintiffs did not provide written notice of intent to use the convictions.

2.     Revocation of Medical License

Defendant Lopez moves to exclude evidence regarding the revocation of his medical license on the ground that it is inadmissible character evidence. Defendant Lopez contends that the only reason to allow such evidence is to prove that he was a drunk, a convict and engaged in unlawful behavior which is improper under Rule 404(b). Defendant Lopez states that Plaintiffs have argued that the revocation of his medical license is admissible to show that he was not qualified to review and approve the State 2567 report that was published because his medical license was revoked. However, Defendant Lopez argues that this is incorrect and no medical license is required for his position as a Health Facilities Evaluator Supervisor or for his position as a Staff Services Manager I.

Citing Welden v. Hale, No. 2:15-CV-2410, 2017 WL 3479622, at 7–8 (S.D. Ohio, Aug. 14, 2017) report and recommendation adopted No. 2:15-CV-2410, 2017 WL 3769346.) (S.D. Ohio, Aug. 29, 2017), Plaintiffs counter that, while the misdemeanor convictions are not relevant by themselves, they are significant because they resulted in the revocation of Defendant Lopez's medical license. Plaintiff contend that the convictions possess the probative value that overcomes its prejudice under section 609(a)(1)(2).

In Welden, a physician had his medical license revoked after a finding that he was impaired in his ability to practice according to acceptable and prevailing standards of care because

41

of habitual or excessive use or abuse of drugs or alcohol, failure to provide required documentation of compliance, and failure to submit to random urine screens and processes. 2017 WL 3479622 at *8. The physician was incarcerated and brought a medical deliberate indifference claim against the physicians who treated him in prison. Id. at *5. On summary judgment, he sought to exclude evidence of the revocation of his medical license and the defendants argued that it was admissible under Rule 803(8) of the Federal Rules of Evidence. Id. at *8. The court agreed finding the revocation of the medical license was admissible and relevant. Id. The revocation of the medical license was relevant because the physician was seeking to present evidence as a medical expert in the case. Id. at *10. The court found that "Plaintiff is not a licensed physician in good standing with the Ohio Medical Board. Accordingly, 'Plaintiff's assertions regarding his interpretation of the medical evidence and recitation of treatment received since his release from ODRC do not constitute medical expert testimony.' " Id. (internal citation omitted).

This case is distinguishable because Defendant Lopez is not testifying as a medical expert regarding the appropriateness of Plaintiff Chaudhry's treatment of Mr. Perez. Unlike the physician in Welden, the revocation of Defendant Lopez's license did not include a finding that he was impaired in his ability to practice according to acceptable and prevailing standards of care because of habitual or excessive use or abuse of drugs or alcohol. (ECF No. 91-1.) More importantly, Defendant Lopez is not offering medical testimony in this action. Since Defendant Lopez is not testifying regarding medical issues or as a medical expert the revocation of his license is not relevant.

Mr. Lopez is testifying in his position as a Health Facilities Evaluator Supervisor (HFES) and Plaintiffs have presented no evidence that a medical license is required for Defendant Lopez to work as a HFES or a Staff Services Manager. (See Duty Statement for Health Facilities Evaluator II (Supervisor), ECF No. 91-2; Duty Statement, Staff Services Manager I, ECF No. 91-3.)

> [A HFES] provides the first level of supervision to a field staff (Health Facilities Evaluator Nurses (HFEN) and Health Facilities Evaluator I) responsible for surveying health care facilities and enforcing licensing and certification standards

in accordance with State, Federal, and local laws and regulations. The HFE II (Sup) reviews all reports, surveys and correspondence prepared by field staff, including consultant and State Fire Marshall input. The Supervisor communicates with the public and health facility operators/administrators on policy, procedures and regulatory interpretations for the health facilities in his/her assigned area. The HFE II (Sup) is responsible for working together with all Program personnel to assure quality work and performance, in order to achieve established goals and objectives and fulfill the mission of the Department.

(Id. at 2.) Since Defendant Lopez is testifying as to compliance of the heath care facility with licensing and certification standards with State, Federal, and local laws and regulations and not as a medical expert, the revocation of his medical license is not relevant to his testimony.

Plaintiffs argue that even though Defendant Lopez was not required to hold a medical license for his positions at CDPH, his testimony will require medical knowledge and allowing him to testify without the jury considering the revocation of his medical license represents manifest injustice. But Plaintiffs have not presented any evidence or explained why allowing Defendant Lopez to testify to CRMC's compliance with its own bylaws or state or federal regulations will require medical knowledge. The Court rejects the argument that it would result in manifest injustice to allow his testimony in this matter without admission of the fact that his medical license was revoked.

Plaintiffs also argue that the convictions raise questions about Defendant Lopez's truthfulness in reporting the license revocation which reflects on his credibility as a witness. Rule 608 of the Federal Rules of Evidence allows examination into "specific instances" of a witness's conduct if it is probative or the witnesses truthfulness or untruthfulness. United States v. Dickens, 775 F.2d 1056, 1058 (9th Cir. 1985). Rule 608(b) only allows impeachment by specific acts that have not resulted in a criminal conviction. United States v. Osazuwa, 564 F.3d 1169, 1175 (9th Cir. 2009). Neither Defendant Lopez's arrest for possession of cocaine or the revocation of his medical license are probative as to his character for truthfulness. Further, Plaintiffs' argument that Defendant Lopez may not have reported his license revocation when required to do so is speculative. Evidence of the revocation of his medical license is not probative as to Defendant Lopez's truthfulness, would be confusing to the jury and prejudicial. Fed. R. Evid. 403.

Finally, Plaintiff contends that Defendant Lopez could have been motivated by animus

toward Plaintiff Chaudhry that resulted from the loss of his medical license as is evidenced by the "hatchet job" report that was produced regarding Plaintiff Chaudhry. "Evidence helpful in evaluating the credibility of a witness is of consequence to the determination of the action. Evidence is relevant to a matter of consequence to the determination of the case if it has a mere tendency to impeach a witness' credibility by a showing of bias or coercion." United States v. Hankey, 203 F.3d 1160, 1171 (9th Cir. 2000). "Proof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony." United States v. Abel, 469 U.S. 45, 52 (1984). Neither Plaintiffs' speculation regarding possible bias nor their characterization of the investigation as a "hatchet job" are sufficient to show animus by Defendant Lopez such that the revocation of his medical license would be relevant here.[8]

The Court finds that the revocation of Defendant Lopez's medical license is not relevant in this matter.

3.    Conclusion

Defendant Lopez's prior misdemeanor convictions, arrest for possession of cocaine, and the revocation of his medical license are not relevant in this matter and admission of the evidence would be prejudicial to Defendant Lopez and confusing to the jury. Defendants' motion *in limine* no. 1 to preclude evidence of the revocation of Defendant Lopez's medical license, his prior convictions, and his arrest for cocaine possession is granted.

**J.    Documents That Have Not Been Timely Disclosed**

Defendants' sixth motion *in limine* seeks to exclude any documents that Plaintiffs did not timely disclose in discovery. Specifically, Defendants contend that Plaintiffs have indicated that they intend to admit an audio recording of Plaintiff Chaudhry's dictation during the operation on Mr. Perez and a transcript of the recording which were not disclosed during discovery. Similarly,

---

[8] The Court recognizes that it is conceivable that Defendant Lopez harbored animosity toward Plaintiff Chaudhry due to the revocation of his medical license and such evidence may go towards bias. However, Plaintiff Chaudhry has not presented any evidence of such animosity, such as deposition testimony or statements by Defendant Lopez that would exhibit bias in this matter. Plaintiffs' argument is based on pure speculation and conjecture. This is insufficient for impeachment purposes as to bias and frankly also falls within the purview of Rule 403 to the extent that there is any probativeness based upon mere speculation and conjecture.

Defendants argue that Plaintiffs have included other items on the exhibit list that were disclosed in Perez, but were not disclosed in this case.  Defendants state that they were not parties to the Perez case and were not provided with an opportunity to conduct discovery on the documents or to challenge their accuracy.  Defendants contend that the failure to timely disclose was neither harmless nor justified and the documents should be excluded in this matter.

Plaintiffs argue that they submitted their proposed exhibit list to Defendants over four months ago and Defendants refused to exchange documents at that time.  Plaintiffs contend that Defendants were aware of the dictation and transcript because the majority of the exhibits are drawn from the Perez case.  Plaintiffs further argue that the documents were disclosed in their pretrial report and Defendants waived any objection to the recording or the transcript by failing to object sooner.

First, the Court considers Plaintiffs' argument that Defendants waived any objection to the recording and transcript because the documents were disclosed in their pretrial report and no objection was made.  Plaintiffs have submitted no authority in support of their argument that failure to object to the exhibits waived any objection.  Neither the Local Rules or the pretrial order establish a timeline for objections to the exhibits listed in a party's pretrial report.

Plaintiffs' exhibits are listed, as relevant here, as

> 13.  Post-operative brief note;
> 14.  Post-operative orders (Other Orders (continued));
> 15.  Operative report;
> 16.  Post-surgical dictation transcript[.]

(ECF No. 88 at 32.)  Vague descriptions of documents are insufficient to meet the disclosure requirements under Rule 26.  Cervantes v. Zimmerman, No. 17-CV-1230-BAS-NLS, 2019 WL 1598219, at *5 (S.D. Cal. Apr. 15, 2019).  Plaintiffs' identification of the transcript as "post-surgical dictation transcript" would not reasonably inform the defendants that the document was an audio recording of the surgery of Mr. Perez.  At the February 7, 2020 hearing, Defendants stated that it was not until the meet and confer approximately one month ago that they realized that the transcript and dictation at issue were different than the operative report.  In this instance, Plaintiffs have not demonstrated that Defendants waived any objection to the dictation and report

by failing to object earlier.

Rule 26 of the Federal Rules of Civil Procedure requires a party to produce without a discovery request, "a copy--or a description by category and location--of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses, unless the use would be solely for impeachment." Fed. R. Civ. P. 26(a)(1)(ii). The parties are required to supplement their initial disclosures or discovery responses "(A) in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing; or (B) as ordered by the court." Fed. R. Civ. P. 26(e). Rule 36(c)(1) gives teeth to the expert disclosure "requirements by forbidding the use at trial of any information required to be disclosed by Rule 26(a) that is not properly disclosed." Yeti v. Molly, Ltd., 259 F.3d at 1106. Rule 36 provides that a party is not allowed to use information or witnesses that are not disclosed or supplemented as required by Rule 26(a) or (e) unless the failure was substantially justified or harmless. Fed. R. Civ. P. 36(c)(1). "The Advisory Committee Notes describe [this] as a 'self-executing,' 'automatic' sanction to 'provide[ ] a strong inducement for disclosure of material. . . .' " Yeti by Molly, Ltd., 259 F.3d at 1106 (quoting Fed. R. Civ. P. 37 advisory committee's note (1994)). But Rule 37(c)(1) did not "strip the district courts of discretion to allow expert testimony in appropriate circumstances; to the contrary, it contains an express exception under which a failure timely to serve an expert report may be excused if the failure was substantially justified or is harmless." Lanard Toys Ltd. v. Novelty, Inc., 375 F. App'x 705, 713 (9th Cir. 2010). The burden is on the party seeking to admit the evidence to demonstrate that the failure to disclose was substantially justified or harmless. Yeti by Molly, Ltd., 259 F.3d at 1107; R & R Sails, Inc. v. Ins. Co. of Pennsylvania, 673 F.3d 1240, 1246 (9th Cir. 2012).

"Among the factors that may properly guide a district court in determining whether a violation of a discovery deadline is justified or harmless are: (1) prejudice or surprise to the party against whom the evidence is offered; (2) the ability of that party to cure the prejudice; (3) the

likelihood of disruption of the trial; and (4) bad faith or willfulness involved in not timely disclosing the evidence." Lanard Toys Ltd., 375 F. App'x at 713 (citing David v. Caterpillar, Inc., 324 F.3d 851, 857 (7th Cir. 2003)); Monroe v. Davis, No. 2:13-CV-00863-GMN, 2014 WL 3845121, at *2 (D. Nev. Aug. 4, 2014).

Here, the pretrial order provided that the parties were to make all initial disclosures required by Fed. R. Civ. P. 26(a)(1) by May 5, 2017, with all non-expert discovery to be completed by November 6, 2017. (ECF No. 17 at 2.) The order advised the parties, "The provisions of Fed. R. Civ. P. 26(e) regarding a party's duty to timely supplement disclosures and responses to discovery requests will be strictly enforced. (Id.) Subsequently, the non-expert discovery deadline was extended and non-expert discovery closed on April 9, 2018, with a further extension for the limited purpose of deposing Defendant Kappmeyer by July 20, 2018. (ECF Nos. 30, 34.)

At the February 7, 2020 hearing, Plaintiffs' counsel stated he is not aware if the audio recording and transcription were produced during discovery, however, in their motion Defendants state that the evidence was not produced during discovery. Plaintiffs argue that Defendants were aware of the recording and transcript because it was used during the Perez action. However, Defendants in this action were not parties in the Perez action so disclosure in that case is not sufficient to demonstrate that the defendants here had knowledge of the recording and transcript. Plaintiffs have not demonstrated that Defendants were aware of the recording or transcript prior to the filing of the joint pretrial report.

The audio recording was created by Plaintiff Chaudhry at the time of Mr. Perez's surgery in 2012. Plaintiffs assert that the evidence was used in the Perez case which was tried to a jury in March 2018.[9] Therefore, it is clear that the recording and transcript were in Plaintiff Chaudhry's custody and control prior to discovery closing in this action. Further, that the recording could be used to support Plaintiffs' defense to the statements in the State 2567 report would have been obvious. Rule 26(a)(1)(A)(ii) "requires a party to disclose all documents which are relevant to his

---

[9] The Court takes judicial notice of the records of the Fresno County Superior Court. See Superior Court of California, County of Fresno, Smart Search, enter case number 13CECG03906, https://publicportal.fresno.courts.ca.gov/FRESNOPORTAL/Home/WorkspaceMode?p=0 (last visited Feb. 13, 2020).

claims and defenses." Cervantes v. Zimmerman, No. 17-CV-1230-BAS-NLS, 2019 WL 1598219, at *5 (S.D. Cal. Apr. 15, 2019) (quoting Estakhrian v. Obenstine, No. CV11-3480-FMO (CWx), 2016 WL 6868178, at *8 (C.D. Cal. Feb. 29, 2016).). The audio recording of Mr. Perez's surgery was clearly relevant in this action and should have been disclosed pursuant to Rule 26(a). Plaintiffs have offered no why the audio recording of the surgery or the transcript were not produced during discovery in this action. Plaintiffs have not met their burden to demonstrate that the failure to produce the recording or transcript was substantially justified.

Defendants have sufficiently alleged that the production of the transcript and recording was a surprise and that they were unable to cure any prejudice because discovery has been closed and trial is imminent. Based on Defendants motion and argument at the February 7, 2020 hearing, Defendants were unaware of this recording and transcript until approximately one month prior to the filing of the motions *in limine*. The Court construes Plaintiffs' argument to be that the failure to produce the evidence was harmless because they submitted their exhibit list over four months ago and they offered to exchange exhibits but Defendants refused. However, Defendants argue that they were not afforded the opportunity to conduct any discovery as to the recording or to challenge the accuracy of the evidence.

Discovery in this matter has been closed for almost two years and trial is imminent. To reopen discovery at this time would require the trial date in this matter to be continued yet again. The trial of this matter has been continued on three prior occasions. (ECF Nos. 67, 70, 85, 95.) The Court has informed that parties on numerous occasions that no further continuances will be granted in this matter. To continue the trial a fourth time based on the last-minute disclosure of evidence that Plaintiffs have had in their possession and control for several years would be prejudicial to defendants. See Ollier v. Sweetwater Union High Sch. Dist., 768 F.3d 843, 863 (9th Cir. 2014) (exclusion of 38 relevant witnesses disclosed on the eve of trial not abuse of discretion); Hoffman v. Constr. Protective Servs., Inc., 541 F.3d 1175, 1180 (9th Cir. 2008), as amended (Sept. 16, 2008) (affirming preclusion of evidence of damages disclosed on the eve of trial); Ingenco Holdings, LLC v. Ace Am. Ins. Co., 921 F.3d 803, 821–22 (9th Cir. 2019) (late disclosure was not harmless because it disrupted both defendant's and the court's schedules); );

Hoffman v. Constr. Protective Servs., Inc., 541 F.3d 1175, 1180 (9th Cir. 2008), as amended (Sept. 16, 2008) (late disclosure was not harmless where it would likely require court to create a new briefing schedule and re-open discovery); Nat'l R.R. Passenger Corp. v. Young's Commercial Transfer, Inc., No. 1:13-CV-01506-DAD-EPG, 2016 WL 1573262, at *6 (E.D. Cal. Apr. 19, 2016) (excluding testimony where all discovery had closed, the time for the filing of dispositive law and motion had passed, and final pretrial conference was less than six weeks away). The Court finds that Defendants have demonstrated prejudice due to the late disclosure of the recording and transcript. Plaintiffs have failed to meet their burden to show that the failure to produce the recording and transcript is harmless.

Plaintiffs have failed to meet their burden to demonstrate that the failure to disclose was substantially justified or harmless. Yeti by Molly, Ltd., 259 F.3d at 1107. Accordingly, Defendants' motion *in limine* no. 6 to exclude the audio recording and transcript is granted.

### K.    Relitigating the Negligence Cause of Action Tried and Determined in Perez

Defendants' seventh motion *in limine* seeks to preclude Plaintiffs from relitigating the negligence cause of action that was tried in Perez in which Plaintiff Chaudhry was found liable for medical malpractice. Defendants move to exclude witnesses on Plaintiffs' list that were not involved in the investigation which resulted in the issuance of the State 2567 report on the ground that their testimony is irrelevant, will confuse the jury and will waste time. Defendants seek an order requiring Plaintiffs to make an offer of proof as to each witness before that individual takes the stand to show that they have unique and relevant information pertinent to the due process claim being tried in this action.

Plaintiffs counter that this action cannot be tried without discussing the medical details of what happened the day of the surgery. Plaintiffs argue that Defendants have not specified which witnesses or evidence they seek to exclude and therefore, Plaintiffs are unable to offer a substantial opposition to the motion.[10]

The Court finds that whether a specific witness should be excluded is an issue that will

---

[10] In their opposition to Defendants' motion *in limine*, Plaintiffs raise a "newly discovered issue" regarding Plaintiff Chaudhry's licensure. At the February 7, 2020 hearing, Defendants asserted that they do not intend to bring this issue up in front of the jury.

need to be addressed at trial. Defendants may raise an objection to any specific witness at the time that the witness is called to testify. Defendants' motion *in limine* no. 7 is denied without prejudice.

## IV.

## CONCLUSION AND ORDER

Based on the foregoing, IT IS HEREBY ORDERED that:

1.      Plaintiffs' motions *in limine* nos. 5, 9, and 12 are GRANTED;

2.      Plaintiffs' motions *in limine* nos. 1, 2, 3, 4, 6, 7, 8, 10, and 11, are DENIED;

3.      Defendants' motions *in limine* nos. 1, 2, 5, 6 are GRANTED;

4.      Defendants' motions *in limine* no. 7 is DENIED without prejudice; and

5.      Defendants' motion *in limine* no. 3 is GRANTED IN PART and Plaintiffs' expert witnesses may only testify as to their percipient knowledge developed in treating Plaintiff Chaudhry or preparing Plaintiffs' tax return;

6.      Defendants' motion *in limine* no. 4 is GRANTED IN PART AND DENIED IN PART as follows:

   a.      The motion to exclude testimony from Plaintiffs' former attorneys as to economic loss or causation is GRANTED; and

   b.      The motion to exclude Plaintiff Chaudhry's testimony regarding business valuation or losses is DENIED.

IT IS SO ORDERED.

Dated:   __February 21, 2020__

_____
UNITED STATES MAGISTRATE JUDGE