1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

9
10

| | |
|---|---|
| PERVAIZ A. CHAUDHRY, M.D., et al., | Case No. 1:16-cv-01243-SAB |
| Plaintiffs, | MEMORANDUM OF DECISION FOLLOWING BENCH TRIAL AND ORDER ENTERING JUDGMENT IN FAVOR OF DEFENDANTS AND DIRECTING CLERK OF COURT TO CLOSE CASE |
| v. | |
| SONIA ANGELL, et al., | |
| Defendants. | ORDER DENYING PLAINTIFFS' MOTIONS FOR ADMISSION OF TESTIMONY AND DEPOSITION DESIGNATIONS AND GRANTING DEFENDANT'S MOTION TO STRIKE COUNTER-DESIGNATIONS |
| | (ECF Nos. 160, 170, 173-182) |

11
12
13
14
15
16
17
18
19

## I.

## INTRODUCTION

20
21
22

Pervaiz A. Chaudhry, M.D. ("Dr. Chaudhry") and Valley Cardiac Surgery Medical Group ("Valley Cardiac") (collectively "Plaintiffs"), filed this civil rights action that proceeded into trial against Defendants Sonia Angell ("Angell"), in her official capacity as the Director of the California Department of Public Health ("CDPH"), Steven Lopez ("Lopez"), in his personal capacity, and Shirley Campbell ("Campbell"), in her personal capacity, alleging a violation of due process pursuant to 42 U.S.C. § 1983.

23
24
25
26
27

Following a waiver by all parties of their right to a jury trial, a bench trial was held before

28

the undersigned on May 4, 2021, through May 10, 2021.  Having considered the testimony of the witnesses and those exhibits that were admitted at trial, the Court, by this memorandum of decision, issues its findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.  For the reasons set forth below, the Court concludes that Plaintiffs have not proven a violation of their due process rights and are not entitled to relief on any of their claims.

## A.    Jurisdiction and Venue

This Court has original jurisdiction under 28 U.S.C. §§ 1331, 1441(a), in that this action arises under alleged violations of the Constitution of the United States.  Venue is proper because the events that underlie this action occurred in the Eastern District of California, and in particular, Fresno County.

## B.    Relevant Procedural history

On June 17, 2016, Plaintiffs Dr. Chaudhry and Valley Cardiac filed a complaint in Fresno County Superior Court against Defendants Karen Smith ("Smith"), Lopez, Eric Creer ("Creer"), Campbell, and Deidre Kappmeyer ("Kappmeyer").  (ECF No. 1 at 10-30.)  On August 19, 2016, Defendants removed the action to the Eastern District of California.  (ECF No. 1.)  On August 29, 2016, Plaintiffs filed a first amended complaint bringing two causes of action.  (ECF No. 6.)  Both causes of action allege the violation of civil rights and due process pursuant to 42 U.S.C. § 1983.  Plaintiffs' first cause of action was brought against Defendant Smith in her official capacity, seeking declaratory and injunctive relief.  (FAC ¶¶ 62-71, ECF No. 6.)  Plaintiffs' second cause of action was brought against Defendants Lopez, Campbell, Creer, and Kappmeyer, in their personal capacities, seeking monetary damages for emotional distress to Dr. Chaudhry, as well as economic harm to each of the Plaintiffs.  (FAC ¶¶ 72-76, ECF No. 6.)

On December 16, 2016, District Judge Lawrence J. O'Neill denied Defendants' motion to dismiss in its entirety.  (ECF No. 12.)  On January 26, 2017, Defendants filed an answer to Plaintiffs' first amended complaint. (ECF No. 13.)  On January 18, 2019, District Judge O'Neill issued an order granting a motion for summary judgment as to Defendant Eric Creer only, and denying the motion for summary judgment as to Defendants Smith, Lopez, Campbell, and

1  Kappmeyer.  (ECF No. 56.)  The order further directed the parties to either dismiss Kappmeyer,

2  who is now deceased, or substitute a proper defendant, and on January 28, 2019, the Court

3  dismissed Kappmeyer pursuant to the parties' stipulation.  (ECF No. 60.)

4  　　　　On February 14, 2019, pursuant to the parties' consent to magistrate judge jurisdiction,

5  this action was assigned to Magistrate Judge Stanley A. Boone for all purposes, including trial

6  and entry of final judgment.  (ECF No. 64.)  On February 21, 2020, the Court issued an order

7  adjudicating the parties' motions *in limine*.  (ECF No. 97.)

8  　　　　On March 18, 2020, pursuant to the parties' stipulation and Federal Rule of Civil

9  Procedure 25(d), the Court ordered Defendant Angell, in her official capacity as the Director of

10  the CDPH, to be substituted in place of Defendant Smith.  (ECF No. 101.)

11  　　　　On March 18, 2020, the parties filed a stipulation for the withdrawal of Dr Chaudhry's

12  request for damages relating to emotional distress or physical manifestations of emotional

13  distress.  (ECF No. 102.)  On March 19, 2020, pursuant to the parties' stipulation, the Court

14  entered an order withdrawing Dr. Chaudhry's requests for damages which were "claim[ed] to

15  have been proximately caused by Defendants' conduct, including but not limited to depression,

16  anxiety, sleeplessness, and cluster headaches," and further ordered that "Plaintiffs shall not

17  introduce any evidence whatsoever in support of the general damages claims or to request

18  damages for such claims."  (ECF No. 103.)  In relation to the withdrawal of Dr. Chaudhry's

19  claims for emotional distress, on March 30, 2020, Plaintiffs submitted supplemental briefing,

20  which the Court construed as a motion for reconsideration of the Court's February 21, 2020

21  order on the parties' motions *in limine*.  (ECF No. 104.)  On April 27, 2020, the Court granted in

22  part and denied in part the construed motion for reconsideration of the motions *in limine*.  (ECF

23  No. 110.)

24  　　　　On March 12, 2021, Defendants filed, and on March 18, 2021, Plaintiffs filed, notices

25  withdrawing their demand for a jury trial, waiving their right to a jury trial, and consenting to a

26  bench trial before the undersigned.  (ECF Nos. 136, 141.)

27  　　　　On May 4, 2021, a bench trial commenced in this action on Plaintiffs' claims against

28  Defendant Angell in her official capacity, and Defendants Lopez and Campbell in their

1   individual capacities.  (ECF No. 173.)  Plaintiffs were represented at trial by counsel Hadi Ty

2   Kharazi and Thornton Davidson.   Defendants were represented at trial by counsel Diana

3   Esquivel.  On May 10, 2021, the evidence was closed and the trial concluded.  (ECF No. 182.)

**II.**

**OUTSTANDING EVIDENTIARY RULINGS**

6       The Court addresses three remaining evidentiary issues: (A) Plaintiffs' request to admit

7   the testimony of Laura McComb ("McComb") from a different preceding trial; (B) Plaintiffs'

8   late-filed designations of the deposition testimony of Adams Yussif ("Yussif"), from the same

9   preceding litigation; and (C) Defendants' objections and request to strike Plaintiffs' counter

10  deposition designations of Berj Apkarian ("Apkarian") and Kalwant Dhillon ("Dhillon"), also

11  from the same preceding litigation.

### A.       Testimony of Laura McComb

13      Prior to the close of evidence in the bench trial held in this action, Plaintiffs filed a brief

14  in support of the admission of testimony given by third party witness McComb in the prior

15  separate action of Alvarez v. Fresno Community Hospital, et al., Fresno Superior Court Case No.

16  13CECG03906 ("Alvarez" or the "Perez Malpractice Case").   (Pls.' Limited Brief Supp.

17  Admission Trial Testimony Laura McComb ("Br."), ECF No. 177.)

### 1.   Plaintiffs' Arguments

19      Plaintiffs seek to admit the testimony from Alvarez wherein McComb testified

20  concerning the drafts of the "Plans of Correction,"[1] and specifically previous testimony from

21  McComb stating the initial proposed Plan of Correction was "rejected because the hospital had

22  not been specific enough in its discipline of Dr. Chaudhry."   (Br. 2.)  Plaintiffs proffer the

23  testimony is about "Campbell pressuring the hospital to more harshly[]discipline Dr. Chaudhry."

24  (Br. 3.)   Plaintiffs submit the testimony is highly relevant because it tends to show the

25  Defendants' investigations and reports specifically sought to injure Dr. Chaudhry's reputation,

---

[1]  These evidentiary rulings precede the main factual findings and legal analysis in this memorandum.  The Court incorporates the below factual findings and legal analysis by way of reference as to obviate the need to define terms and explain relevance of certain facts that are more fully developed in the later sections of this memorandum.

1   by forcing the hospital, under threat of losing Medicare funding, to remove him from his

2   position, and further impeaches Campbell.  (Br. 3.)

3        Plaintiffs first argue that the introduction of McComb's prior testimony should be

4   permitted under Federal Rule of Evidence 804(b)(1) as she is an unavailable witness due to the

5   inability to recollect the subject matter.  (Br. 3-5.)  Second, Plaintiffs argue McComb's prior

6   testimony should be admitted as a statement against interest under Federal Rule of Evidence

7   804(b)(3), because as an employee of the hospital, she was risking her employment and the

8   hospital's funding for Medicare and Medicaid by exposing the actions of the CDPH

9   investigators.  (Br. 5.)  Alternatively, Plaintiffs argue McComb's testimony may also be

10  introduced because she is "feigning forgetfulness," and given the prior sworn statements, the

11  Court may admit those statements under the exception for prior sworn inconsistent statements

12  "despite the fact that present forgetfulness is not technically inconsistent with the prior

13  statements."  (Br. 5.)

14        2.   Legal Standard

15        "A deposition lawfully taken . . . may be used in a later action involving the same subject

16  matter between the same parties, or their representatives or successors in interest, to the same

17  extent as if taken in the later action."  Fed. R. Civ. P. 32(a)(8).  The Rules of Evidence provide a

18  parallel exception.  "A declarant is considered to be unavailable as a witness if the declarant: . . .

19  testifies to not remembering the subject matter," Fed. R. Evid. 804(a)(3), and the following types

20  of former testimony are not by excluded by the rule against hearsay if the declarant is

21  unavailable: (A) testimony that "was given as a witness at a trial, hearing, or lawful deposition,

22  whether given during the current proceeding or a different one; and (B) is now offered against a

23  party who had--or, in a civil case, whose predecessor in interest had--an opportunity and similar

24  motive to develop it by direct, cross-, or redirect examination," Fed. R. Evid. 804(b)(1).

25        A statement against interest is not excluded as hearsay if the statement is one that: "(A) a

26  reasonable person in the declarant's position would have made only if the person believed it to

27  be true because, when made, it was so contrary to the declarant's proprietary or pecuniary

28  interest or had so great a tendency to invalidate the declarant's claim against someone else or to

1    expose the declarant to civil or criminal liability; and (B) is supported by corroborating

2    circumstances that clearly indicate its trustworthiness, if it is offered in a criminal case as one

3    that tends to expose the declarant to criminal liability."  Fed. R. Evid. 804(b)(3).

4         "The decision whether to admit a deposition from a prior lawsuit is vested in the district

5    court's sound discretion."  Hub v. Sun Valley Co., 682 F.2d 776, 777 (9th Cir. 1982).  The

6    requirements of "same subject matter" and "same parties, or their representatives or successors in

7    interest" "have been construed liberally in light of the twin goals of fairness and efficiency."

8    Hub, 682 F.2d at 778 ("The accepted inquiry focuses on whether the prior cross-examination

9    would satisfy a reasonable party who opposes admission in the present lawsuit.").  Thus, "courts

10   have required only a substantial identity of issues . . . and the presence of an adversary with the

11   same motive to cross-examine the deponent."  Id. (citations omitted) ("We too believe that the

12   two lawsuits need not involve identical issues and parties, though we reserve for another day

13   deciding whether the presence of an adversary with the same motive to cross-examine is

14   sufficient."); see also Hynix Semiconductor Inc. v. Rambus Inc., 250 F.R.D. 452, 458 (N.D. Cal.

15   2008) ("The modern test does not require privity between the current party and the party who

16   participated in the prior proceeding.").

17        3.    Plaintiffs' Motion Shall be Denied

18        The Court will accept for purposes of this motion that given McComb testified she did

19   not recall the conversations regarding the Plans of Correction, she is unavailable for purposes of

20   Rule 804(a)(3) as to that specific subject matter.[2]  However, the Court finds Defendants are not

21   successors in interest to the Plaintiffs in the Perez Malpractice Case in a manner sufficient as to

22   satisfy Rule of Evidence 804(b)(1), nor Rule of Civil Procedure 32(a)(8), even under the liberal

23   interpretations of such rules.  See Hub, 682 F.2d at 778; Hynix, 250 F.R.D. 452, 458 ("[T]he test

24   is 'inherently factual' and depends on the similarity of issues and context of questioning.").

25        Plaintiffs argue "Alvarez was a predecessor in interest of CDPH because they both shared

26   a common interest in upholding and defending the investigative report that impugned Dr.

27   

28   [2]  The Court addresses this and related testimony of McComb and Utecht in relation to some of the issues discussed in this evidentiary motion in Sections III(D)-(E) and IV(C)(2), infra.

1   Chaudhry for committing medical errors in the context of his treatment of Mr. Perez."  (Br. 5.)
2   The Court rather agrees with Defendants and finds that no party in the Perez Malpractice Case
3   had a common interest with Defendants Campbell, Lopez, or CDPH.   The focus of the
4   malpractice action was Dr. Chaudhry's conduct and the standard of care as a physician, whereas
5   the hospital and its compliance with its policies and as to the federal Conditions of Participation
6   for Medicare and Medicaid, was the subject of the investigations and reports at issue in this
7   action.

8        Plaintiffs heavily depend on a previous findings and recommendations from the
9   undersigned, Howell v. Cruz, No. 119CV00782DADSABPC, 2020 WL 6700178, at *5 (E.D.
10  Cal. Nov. 13, 2020), report and recommendation adopted, No. 119CV00782DADSABPC, 2021
11  WL 24756 (E.D. Cal. Jan. 4, 2021).  (Br. 4.)  In Howell, the plaintiff was the same as in "his
12  other ongoing cases," and "[a]lthough the Defendants [were] different, they [were] all employees
13  of CDCR, and in Burns, employees specifically at CSP-Corcoran."  2020 WL 6700178, at *5.
14  As the undersigned noted therein, "the general subject matter of exhaustion and the fact that
15  Plaintiff [was] familiar with the process [was] the same in the cases," and "[a]t each of the prior
16  depositions an adversary was present to examine Plaintiff regarding his familiarity with CDCR's
17  administrative  grievance  process  [and]  [i]ndeed,  motions  for  summary  judgment  on
18  administrative exhaustion grounds are pending in both of Plaintiff's other ongoing cases."  Id.
19  ("Therefore, Plaintiff's deposition transcripts from his two other cases are admissible for
20  consideration in ruling on the instant motion.").

21       The motives of the CDCR employees in deposing the plaintiff in Howell were similar if
22  not identical.  There is no indication that the plaintiff in the Perez Malpractice Action had a
23  sufficiently similar motive to develop testimony on the relevant issues as Defendants in this
24  action.  See Hynix, 250 F.R.D. at 458 (N.D. Cal. 2008) ("With respect to Mr. Kalter and Mr.
25  Kilbuck, the issues and motives were identical."); Hub, 682 F.2d at 778 ("The shortcoming here
26  is that Hub failed to show that the deposition relates to issues common to both lawsuits.");
27  Shahbaz v. Johnson & Johnson, No. CV 13-07382-AB (SSX), 2020 WL 5894590, at *15 (C.D.
28  Cal. July 31, 2020) ("Defendants were not parties to either of those cases, and Plaintiff has not

1    shown that the subject matter in those actions is similar to that of this case, or even involved

2    Prolene."); Affinity Labs of Texas, LLC v. Apple Inc., No. C 09-04436 CW, 2011 WL 232521,

3    at *2 (N.D. Cal. Jan. 24, 2011) (Hynix "is not analogous to this case.").

4         As for Plaintiffs' argument that McComb's testimony should be admitted as a statement

5    against self-interest, Defendants argue there is no evidence demonstrating her employment or the

6    hospital's relationship with the Centers for Medicaid & Medicare Services (CMS) was in

7    jeopardy or threatened.  The Court agrees.  Plaintiffs have failed to show that McComb risked

8    her employment or the hospital's relationship with CMS as Plaintiffs, argue, and significantly,

9    McComb testified at trial that disagreements were not uncommon with CDPH, and specifically

10   that it was not surprising when CDPH stated it would not change certain aspects of CDPH's

11   reports concerning alleged misquotations, because the CDPH has their "truth" and interpretation

12   of the facts, and the hospital has its own, and they do not always agree with each other.  See Cty.

13   of Stanislaus v. Travelers Indem. Co., 142 F. Supp. 3d 1065, 1076–77 (E.D. Cal. 2015)  (" 'A

14   statement is against pecuniary and proprietary interest when it threatens the loss of employment,

15   or reduces the chances for future employment, or entails possible civil liability' . . . nothing in

16   the record suggests that Franck was responsible for those excavations or that the statements were

17   against his pecuniary interest for some other reason.") (quoting Gichner v. Antonio Troiano Tile

18   & Marble Co., 410 F.2d 238, 242 (D.C. Cir. 1969)).

19        The Court also rejects Plaintiffs' alternative argument that McComb's prior testimony

20   should nevertheless be admitted because she is "feigning forgetfulness."  (Br. 5.)  The Court

21   agrees with Defendants that whether McComb feigned forgetfulness goes to the weight of her

22   testimony, not the admissibility of her prior sworn testimony, and is not a legal basis for

23   admitting the prior testimony.  The Court addresses the credibility, weight, and relevance of

24   McComb's testimony in the factual findings and legal analysis sections of this memorandum.

25        Further, even if the Court were inclined to admit the testimony under the above

26   exceptions, the Court agrees with Defendants that the testimony sought to be introduced is

27   vague, and though possibly relevant if was in line with what Plaintiffs frame it to be, it is

28   irrelevant as presented and in the context of what McComb actually stated in the previous Perez

1    Malpractice Case.  First, Defendants correctly highlight that the proffered testimony does not

2    refer to whether the Plan of Correction is referring to the CMS, or State report.  Further, the prior

3    testimony does not state that Campbell or CDPH was "pressuring the hospital to more harshly

4    discipline Dr. Chaudhry" as Plaintiffs assert, but rather, McComb specifically answered "no" to

5    the question of whether CDPH told McComb they wanted Dr. Chaudhry disciplined more

6    severely:

> Q.      Now, I'm not asking you anything about any of the changes that you made
> in the plan of correction, but what was the primary complaint that Shirley
> Campbell voiced to you about the first plan of correction that was rejected?
>
> A.      The primary complaints dealt with the specificity of the education, listing
> it out, and the specificity of what occurred in the disciplinary measures for Dr.
> Chaudhry.
>
> Q.      And so is it correct that the State wanted you – the State is telling you that
> they want harsher discipline visited on Dr. Chaudhry in this plan of correction; is
> that right?
>
> A.      No.  They wanted it specified clearly.  Instead of saying MEC met on 8-12
> and discussed the incident and levied a suspension, she wanted it clearly laid out
> what education, what suspension, everything that MEC had for that particular
> incident."
>
> Q.      Did she tell you that verbally, is that over the telephone or how is that
> communicated?
>
> A.      In talking with her or Steve [Lopez], yes.

(Br. 10-11.)

19    Thus the testimony in fact shows that if anything, McComb recalled Campbell *or* Lopez

20    at CDPH wanted the Plan of Correction to state more clearly what the punishment actually was

21    that was in place *already*, not that they wanted Dr. Chaudhry punished more severely by the

22    hospital.

23    For all of the above reasons, Plaintiffs' motion to admit the prior trial testimony of

24    McComb from the Perez Malpractice Case shall be denied.

25    **B.      Plaintiffs' Late-Filed Request to Designate Deposition Testimony of Adams
          Yussif**

27    On May 7, 2021, the morning of the fourth day of trial in this action, Plaintiffs filed a

28    notice of designation of deposition testimony of Yussif.  (ECF No. 176.)  On May 10, 2021,

1   while mounting specific objections to certain designations as an alternative argument,

2   Defendants objected to the entirety of Plaintiffs' designations on the grounds they were untimely

3   and unduly prejudicial to Defendants.   (ECF No. 179.)   For the reasons explained below,

4   Plaintiffs' late-filed request to designate the deposition testimony of Yussif shall be denied.

5          Plaintiffs filed no formal motion or express request to amend the pretrial order to allow

6   for their untimely deposition designations.   The Court will nonetheless construe the filing as a

7   motion to amend the pretrial order.   See Fresno Rock Taco, LLC v. Nat'l Sur. Corp., No. 1:11-

8   CV-00845-SKO, 2013 WL 2182864, at *7 (E.D. Cal. May 20, 2013).   On such a motion,

9   Plaintiffs have "the burden of showing that an amendment to the pretrial order was necessary to

10  prevent "manifest injustice."   Galdamez v. Potter, 415 F.3d 1015, 1020 (9th Cir. 2005); see Fed.

11  R. Civ. P. 16(e) ("The court may modify the order issued after a final pretrial conference only to

12  prevent manifest injustice.").   In evaluating a motion to amend the pretrial order, the Court

13  "should consider four factors: (1) the degree of prejudice or surprise to the defendants if the

14  order is modified; (2) the ability of the defendants to cure the prejudice; (3) any impact of

15  modification on the orderly and efficient conduct of the trial; and (4) any willfulness or bad faith

16  by the party seeking modification."   Galdamez, 415 F.3d at 1020.   The Court has the discretion

17  to exclude the proffered evidence if the pretrial order is violated.   See Local Rule 283(c); Fed. R.

18  Civ. P. 16(f)(1)(C) ("On motion or on its own, the court may issue any just orders, including

19  those authorized by Rule 37(b)(2)(A)(ii)-(vii), if a party or its attorney . . . fails to obey a

20  scheduling or other pretrial order."); Fed. R. Civ. P. 37(b)(2)(A)(ii) ("prohibiting the disobedient

21  party . . . from introducing designated matters in evidence"); Lind v. United States, No. CV-13-

22  00032-TUC-JAS, 2016 WL 11652879, at *2 (D. Ariz. July 6, 2016) ("The Court holds that all of

23  Plaintiff's untimely evidence implicated in the three motions at bar are excluded as time-barred

24  by this Court's Scheduling Orders; this untimely evidence will not be considered by the Court

25  and will not be admissible for any purpose at the trial in this case.").

26         The Court finds the degree of prejudice or surprise to the Defendants is substantial, given

27  the Plaintiffs' designations were not submitted until May 7, 2021, the morning of the fourth day

28  of trial, which was the last day any witnesses testified, and after almost all witnesses that had

1    completed testimony had been excused.  Defendants did not have proper time to properly

2    counter-designate deposition testimony.  Some ability to cure prejudice was present given

3    Defendants did mount objections to specific designations, though under time-pressure given they

4    were filed on May 10, 2021, following the weekend break after the trial day May 7, 2021, and

5    submitted while preparing for closing arguments that were held on Monday May 10, 2021, and

6    while submitting a response to Plaintiffs' motion to admit the testimony of McComb.  (ECF Nos.

7    176, 177, 179, 180, 182.)  However as Defendants stated in opposition, they were unable to

8    submit counter designations to address many portions of the belated designations.  (ECF No. 179

9    at 2.)

10          Given the designations were not submitted until the morning of the fourth day of trial,

11   and the final day that witnesses presented testimony, there is a substantial impact on the orderly

12   and efficient conduct of the trial.  As explained in Defendants' filing: the parties appeared for a

13   status conference on April 22, 2021 (ECF No. 149); Defense counsel informed the Court that

14   Yussif was not available to testify at trial because of his serious medical condition; counsel for

15   Plaintiffs agreed that Yussif's deposition testimony given in the Perez Malpractice Case would

16   be used at trial in lieu of his live testimony; the Court ordered the parties to file deposition

17   designations for Yussif by April 26, 2021, and counter designations by April 29, 2021 (ECF No.

18   150); Defendants timely filed their designations (ECF No. 162); Plaintiffs did not file any

19   designations, nor object to Defendants' designations by the deadlines; and instead filed the

20   designations on May 7, 2021.  These facts also tend to show a willfulness, or at least a

21   carelessness, underlying the failure by Plaintiffs to timely designate.

22          Accordingly, in consideration of the above factors and the pretrial order in this matter, the

23   Plaintiffs' construed motion to modify the pretrial order to designate deposition testimony of

24   Yussif shall be denied, and the late-filed deposition designations of Yussif shall be excluded

25   from consideration as evidence.  See Galdamez, 415 F.3d at 1020; Fresno Rock Taco, 2013 WL

26   2182864; Local Rule 283(c); Fed. R. Civ. P. 16(f)(1)(C).

27          **C.    Deposition Designations of Berj Apkarian and Kalwant Dhillon**

28          On April 26, 2021, in submitting objections and counter-designations to Defendants'

1   deposition designations, Plaintiffs designated testimony of Apkarian and Dhillon as counter-
2   designations, despite the fact that Defendants designated no testimony from Apkarian or Dhillon.
3   (ECF No. 160 at 3-4.)  On April 29, 2021, Defendants submitted objections and a motion to
4   strike the counter designations of Apkarian and Dhillon.  (ECF No. 170.)  Defendants argue that
5   Plaintiffs' counter-designations violate Federal Rule of Civil Procedure 32 and the Court's
6   pretrial orders because Defendants did not designate any portion of the Apkarian and Dhillon
7   depositions, and thus these are not proper counter-designations.  (Id.)

8       Under Rule 32, after a party has offered part of a deposition into evidence, the opposing
9   party "may require the offeror to introduce other parts that in fairness should be considered with
10  the part introduced, and any party may itself introduce any other parts."  Fed. R. Civ. P. 32(a)(6);
11  see also Fed. R. Evid. 106 ("If a party introduces all or part of a writing or recorded statement, an
12  adverse party may require the introduction, at that time, of any other part . . . that in fairness
13  ought to be considered at the same time."); In re Pac. Fertility Ctr. Litig., No. 18-CV-01586-JSC,
14  2021 WL 2075560, at *1 (N.D. Cal. May 24, 2021) ("This principle is known as the rule of
15  completeness and it exists to avert misunderstanding or distortion caused by introduction of only
16  part of a document or recording.") (quoting United States v. Vallejos, 742 F.3d 902, 905 (9th Cir.
17  2014)) (internal quotation marks omitted).

18      Defendants argue Plaintiffs seek to use the deposition testimony of Apkarian and Dhillon
19  not to complete the testimony of any witness' deposition testimony that Defendants designated,
20  but rather to rebut or introduce additional testimony they failed to timely designate.  (ECF No.
21  170 at 2.)  Defendants argue this is improper under Rule of Procedure 32 and Rule of Evidence
22  106, as they do not permit using one witness' testimony to complete the testimony of another,
23  and do not allow for rebuttal of designated testimony.  (Id.)  The Court agrees.

24      Plaintiffs submitted a response to Defendants' objections on April 30, 2021.  (ECF No.
25  172.)  Plaintiffs argue that they had subpoenaed Yussif who interviewed these doctors; within the
26  last two weeks before the filing, Plaintiffs were notified that Yussif was not available to attend
27  trial due to his illness; Yussif's absence required a counter-designation of Apkarian; Plaintiffs
28  did not have Apkarian under subpoena because Plaintiffs planned on Yussif testifying;

12

1   Defendants filed a revised report which raises "new issues"; and Defendants' extensive

2   designations of Bella Albakova require the designation of Dhillon's testimony.  (ECF No. 172.)

3        The Court does not find Plaintiffs' generalized and vague arguments availing.  The Court

4   has reviewed the designations of Apkarian and does not find anything that would only be

5   relevant because of the absence of Yussif as a witness at trial.  None of the designations of

6   Apkarian specifically mention Yussif.  Further, while Plaintiffs proffer that Yussif interviewed

7   both of "these doctors" (ECF No. 172 at 2), it is an undisputed fact that Yussif did not interview

8   Dhillon during his investigation.  (UF 14, ECF No. 88 at 4.)  Further, given Dhillon was a

9   surgeon and primary witness present in the operating room, it is not clear why all of a sudden the

10  fact that Defendants designated testimony from Albakova, designation of testimony from Dhillon

11  is necessary.  Plaintiffs should have been keenly aware of any need to designate the testimony of

12  Dhillon well before any testimony of Albakova was designated.

13       Aside from the Court not being swayed by these specific arguments offered by Plaintiffs,

14  more importantly, the Court finds the counter-designations are not appropriate counter-

15  designations under Federal Rule of Civil Procedure 32(a)(6), nor Federal Rule of Evidence 106.

16  See Phoenix Techs. Ltd. v. VMware, Inc., No. 15-CV-01414-HSG, 2017 WL 2001981, at *10

17  (N.D. Cal. May 11, 2017) ("The burden of establishing the applicability of the rule of

18  completeness falls on the party seeking to have a counter-designation played in the other party's

19  case.").  Plaintiffs provide no legal authority or legal argument rebutting Defendants' arguments

20  that would refute the clear application of these rules.  Further, aside from failing to correspond to

21  any deposition testimony from Dhillon or Apkarian designated by Defendants, as Defendants did

22  not designate any, the counter-designations failed to identify *any* testimony designated from *any*

23  witness that these counter-designations seek to address or complete such that no adequate

24  evaluation can be made whether these designations are appropriate under the rule of

25  completeness.

26       Further, if considered designations and not counter-designations, Plaintiffs' proffered

27  designations would be untimely in violation of the Court's fifth amended pretrial order and April

28  14, 2021 order requiring the parties to file deposition designations on or before April 20, 2021.

(ECF Nos. 134, 145.)  Plaintiffs did not seek leave to file late designations and provided no accompanying motion, request, or proffered reasonable justification for the late disclosures until Defendants submitted objections.  Alternatively, even if the Court were to construe Plaintiffs' April 30, 2021 response as a motion to modify the pretrial order to allow for the designation of the depositions of Apkarian and Dhillon, such motion would be denied and the late-filed deposition designations of Apkarian and Dhillon would be excluded, under the standards discussed in the previous subsection.  See Galdamez, 415 F.3d at 1020; Fresno Rock Taco, 2013 WL 2182864; Local Rule 283(c); Fed. R. Civ. P. 16(f)(1)(C).  Specifically, the Court finds: (1) the prejudice to Defendants outweighs any need to modify the pretrial order; (2) there was limited ability for Defendants to cure such prejudice on the eve of trial; and (3) the modification to the orderly and efficient conduct of the trial is substantial given such prejudice.

Accordingly, in consideration of the above, the Defendants' objections are sustained, and Defendants' request to strike Plaintiffs' deposition designations of Apkarian and Dhillon shall be granted.

### III.

### FINDINGS OF FACT

The Court makes the following findings of fact based on the documentary and testimonial evidence introduced at trial, as well as the undisputed facts stipulated to by the parties and entered into the record through the Court's December 4, 2019 pretrial order.  (ECF Nos. 87, 88, 89.)  The Court has considered the credibility of the testifying witnesses and documentary evidence in resolving conflicts and determining the weight given to such evidence when determining these findings of fact.

### A.   The Perez Surgery

At all relevant times, Plaintiff Dr. Chaudhry, was a cardiothoracic surgeon with Plaintiff Valley Cardiac, and had substantial financial and leadership interests in Valley Cardiac.  In 2007 Dr. Chaudhry joined Community Regional Medical Center ("CRMC"), located in Fresno, California.  Dr. Chaudhry became the busiest heart surgeon in the state of California, completing about 300-350 surgeries per year, and testified that over the course of about 8 years, had

1    completed about 2,000 heart surgeries.  Dr. Chaudhry was instrumental in making CRMC the

2    busiest private heart surgery program in California, excluding programs such as Kaiser

3    Permanente, or university hospitals.

4         During heart surgery, the sternum is cut, the ribs are not cut from the sternum.  About ten

5    to fifteen minutes after the bypass portion of the surgery is completed, the patient usually comes

6    off the heart and lung machine (often referred to as the "pump"), which is operated by the

7    perfusionist.  The chest is open and the surgeon and staff observe the heart as the heart and lung

8    machine is slowed down; then when the heart is tolerating the transition and there is no bleeding,

9    the patient can gradually come off the heart and lung machine, and the machine can be shut

10   down.  The surgeon then removes the catheter lines, and the chest is closed.  Surgeons are

11   generally not required to stay with patients throughout the entire recovery.  The anesthesiologist

12   is required to stay until the patient is awake to let the drugs wear off over three to five hours, and

13   once the anesthesiologist feels the patient is well enough, the patient goes to the intensive care

14   unit under the care of nursing staff.

15        On April 2, 2012, Dr. Chaudhry performed an open-heart surgery on a patient by the

16   name of Silvino Perez ("Patient" or "Perez").  This surgery was performed at CRMC in Fresno,

17   California.  The diagnosis for Perez, both preoperative and postoperative, was (a) ascending

18   aortic aneurysm, and (b) aortic valve stenosis, bicuspid valve.  Present in the operating room for

19   the surgery, in addition to Dr. Chaudhry, were the following: (a) the assistant surgeon Kalwant

20   Dhillon, M.D. ("Dhillon"); (b) the anesthesiologist Ashwin Bhatt, M.D. ("Bhatt"); (c) the

21   physician assistant Bella Albakova ("Albakova"); (d) the perfusionist Aaron Schreur

22   ("Schreur"); (e) the scrub nurse Martha Allen ("Allen"); (f) a circulating nurse Geri Breaux

23   ("Breaux"); and (g) another circulating nurse Nichole Kroes ("Kroes").

24        By April of 2012, Dr. Chaudhry had worked with Dhillon since 2005; with Bhatt for at

25   least 1500 cases; with Allen, Kroes, and Breaux for hundreds of surgeries; with Albakova for

26   hundreds if not thousands of surgeries; and with Schreur for about five (5) years and about 250

27   surgeries.  Prior to the Perez surgery, Dr. Chaudhry witnessed no animosity by Schreur toward

28   Dr. Chaudhry; had disagreements with Allen but didn't feel she had animosity toward him; and

1   witnessed no animosity by Allen or Breaux.[3]

2   Dr. Chaudhry generally dictates post-operative notes in the operating room at the
3   dictation table, then goes to the surgery table to make sure the patient is stable, then leaves.  The
4   dictation table is about five to seven feet from the operating table.  (Exs. 116, 117.)  The
5   perfusionist Schreur would generally prepare a perfusion record or summary of the operation,
6   and provide that information to Dr. Chaudhry to finish the post-operative reports.  In this case,
7   Dr. Chaudhry did not get the physical record to finish the dictation, and Schreur read the
8   information orally while dictating.

9   Perez came off of bypass at 11:45:47 a.m., meaning Perez was taken off the heart and
10  lung machine, but the operation was not over and the surgeons continued working.  (See
11  Perfusion Record, Ex. 102 at 1.)  The last entry in the Perfusion Record for the heart and lung
12  machine is at 12:09 p.m., however Schreur remained in the operating room after such time
13  performing work.  Dr. Chaudhry was at the dictation table computer before 12:09 p.m. putting in
14  postoperative notes.

15  After Dr. Chaudhry completed the dictation, he went on the anesthesia side of the
16  operating room and saw that the blood pressure was a little high.  Dr. Chaudhry told staff to
17  adjust the blood pressure and take off anesthesia, said to stop epinephrine, and told staff to start
18  milrinone to lower the blood pressure.

19  Dr. Chaudhry did not leave the operating room at any time prior to 12:15 p.m.  At
20  approximately 12:15 p.m., and perhaps a minute or two later, Dr. Chaudhry left the operating
21  room, leaving his physician assistant Albakova and assistant surgeon Dhillon to complete the
22  surgery, including the closure of Perez's chest.  Dhillon and Albakova left the operating room
23  around 12:35 p.m.

24  After Dr. Chaudhry left the operating room and the hospital, Perez was bleeding an
25  abnormal amount.  Dr. Chaudhry was called at 12:45 p.m., and Dr. Chaudhry instructed Bhatt to

---

[3]  Dr. Chaudhry also stated he had witnessed no direct animosity from Albakova by that time.  When asked if Dr.
Chaudhry knew Albakova to be a liar during their seven (7) year working relationship, Dr. Chaudhry stated they
broke up in May of 2013, when she was cheating on Dr. Chaudhry, so she had been caught lying at that point.
However, Dr. Chaudhry trusted her, and still trusts her work as he believes she had impeccable work ethics and
impeccable hands in the operating room.

1   continue giving blood products.  Perez developed arrhythmias (abnormal heart beats) which

2   progressed to ventricular fibrillation.   The remaining staff began CPR with intermittent

3   defibrillation but were unsuccessful at getting a normal rhythm back.  At around 12:58 p.m., Dr.

4   Chaudhry was called to return to the operating room because the patient had arrested.  CPR was

5   continued until around 1:12 p.m. when Albakova returned.  Albakova then opened Perez's chest

6   and found the heart had been perforated.  Albakova tried to cannulate to allow Perez to go back

7   on cardiopulmonary bypass, but Albakova struggled and frantically spoke to Dr. Chaudhry over

8   the phone to get instructions.   The anesthesiologist Bhatt then put on gloves to assist with

9   cannulation and at 1:24 p.m. Schreur commenced cardiopulmonary bypass on a limited basis.  At

10  around 1:29 p.m., Dr. Chaudhry returned to the operating room with Dr. Robert Stewart

11  ("Stewart").  Stewart and Dr. Chaudhry adjusted the cannulas and Perez was returned onto a full

12  cardiopulmonary bypass.

13          It was determined that Perez's ventricle had been lacerated by the chest compressions

14  which had caused the recently operated sternum to fracture and slice into the heart chamber.

15  This resulted in a long and difficult further operation and Perez is believed to have suffered

16  hypoxic brain injury as a result of a period of poor perfusion.

17          The Perfusion Record contains notes entered by Schreur on April 2, 2012, that read in

18  part:

19          Patient codes approximately 12:55 [p.m].  Dr. Chaudhry called at 12:58 [p.m.].
            CPR is started with intermittent defibrillation.  Albakova and Bhatt attempt
20          cannulation around 1:20 [p.m.].  Patient started on partial CPB around 1:25
            [p.m.].  Chaudhry enters at 1:29 [p.m.] with Dr. Stewart.  They take over and
21          patient is put on full CPB at 1:38 [p.m.].  Pump was primed with 2L Normosol
            and 60,000 units of heparin.  The high heparin dose was due to the patient having
22          no circulation, thus no way for anesthesia to give loading dose.

23  (Ex. 102 at 4.)

24          Schreur also entered notes into his cellular phone throughout the day of the Perez

25  surgery.   These notes state in part that: Dr. Chaudhry leaves at 12:03 p.m.; at 12:35 p.m.

26  Albakova and Dhillon finish the closing of the chest and leave; Perez is bleeding; Dr. Chaudhry

27  is called at 12:45 p.m. and tells Bhatt to give blood products; at 12:58 p.m. Dr. Chaudhry is

28  called to return; at 1:12 p.m. Albakova opens the chest, is "hysterical, but tries to take

1   instructions from [Dr. C]haudhry over the phone"; and at 1:15 p.m. Bhatt put on gloves and tried

2   to help cannulate.  (Ex. 512 at 1.)  Schreur's phone notes also indicate that an x-ray was taken

3   sometime between 12:45 p.m. and 12:55 p.m., and that at 5:45 p.m., Dr. Chaudhry "sa[id] to get

4   patient to cvu quickly, there is nothing else he can do.  [6:15 p.m.] [C]huadhry called for

5   excessive bleeding, he calls [S]tewart to come in.  [7:00 p.m.] [S]tewart reopens, and at [7:20

6   p.m.] finds surgical bleed and takes care of it."  (Ex. 512 at 1.)

7          Schreur wrote a written account of the events surrounding the Perez surgery, at the

8   request of James Robillard ("Robillard"), who was Schreur's boss.  (Ex. 511.)  Schreur

9   understood Robillard requested the written account because Robillard intended to file a

10  complaint to CDPH or another agency.  The written account was completed within two (2) days

11  of the surgery.  Schreur's written account states in relevant part:

12          Operation goes well and patient comes off CPB at [11:45 a.m.].  At [12:03 p.m.]
            Chaudhry finishes his op. note and leaves the room while patient's chest is still
13          open, as he frequently does, leaving his PA [Albakova] and assistant surgeon to
            close.  Patient is closed at [12:35 p.m.] and the PA and asst. surgeon leave the
14          room.  The patient is still bleeding an abnormal amount and is never moved from
            the op. table.  Chaudhry is called at [12:45 p.m.], and he gives orders to anesthesia
15          to continue giving blood products.  The patient continues to bleed and by 12:55
            p.m.] has put out 1500 ml of blood into the chest tubes.  Patient goes into
16          hypovolemic shock and then v-fib at [12:55 p.m.].

17          Cardiac team begins CPR with intermittent defibrillation but is unsuccessful at
            getting a normal rhythm back.  At [12:58 p.m.] Chaudhry is called to rush back to
18          the OR because the patient has arrested and we need him immediately.  Team
            continues CPR until [1:12 p.m.] when the PA arrives, opens the chest and finds
19          the heart has perforated.  She tries to cannulate to go on CPB, but struggles
            greatly as she has never done this on her own before.  She talks with Chaudhry on
20          the phone to get instructions.  The anesthesiologist puts on gloves to assist with
            cannulation and at [1:24 p.m.] the perfusionist commences CPB on a very limited
21          basis using pump suckers for venous return.  At this point the patient has had a
            MAP of around 20 mmHg for close to 30 minutes.  CPR was only minimally
22          effective because the heart was perforated and unable to properly eject volume
            and create a pulse pressure.
23
            At [1:29 p.m.] Chaudhry finally arrives in the OR, 31 minutes after being called
24          for a stat return.  With him is another cardiac surgeon, Dr. Robert Stewart.  They
            adjust the cannulas and at [1:39 p.m.] the perfusionist brings the patient up to full
25          flow CPB.  At [1:55 Chaudhry asks an aid to get his car keys and repark his car
            from the patient drop off area so it doesn't get towed (he obviously had left the
26          hospital facility while his patient was still on the OR table and had to drive back
            after being called).  The patient is stabilized on CPB but is unable to come off.  At
27          [3:53 p.m.] the patient is placed on ECMO support.  At [5:45 p.m.] Chaudhry
            again leaves the room despite the patient bleeding profusely into the chest tubes.
28          At [7:00 p.m.] Dr. Stewart arrives back to assess the patient.  He opens the chest

and finds a surgical bleed, which he then repairs. The patient stabilizes somewhat, but continues to ooze blood into the chest tube. At [9:40 p.m.] the patient is brought to the CVU on ECMO and IABP support.

It is now [April 5, 2012] and the patient remains on ECMO and IABP. His neurological status is not known, but he has not woken up yet. It would appear that there is significant, if not total, brain death. However, this can't be fully determined at this time.

I believe this case needs to be thoroughly investigated. There is gross negligence in this case where it took the primary cardiac surgeon over 30 minutes to return to the OR after being called to treat the cardiac arrest of his patient. He had left the building while his patient was still on the table, and likely while the patient's chest was still open and his condition was critical. These situations are very common where a patient does not do well post-CPB and needs to go back on in order to reperfuse and recover. In this specific case, had the surgeon been there to perform the procedure in a timely manner, I believe the patient's chances for recovery would be high. But because it took so long, partial brain damage is all but a certainty. Ultimately, death is very likely in the next few days for this patient. It is unacceptable that the patient was subjected to this kind of gross negligence.

I must emphasize that my identity remain anonymous in regards to this case. This surgeon has so much power at this institution that if it was found I had made a complaint against him he would certainly come after me and have me fired. It is for this reason that he has avoided complaints on multiple ethics issues in the past involving sexual misconduct, operating while intoxicated, and substandard care . . .

(Ex. 511 at 1-2.)

In writing the chest was "still open," Schreur meant that the sternal wires had not been closed putting the sternum back together. In writing "as he frequently does," Schreur meant that it was Dr. Chaudhry's custom to allow his assistant surgeon and physician assistant to close the chest in such manner, which would entail Dr. Chaudhry leaving the operating room.[4]

## B.    The Investigation of the Perez Surgery by CDPH

Here, the Court will summarize the role of the relevant agencies and employees that

---

[4]  Dr. Chaudhry and Schreur were the only witnesses that testified during this trial that were physically present in the operating room for the Perez surgery. Dr. Chaudhry testified that he disagreed with Schreur's account. Dr. Chaudhry also testified he learned Perez "coded" at 12:59 p.m., and Dr. Chaudhry was back at the hospital at 1:18 p.m. Dr. Chaudhry proffered the medical staff bylaws, his call coverage contract, and his privilege cards, all state he has to answer page calls in fifteen (15) minutes and be in hospital in thirty (30) minutes, and that he was at hospital within nineteen (19) minutes. Dr. Chaudhry proffered that the "swipe card" records reviewed while testifying meant Dr. Chaudhry was in the hallway at 1:18 p.m. and thus he must have been on the second floor on the way to the operating room, and running through to the operating suite. The Court addresses the credibility of this testimony in conjunction with all of the admitted evidence and testimony, including the designated testimony of witnesses that did not testify in person at this trial nor were specifically deposed in this action, but were present in the operating room, in the legal analysis section below.

1  conducted the investigatory and regulatory functions involved in this action, as was presented to

2  the Court in the testimony of Defendants, other witnesses, and documentary evidence.   In

3  Section IV(A), infra, the Court provides the relevant statutes and regulations underlying the

4  agencies and survey investigation process.

5       The CDPH oversees licensed health care facilities, and does not directly oversee

6  physicians such as Dr. Chaudhry.  Rather, the Medical Board of California oversees physicians.

7       Complaints made to CDPH regarding covered health care facilities are processed by

8  CDPH through the Aspen Complaint Tracking System ("ACTS"), and entered into an ACTS

9  complaint/incident investigation report.  (See Ex. 502.)  The form is a California form approved

10 by the federal government.  CDPH staff fills in information and CDPH assigns a supervisor to

11 the complaint.  After staff has verified sufficient information, the evaluator gives the information

12 to the supervisor to make a decision whether it is referred to the Centers for Medicare and

13 Medicaid Services ("CMS") or stays with the State.[5]   CDPH employees conduct the initial

14 survey investigation, then the report goes to CMS.  CMS then determines what should be done

15 on the federal side, and then directs the state agency how to proceed.

16      CDPH and CMS investigation surveys are completed by assigned surveyors.  Surveyors

17 collect sources of evidence consisting of observations, interviews, or record reviews, analyze that

18 data, put the deficient practices together if applicable, and submit the information to a supervisor

19 or manager for review.  The written report outlining the deficient practice is called a Statement

20 of Deficiencies ("SOD"), or referred to as a "2567."  Both CDPH and CMS may issue a SOD.  A

21 SOD is submitted to the hospital to address systemic problems of the hospital or facility,

22 including compliance with the Conditions of Participation for CMS.

23      A Plan of Correction ("POC") is created after the investigated facility obtains the SOD,

24 whether state or federal, and the hospital or other facility enters their corrective plan of action

25 _____

26 [5]  CMS is a component of the Department of Health and Human Services, administers the Medicare program." Fox
    Ins. Co. v. Centers for Medicare & Medicaid Servs., 715 F.3d 1211, 1214–15 (9th Cir. 2013).  The term "State" is
    used generally herein to refer to the investigations conducted or reports issued by CDPH as an agency of the state of
27  California, or its employees, as opposed to the federal CMS investigations or reports.  In Section IV(A), the Court
    provides the statutes and regulations governing the relationship between CMS and CDPH and the parallel processes
28  for the investigations they conduct, and reports they issue.

1  into a blank column on the SOD document to address the stated deficiencies, for the purpose of

2  ensuring the facility does not repeat the deficient practices.  The left-hand side of the document

3  contains the SOD, and the right-hand side contains the POC.  CDPH uses the format for a POC

4  as provided by CMS.  Following completion of a SOD/POC, the hospital or facility is required to

5  post the SOD/POC, generally by either putting the report in a survey results binder, or on a

6  bulletin board, where the public can ask to see or have access.

7      A SOD does not target a particular individual practitioner or doctor, though a facility may

8  discipline individual practitioners afterward or in relation to the POC.  CDPH does not have the

9  direct authority to deny or limit Medicare reimbursement to the facility, as that falls under the

10  authority of CMS.  For a federal survey, CDPH submits the survey report to CMS for final

11  review, not directly to the hospital.

12      At all relevant times, Defendant Lopez, Defendant Campbell, formerly named Defendant

13  Kappmeyer, and nonparties Joan Spence ("Spence") and Adams Yussif ("Yussif"), were

14  employees of the CDPH and acting under color of state law.  As CDPH employees, they were

15  not federal employees during the relevant investigation, but acted as agents of the federal

16  government in applying the rules and regulations that govern health care facilities for which

17  CDPH has jurisdiction over.

18      In 2012 and part of 2013, Lopez was employed by CDPH as a Health Facilities Evaluator

19  Supervisor, and assigned to the Fresno District Office.  From October 31, 2013 to August 2,

20  2016, he held the position of Staff Services Manager I.  As of the time of his testimony in this

21  trial, he was a Health Facilities Evaluator Manager II.

22      At all relevant times, Defendant Campbell was employed by the CDPH as a Health

23  Facilities Evaluator Manager I.  Prior to her promotion to that position that occurred in 2012

24  around the time of the Perez investigation, she was a Health Facilities Evaluator Supervisor.

25  Since November 30, 2014, Defendant Campbell has been retired.  Spence was Campbell's

26  supervisor at the time of the investigation.

27      At all relevant times, Yussif was employed by the CDPH as a Health Facilities Evaluator

28  Nurse, with surveyor identification number 27126.  Lopez was Yussif's supervisor during the

State investigation and relevant time when the State reports were issued.  In 2012, Lopez and Campbell were peers, as they were both supervisors.  In 2012, Kappmeyer was not on Lopez's team, and did not report to him.  By 2013, Lopez reported to Campbell.

On April 11, 2012, CDPH received an anonymous call alleging that Dr. Chaudhry left the operating room while Perez's chest was still open, then left the hospital before the surgery was completed leaving his physician assistant Albakova to take over the surgery, and that Perez went into cardiac arrest.  The complaint was processed by CDPH and entered into an ACTS complaint/incident investigation report.  (See Ex. 502.)  The ACTS complaint triggered a State investigation.  The intake spot for "SA Contact" stands for "State Agency Contact."  Campbell was the State Agency Contact listed on the initial state intake form because Campbell is the supervisor generally assigned to oversee CRMC.  However, Lopez was the supervisor that assigned CDPH surveyor Yussif to this initial State-complaint investigation after Lopez was informed by Spence, the district manager of CDPH at the time, when the anonymous complaint for the Perez surgery was put into the system.  (See Exs. 500 at 9, 502.)[6]

On or about April 16-19, 2012, CDPH began the initial State investigation of the anonymous complaint.  Given the Perez surgery allegations were considered a serious priority, there needed to be an on-site visit begun within 24 to 48 hours, and Yussif commenced such on-site investigation.  During his investigation, Yussif did not interview Drs. Chaudhry, Dhillon, or Bhatt, nor the physician assistant Albakova.  Dr. Chaudhry was aware someone from CDPH was at CRMC investigating the Perez surgery.  Dr. Chaudhry found out about the investigation when Dr. Jeffrey Thomas ("Thomas") told him the "State" was there.  Dr. Chaudhry provided a written statement for Thomas, and turned it into the medical staff office at CRMC.

Yussif, the state surveyor of record collected evidence and evaluated the evidence for the initial State investigation.  Lopez's role at CDPH included reviewing SODs under the agency's

---

[6]  The Court notes that Plaintiffs' counsel pressed Campbell that it was in fact her that assigned the complaint to Yussif.  In deposition testimony from the Perez Malpractice Case designated by Defendants, the Court notes that Yussif in fact testified that Campbell called him and asked Yussif to investigate CRMC.  (Dep. Adams Yussif November 9, 2015 ("Yussif Dep."), 25:22-26:6.)  However, an email dated April 11, 2012, reflects that Spence wrote to Lopez "can you assign this please in the absence of Shirley [Campbell]."  (Ex. 500 at 9.)  Campbell was cc'ed on the email.  (Id.)  Campbell conceded in testimony it is possible she could have assigned to Yussif.  Whether Campbell or Lopez assigned the initial investigation is not determinative of any ultimate conclusions by the Court.

1   principles of investigation, looking at supportive evidence, and ensuring the written product

2   followed the principles of documentation.   Lopez and Campbell were not directly coordinating

3   the State investigation while it was ongoing at CRMC, however, as supervisor, Lopez was aware

4   of the allegations and Yussif's preliminary findings from the initial State investigation, and

5   generally oversaw the investigation at that point.  It is an undisputed fact that at all relevant

6   times, Lopez verified and supervised the two investigations of CRMC as related to the heart

7   surgery operation of Perez by Dr. Chaudhry, and made the final decision as to the accuracy of

8   the State Report published in 2013.[7]  (UF 4.)

9        While Yussif was supervised by Lopez, given CRMC was assigned to Campbell, Lopez

10  would have reviewed the information and communicated the preliminary findings of the State

11  investigation to Campbell to determine the next step, and the next step here was to inform CMS

12  that there were problems that may need to be investigated on the federal side.  CDPH is expected

13  to report to CMS any serious problems with the hospital provider, and here, the complaint and

14  preliminary findings obligated CDPH's office to inform CMS of the results of the April 2012

15  investigation into CRMC, which then authorized the federal complaint validation survey that

16  began on July 13, 2012.  Thus, based on the results of Yussif's initial investigation, the CMS

17  investigation was triggered.

18       **C.    The CMS Investigation**

19       Campbell and Kappmeyer were co-surveyors assigned to the federal-complaint validation

20  investigation which took place from July 13, 2012 to July 17, 2012 (the "CMS Investigation").

21  Spence was a supervisor over the CMS Investigation.  Dr. Everette Davis ("Davis"), also

22  provided consultant work on the federal investigation.  During this time, as CRMC was not

23  ────────────────────────────────────────────

[7]  When the proposed POC was later returned by CRMC, Lopez's role was to review the right hand side of the POC,

24  looking at the content and the action that was needed in order to address the deficient practice.  Lopez would read
    the left side for content (SOD), and for supportive evidence that relates to the deficient practice, as the right side of

25  the form (POC), must address actions in order to correct deficiencies.  Lopez does not generally, and did not in this
    case, retrieve or review all of the investigative notes or supportive data at that time, but rather, reviewed the content

26  of the deficient practice, the sources of evidence, and how it relates to the deficient practice in order to guide the
    hospital to direct their corrective actions.  Before issuance, the report would then go to next level of review, because

27  of the involvement of an administrative penalty.  Specifically here, the report would have gone to the manager of the
    office, then to Davis as the medical consultant, then to the office of legal services for CDPH, and then to the Branch

28  Chief prior to issuing the combined SOD and POC form.  Lopez was not involved during this further review.

1   assigned to Lopez as a supervisor, Lopez was not involved in this part of the process.

2       Campbell initially received the complaint typed on an ACTS form used to initiate a CMS

3   investigation, and then entered the information into the ACTS system.  (See Ex. 501 at 1; Ex.

4   103 at 1.)  Under "Intake," the form stated:

> Patient was having open heart surgery and his surgeon, Dr. Pervaiz Chaudhry, left
> the operating room while the chest was still open and then left the hospital before
> the surgery was done leaving his PA to take over their surgery while he went to
> lunch.  Patient was bleeding profusely.  The patient arrested in the operating room
> and the surgeon was not even in the hospital to attend to the patient.  It took Dr.
> Chaudhry 30 minutes to get back into the operating room and by then the patient
> had very little blood pressure for approx 30 minutes.  The patient had to be put on
> life support and is in a coma.  ¶ The patient went into hypovioemic shock and
> then cardiac arrest.  The patient was resuscitated and stabilized with the support of
> ECMO and a balloon pump.  This patient is now in a state of near total brain
> death as a result of being in arrest for such a long duration.

11  (Exs. 103 at 1, 501 at 1.)

12      The CMS Investigation covered CRMC's compliance with the federal Conditions of

13  Participation under the Code of Federal Regulations.  Once the CMS survey begins, it follows

14  the federal process of collecting data and determining whether or not there is a deficient practice,

15  and CDPH has ten (10) business days in order to submit a SOD to CMS for review.  While the

16  investigation's focus was the Perez surgery incident, it was broader in that it looked at CRMC's

17  policies and procedures, the governing body, hospital staff, and reviewed the hospital system as a

18  whole to ensure proper functioning under the Conditions of Participation.

19      There were five CMS categories of deficiencies that were investigated by Campbell and

20  Kappmeyer: (1) Medical Staff; (2) Medical Staff Bylaws; (3) Surgical Services; (4) Organization

21  of Surgical Services; and (5) Operating Room Policies.   (Ex. 501 at 1.)   Campbell and

22  Kappmeyer essentially shared the category of Surgical Services because Campbell was looking

23  at the overall facility, and within that category is the Professional Affairs Committee, the

24  Surgical Committee, and the Medical Executive Committee.   Kappmeyer covered Operating

25  Room Policies, and Campbell covered Medical Staff and Medical Staff Bylaws.

26      During the CMS investigation Campbell and Kappmeyer shared notes and exchanged

27  information.  Physical interviews were conducted at CRMC for four (4) or five (5) days.  Dr.

28  Chaudhry was the only staff person identified by name in the complaint.   Campbell and

1   Kappmeyer determined who was in the operating room, and then proceeded to interview people
2   who facility staff identified, and as relevant to the categories of investigation.  The investigation
3   included review of the rules and regulations, bylaws, and the staff who had oversight over the
4   relevant areas.  Interviewees are somewhat predetermined given the categories, and the facility
5   itself has its own list of key people within these categories.  To obtain a greater perspective on
6   the hospital's functioning, interviews of doctors and staff not involved in the Perez surgery were
7   utilized.

8        During the relevant time period, Laura McComb ("McComb") was an Associate
9   Administrator of Risk Management, Patient Safety and Regulatory Issues, for CRMC.
10   McComb's work included creating POCs in response to SODs, and specifically prepared POCs
11   in response to the State and CMS SODs for the Perez matter.  McComb has known Campbell
12   approximately thirty (30) years or more, and had worked together on CMS surveys before 2012.
13   McComb did not witness any animosity by Campbell toward the hospital or the staff involved,
14   and never experienced any personal bias by Campbell before July 2012 against anyone Campbell
15   was conducting surveys concerning.  McComb is identified as "Administrative Staff 2" in the
16   Federal CMS Report.  Thomas Utecht ("Utecht"), Chief of Quality Control of CRMC, was
17   McComb's immediate supervisor during the relevant time.

18        While McComb's staff initially sat in on the interviews conducted by Yussif in April of
19   2012, when the CMS investigation began in July of 2012, McComb was requested to exclude her
20   staff from being present during interviews.  McComb raised a concern to CRMC's legal
21   department of the risk of misquotations, however the legal department agreed to not have staff
22   present.  This was not the first time this type of request was made during survey investigations,
23   and surveyors, including Campbell and Kappmeyer, had made the request to McComb that
24   investigators be the only people in the room with interviewees in other matters prior to the Perez
25   investigation.

26        During the CMS investigation, Campbell conducted an interview of Dr. Chaudhry.  At
27   the end of the interview with Dr. Chaudhry, Campbell informed him that he could return to her
28   and  provide  additional  information.   Campbell  did  not  know  of  Dr.  Chaudhry  before  the

1  investigation and testified she had no animosity or bias toward him.

2      Campbell and Kappmeyer did not interview Dhillon, Bhatt, nor Albakova.  Campbell was

3  informed that Albakova was in Russia and unavailable for an interview.  Campbell did not try to

4  email or call Albakova in Russia.[8]

5      Campbell interviewed a Dr. Synn, a member of the board of trustees of the facility, to

6  obtain general information on the governing body.  Campbell interviewed Thomas, the president

7  of the medical department, to obtain information on conditions and systemic issues.  Campbell

8  conducted a phone interview with Robillard.

9      Yussif interviewed Schreur during the April 2012 investigation, and Kappmeyer

10  interviewed Schreur in July of 2012 during the CMS Investigation.  Campbell did not interview

11  Schreur.

12      Campbell interviewed Allen, and Campbell's recorded notes reflect that Allen told

13  Campbell that Dr. Chaudhry was "still there to end of skin closing."  (Ex. 104 at 16; 5/4 149.)[9]

14      Kappmeyer interviewed a Julianne Ely, a manager for the surgery department, regarding

15  policies and procedures, and issues regarding Dr. Chaudhry.  Kappmeyer interviewed a Julie

16  Carson, a manager of cardiovascular surgery, for the purpose of ascertaining requirements for

17  cardiovascular versus general surgery, concerning the different policies, procedures, rules,

18  regulations.  Kappmeyer interviewed Griselda Owens, to obtain information on Conditions of

19  Participation.  Kappmeyer interviewed Drew Walker, for general information regarding

20  construction and climate control in the OR.  Kappmeyer interviewed Stan Zulewski, a facilities

21

22  [8]  In designated deposition testimony from the Perez Malpractice Case, Albakova stated she never told anyone at
23  CDPH that she was out of the country, though she might have told "them," referring to CRMC, that she was leaving
   the country.  (Dep. Bella Albakova Vol. I, April 8, 2015 ("Albakova Dep. Vol I"), at 242:14-243:23.)  However,
24  Albakova never actually left the country, but was rather on "vacation" at home in Fresno, and is not aware of how
   CDPH concluded she was out of the country.  (Id.)  Albakova never received any communication from CDPH and
   stated she was available until she left in the beginning of May 2012 for vacation.  (Id.)

25  [9]  Further, designated testimony of Allen from the Perez Malpractice Case reflects she testified that Dr. Chaudhry
26  came over to the operating table during the skin closing after dictating notes.  (Dep. Martha Allen Vol. I Dec. 9,
   2014 ("Allen Dep. Vol I"), at 581:2-582:23.)  However, Yussif's notes of the interview with Allen dated April 18,
27  2012, reflect Allen told Yussif that Dr. Chaudhry "left the room and Dr. Dhillon and Bella [Albakova] were closing
   up."  (See Ex. 507 at 7.)  Campbell initially testified that she did not interview Allen, stating Kappmeyer interviewed
28  Allen, and Campbell stated she vaguely remembered Allen's timeline did not match with other reports.  However,
   Campbell's recollection was then refreshed by her notes that indicated she did interview Allen.

manager, to obtain information regarding climate control or other infection control issues.

Campbell interviewed Utecht in July of 2012, to evaluate whether the Perez incident was a systemic problem or isolated individual problem. Campbell utilized McComb as a kind of point-person to help coordinate documents and interviews. Campbell interviewed McComb for input regarding other staff and to obtain documents pertaining to policies and procedures.

Campbell reviewed the peer review file as to both Dr. Chaudhry and Albakova. During the CMS investigation, Campbell did not review any "swipe cards" which recorded when doctors, nurses and necessary personnel entered private rooms like the operating room.

In resolving conflicts in testimony and evidence, when conducting a CMS investigation, Campbell is trained not to interrogate, but to take the information as given, and then proceed to making a judgment call based on all of the information, drawing a conclusion, and utilizing interviews, policies, procedures, rules, regulations, bylaws, information from committees, and essentially everything that is provided or obtained.

The Court will excerpt some of the relevant notations in the ACTS Complaint/Investigation Report (Ex. 103), reflecting the investigation and interviews conducted by Campbell and Kappmeyer, that were incorporated in part or whole into the CMS SOD. The report states in part:

> Based on staff interview, clinical record and administrative document review, the hospital failed to ensure quality medical care was provided to patients and failed to ensure Medical Staff Bylaws and regulations were enforced when Cardiovascular Surgeon 1 (CV 1) left an open heart surgery prior to the closure of the chest. CV 1 instructed a non-surgeon practitioner (Physician Assistant 1) to close the chest and did not appoint a qualified medical professional in his absence. The dictated operative report for Patient 1's surgery did not reflect the participation of the non-surgeon. The operative report for Patient 1 did not reflect the critical condition of the patient after surgery . . .
> . . . The cumulative effect of these systemic problems resulted in the hospital's inability to ensure the provision of quality health care in a safe environment . . .
>
> . . . On 7/13/12 at 10:35 a.m., during an interview, CV 1 stated he directed PA (Physician Assistant) 1 to finish the case which meant she was to perform the remainder of the surgery – closure of the chest with wires (reference to the staples) and the rest of the closing. CV 1 stated he had checked all tubes and all was routine. CV 1 stated he allowed PA 1 to practice above her privilege card as "she was preparing for an Advanced Quality Practice Exam and for that, she needed so many cases with opening and closing the chest, and to cannulate the insertion of a cannula or tube into a hollow body organ the heart …' CV 1 said he was '… always there when she did this, until this time.' CV 1 stated he left the

27

surgery and went up to the unit to complete orders for the patient at about 11:30 a.m., and then left the hospital premises at about 12:40 p.m.  PA 1 was out of the country and was unavailable for an interview.

On 7/13/12 at 11:40 a.m., during an interview, CV1 acknowledged the entry that Patient 1 was transferred to the surgical intensive care unit in stable condition was an error.  HE stated this was his routine entry but it did not happen ( meaning the patient was not transferred to the SICU in stable condition but was transferred to the cardiovascular intensive care unit in critical condition) in this case.
During an interview on 7/16/12 at 11:30 a.m., MD 2 and Administrative (Admin) Staff 2, both stated CV 1 left the operating room prior to closure/stapling of the bones back together.  MD 2 and Admin Staff 2 stated PA 1 had stapled the bones in this case without the Cardiovascular Surgeon being present.  MD 2 and Admin Staff stated that CV 1 violated the hospital's Rules and Regulations under the Bylaws which does not permit the primary surgeon to leave the operating room prior to the patient being established as stable . . .

Based on observation, staff interview, and clinical record and administrative document review, the hospital failed to ensure surgical services were provided in accordance with acceptable standards of practice when:

1.  Cardiovascular Surgeon 1 (CV 1) left the operating room and the hospital premises prior to the stapling of the ribs back to the sternum (bone to bone closure) and prior to the closure of the remainder of the surgical site (fascia – tissue that holds soft organs in place, muscles and skin) during an open heart surgery for Patient 1 in violation of the hospital's "Rules and Regulations" . . .

3.  The CV 1 did not accurately dictate the operative report to reflect non-surgeon participation in the closing of the chest surgical site for Patient 1 and did not accurately reflect the condition of Patient 1 after the surgical procedure . . .

(Ex. 103 at 2-4.)

### D.    The Issued State and CMS Reports

As a result of the investigations, review process, and completion of the POC portion by CRMC, CDPH prepared a Statement of Deficiencies and Plan of Correction, dated February 14, 2013 ("State 2567" or "State Report"), and a Statement of Deficiencies and Plan of Correction, dated August 23, 2012 ("CMS 2567" or "Federal Report" or "CMS Report").

The State 2567 did not contain Dr. Chaudhry's name, and referred to him as "Cardiovascular Surgeon 1 (CVS 1)."  The State 2567 referred to Perez as "Patient 1," Albakova as "PA 1," and Dhillon as "MD 1."  The top of the State 2567 contains the heading "California Health and Human Services Agency [-] Department of Public Health."  (Ex. 113 at 1 (capitalization altered).)  The State 2567 notes that: "Representing the Department of Public Health: Surveyor ID # 27126, HFEN."  (Ex. 113 at 1.)  As noted above, Yussif's surveyor

1    identification number is 27126.

2    The State 2567 Statement of Deficiencies ("State Report" or "State 2567") found, among

3    other things, that "CVS 1 left the OR at 11:45 a.m.," that "PA 1 and MD 1 sutured the chest

4    closed with metallic wire at approximately 12:00 p.m. and then left the OR," that "CVS 1 left the

5    open-heart surgery on Patient 1 prior to closing of the chest and prior to stabilization in violation

6    of hospital medical staff bylaws," and "CVS 1 left in-charge an individual not qualified to be left

7    in charge (PA 1)."  (Ex. 113 at 3, 7.)

8    The CMS 2567 did not contain Dr. Chaudhry's name, and referred to him as

9    "Cardiovascular Surgeon 1 (CV 1)."  The CMS 2567 referred to Perez as "Patient 1," Albakova

10   as "Physician Assistant 1," Utecht as "MD 2," and McComb as "Administrative (Admin) Staff

11   2."  The top of the CMS 2567 contains the heading "Department of Health and Human Services

12   [-] Centers for Medicare & Medicaid Services."  (Ex. 505 at 1 (capitalization altered).)  The

13   CMS 2567 noted the document "reflect[ed] the findings of [CDPH] – Licensing and Certification

14   during a Complaint Validation Survey conducted on 7/17/12."  (Ex. 505 at 1.)  The CMS 2567

15   also noted: "Representing the [CDPH] – Licensing and Certification: Shirley Campbell RN

16   HFEMI, and Deidre Kappmeyer RN HFES."  (Id.)

17   The CMS 2567 found that the following "Conditions of Participation were not met:  42

18   CFR 482.22 Medical Staff and 482.51 Surgical Services."  Regarding Medical Staff, the CMS

19   2567 stated "the hospital failed to ensure quality medical care was provided to patients and failed

20   to ensure Medical Staff Bylaws and regulations were enforced when Cardiovascular Surgeon

21   (CV 1) left an open-heart surgery prior to the closure of the chest [and] instructed a non-surgeon

22   practitioner (Physician Assistant 1) to close the chest and did not appoint a qualified medical

23   professional in his absence."  (Ex. 505 at 1.)  Regarding Surgical Services, the CMS 2567 stated

24   "the hospital failed to ensure surgical services were provided in accordance with acceptable

25   standards of practice when . . . (CV 1) left the operating room and the hospital premises prior to

26   the stapling of the ribs back to the sternum (bone to bone closure) and prior to the closure of the

27   remainder of the surgical site (fascia – tissue that holds soft organs in place, muscles and skin)

28   during an open heart surgery for Patient 1 in violation of the hospital's 'Rules and Regulations.'

(Ex. 505 at 6-7.)

The CMS 2567 found the hospital did not meet the Conditions of Participation for deficiencies including but not limited to: (1) "the hospital failed to ensure quality medical care was provided to patients and failed to ensure Medical Staff Bylaws and regulations were enforced when Cardiovascular Surgeon 1 (CV 1) left an open-heart surgery prior to the closure of the chest," (2) "CV 1 instructed a non-surgeon practitioner (Physician Assistant 1) to close the chest and did not appoint a qualified medical professional in his absence," (3) "[t]he dictated operative report for Patient 1's surgery did not reflect the participation of the non-surgeon," (4) [t]he operative report for Patient 1 did not reflect the critical condition of the patient after surgery," and (5) "the hospital failed to ensure surgical services were provided in accordance with acceptable standards of practice."  (Ex. 505)

The CMS 2567 also noted that during an interview, "CV 1 stated he left the surgery and went up to the unit to complete orders for the patient at about 11:30 a.m. and then left the hospital premises at about 12:40 p.m."  (Ex. 505 at 3.)  The CMS 2567 also noted during an interview that: "MD 2 and Administrative (Admin) Staff 2, both stated CV 1 left the operating room prior to closure/stapling of the bones back together . . . [and] stated PA 1 had stapled the bones in this case without the Cardiovascular Surgeon being present . . . [and] CV1 violated the hospital's Rules and Regulations under the Bylaws which does not permit the primary surgeon to leave the operating room prior to the patient being established as stable."  (Ex. 505 at 3-4.)

Campbell reached the conclusion that Dr. Chaudhry instructed Albakova to close Perez's chest in his absence, and that the action violated CRMC's policies and procedures.  Campbell's conclusion was based on the totality of the interviews, including Schreur, Allen, Breaux,[10] Dr. Chaudhry, Utecht, McComb, and Robillard, in conjunction with a review of the hospital bylaws

[10] Specifically, Campbell relied in part on Kappmeyer's notes of interview with Breaux, although this interview is not expressly reflected in the CMS Report.  Kappmeyer's notes of her July 13, 2012 interview with Breaux reflect that Breaux stated the operation went well; "Dr. Chaudhry left.  Both Dr. Dhillon and Bella performed closure. (They start @ separate ends)  Dr. Dhillon is a general surgeon.  [Dr. Chaudhry [d]id not sit at desk to do orders . . . or operative report.  This was his practice.  He rarely stayed in OR to orders/operative report."  (Ex. 509 at 6.) Yussif's notes reflect Breaux informed him that Dr. Chaudhry's "usual is to leave the PA and the [assistant] surgeon to close the chest," and "[w]hen [Dr. Chaudhry] left the chest was not closed."  (Ex. 507 at 2.)

1   and procedures.  Campbell based the finding that Albakova was not qualified to close the chest
2   on the peer review file of Albakova, the bylaws, and by looking at what Albakova was granted
3   privileges for, as such privileges were not granted on Albakova's privilege card.

4          Admitted into evidence is a CDPH document entitled "7/12/12 CRMC list of information
5   needed," which describes what documents would have been requested from the facility for
6   CDPH, and to have available to Campbell and her team to review.  (Ex. 105.)  The list
7   specifically references: "Privileges for physician assistants specific to the cardiovascular surgical
8   program."  (Ex. 105.)  Through this request, Campbell received Albakova's privilege card and
9   her peer review file.  Campbell reviewed the privilege card of Albakova but did not take it from
10  facility as they do not take confidential documents.   As to the question of whether a
11  cardiovascular surgeon may delegate a duty to a general surgeon in the operating room,
12  Campbell's investigation found that the designee had to be a qualified professional as expressly
13  allowed on their privilege card, as indicated by the peer review information, and CRMC's rules
14  and regulations.[11]

15         Campbell found Dr. Chaudhry's absence caused Perez's decline due to Dr. Chaudhry's
16  designation to Albakova in closing the chest; there were issues from something being torn or cut
17  during the reattachment of the sternum; and Albakova did not have the privilege on her card to
18  be able to close.   Based on CRMC's bylaws and polices, Campbell concluded there were
19  systemic failures that caused the patient to have cardiac arrest, any one of such failures could
20  have caused the cardiac arrest, and concluded there were violations because Albakova didn't
21  have permission to do the wiring closure.

22         CRMC was subject to a governing document entitled "Community Regional Medical

_____

[11]  Campbell testified she did not specifically remember looking at the general surgeon Dhillon's privilege card but
does know that Albakova did not have such privilege on her card.  Campbell testified that in determining whether
Dhillon or Bhatt were qualified or not appropriately credentialed, Campbell believes she spoke with Utecht who told
her such designee had to be a cardiovascular thoracic surgeon, but does not recall for certain.  Utecht testified that he
never told Campbell that Dhillon or Bhatt were "not qualified as medical doctors in the operating room."  The Court
notes that the line of questioning specifically referenced whether Dhillon and Bhatt "were not qualified as medical
doctors," not whether they had certain privileges or were qualified do the closing of the chest during the surgery, or
whether Albakova could assist in the closing with Dhillon.  Campbell further testified she did not recall seeing
anything specific, such as a bylaw or rule that identified what a qualified physician was, nor seeing anything specific
that stated Dr. Bhatt nor Dhillon were not qualified.

Center Bylaws of the Medical Staff 2011." (Ex. 521 (capitalization altered).) CRMC's bylaws provided in relevant part, under the subsection entitled "EXERCISE OF PRIVILEGES," that: "A practitioner shall be entitled to exercise only those clinical privileges or practice prerogatives specifically granted. Said privileges must be hospital specific and within the scope of the person's license, certificate, or other legal credential authorizing practice in this State. Clinical privileges shall be exercised pursuant to these Medical Staff Bylaws, Rules and Regulations, and Medical Staff and hospital policy, and subject to the authority of the Department Chairpersons and the Medical Executive Committee." (Ex. 521 at 48.)

Campbell also relied upon the "Rules and Regulations and Policies of the Medical Staff," dated 2011, which provide in relevant part, within Section D entitled "Coverage Arrangement," that:

> Each attending physician shall personally provide or otherwise arrange for continuous care and coverage for each of his or her patients who present to the hospital for clinical care or who are currently hospital inpatients or who have been seen on consultative basis. If a physician is unable to provide care for his or her patients, then the physician must provide coverage through another appropriately credentialed physician. The covering physician must be available and qualified to assume responsibility for the patients during the entirety of the attending physician's absence and must be aware of the status and condition of any hospital inpatient which he or she is to cover. Failure to ·arrange appropriate coverage shall be grounds for corrective action as defined in articles VI and VI I of the Medical Staff Bylaws.

(Ex. 520 at 1, 12 (capitalization altered.) Specifically, Campbell used this provision to conclude that Dr. Chaudhry did not appoint a qualified medical professional in his absence.

CRMC's rules and regulations also provide: "The operative report shall include . . . [t]he specific procedures performed and a description of significant surgical tasks that were conducted by practitioners other than the primary LIP (significant surgical procedures include: opening and closing . . . "[c]omplication, if any . . . [and] [p]ostoperative diagnosis." (Ex. 520 at 30-31.) Campbell concluded the operative report (Ex. 101), did not show Albakova's involvement nor indicated the critical condition of the patient after the surgery.

1.   The <u>Time Dr. Chaudhry left the Operating Room and the use of the Term Stapling of the Bones</u>

The CMS Report reflects the following statement regarding Campbell's interview with

Dr. Chaudry, referred to as "CV 1":

> On 7/13/12 at 10:35 a.m., during an interview, CV 1 stated he directed PA (Physician Assistant) 1 to finish the case which meant she was to perform the remainder of the surgery – closure of the chest with wires (reference to the staples) and the rest of the closing). CV 1 stated he had checked all the tubes and all was routine. CV 1 stated he allowed PA 1 to practice above her privilege card as "she was preparing for an Advanced Quality Practice Exam and for that she needed so many cases with opening and closing the chest, and to cannulate the heart…" CV 1 said he was "… always there when she did this, until this time." CV 1 stated he left the surgery and went up to the unit to complete orders for the patient at about 11:30 a.m., and then left the hospital premises at about 12:40 p.m.

(Ex. 112 at 17; Ex. 505 at 17.)

It is an undisputed fact that Dr. Chaudhry did not leave the operating room prior to 12:15 p.m. (UF 11.) While Dr. Chaudhry's post-operative dictation reported leaving at 12:15 p.m., Campbell did not specifically see or incorporate that time stamp in her report, as the specific time Dr. Chaudhry left the operating room was not key to Campbell's findings as to whether the hospital's bylaws were violated. Rather, Campbell's focus was on whether Albakova had the privilege under the hospital's governing policies to close the chest without Dr. Chaudhry present in the operating room. As stated above, Campbell concluded Albakova did not have such privilege based on a review of Albakova's privilege card, her peer review file, and the hospital's governing policies. Campbell also considered that during the interview, Dr. Chaudhry told Campbell he was always with Albakova until this time, and the compilation of these facts allowed Campbell to reach the conclusion that there was a violation of the bylaws and applicable rules and regulations, which was not dependent on the time of departure from the operating room.

Campbell never specifically asked Kappmeyer which surgeon was referred to in Kappmeyer's notes of Schreur's interview where it states "after [patient] stabilized surgeon closes chest." (Ex. 509 at 8.) Campbell relied on Kappmeyer's notes of her interview with Schreur, which stated: "Surgery went well. Came off bypass [at] 11:45. After [patient] stabilized, Surgeon closes chest. Dr. Chaudhry left about 20-15 minutes after coming off bypass. Bella routinely put in wires." (Ex. 509 at 8.) This is despite the fact that this would equate to Dr. Chaudhry leaving the operating room at approximately 12:00 or 12:05. The CMS Report did

not include specific reference to Schreur's interview conducted by Kappmeyer.

The State 2567 reported that Schreur (identified as "Staff 1"), stated during the interview with Yussif, that Dr. Chaudhry had left the operating room at "approximately 11:45 a.m., prior to the closure of the chest," and that Albakova and Dhillon "closed the chest and then left the OR." (Ex. 113 at 5.)  Yussif's notes from the initial State investigation reflect the following statement indicating Schreur stated the following to Yussif:  "We came off bypass at 11:45 a.m. .  Then they started to close up the [chest].  Dr. Chaudhry assessed and then stepped away and his PA and Dr. Dhillon K.S. closed up.  This is normal.  They both hold the wires and pull and then close the [chest].  [Dr. Chaudhry] left the room at that point maybe to go talk to the family." (Ex. 115 at 5)  Campbell testified she was not aware of these notes when she completed the CMS Report, nor when the amended State Report came out.

The CMS 2567, states in one part that: "Cardiovascular Surgeon 1 (CV 1) [Dr. Chaudhry] left the operating room and the hospital premises prior to the stapling of the ribs back to the sternum (bone to bone closure) and prior to the closure of the remainder of the surgical site (fascia – tissue that holds soft organs in place, muscles and skin) during an open heart surgery for Patient 1 in violation of the hospital's 'Rules and Regulations.' "  (Ex. 112 at 6-7; Ex. 505 at 6-7.)  The CMS 2567, specifically reported that Utecht and McComb (identified as MD 2 and Admin Staff 2) had both stated during an interview on July 16, 2012, that Dr. Chaudhry ("CV 1") had left the operating room "prior to closure/stapling of the bones back together," and that "MD 2 and Admin Staff 2 stated PA 1 had stapled the bones in this case without the Cardiovascular Surgeon being present."  (Ex. 505 at 12; Ex. 112 at 12.)[12]

---

[12]  McComb testified that at the time she saw the CMS Report, she believed the reference to Dr. Chaudhry leaving at 11:30 a.m. was inaccurate as the presentation of Dr. Chaudhry's interview in the CMS Report did not make sense. McComb recalled telling Campbell that she had misquoted McComb, as McComb testified she never said Albakova stapled the chest/sternum after Dr. Chaudhry left, as stapling of the bones together are not words she would use because that is not how that type of surgical closing occurs.  McComb testified that she requested Campbell to correct the statements in the CMS Report, and that Campbell said they were not changing anything.  This did not shock McComb as in working with 2567s, she believes CDPH has their truth based on their investigations and interviews, and CRMC has their truth, and they do not always agree with each other, and at times, there are conversations about inaccuracies.  By the time she spoke with Campbell about her concerns, McComb had formed the opinion that Dr. Chaudhry was in the operating room when the sternum bones were closed, based on her review of the medical records, including the time stamp at the end of Dr. Chaudhry's dictation indicating 12:15 p.m., and review of the in/out sheets.

34

1    A largely similar notation of the interview with McComb and Utecht was entered into the

2  State Report authored by Yussif.  (Ex. 113 at 6.)  However, the State Report omits reference to

3  the term stapling in regards to this interview, and instead is phrased as: "On 7/16/12 . . . MD 4 . .

4  . and . . . [Admin 1], both stated CVS 1 left the OR prior to closure of the chest bones back

5  together.   MD 4 and Admin Staff 1 stated that CVS 1 violated the hospital's Rules and

6  Regulations under the Bylaws which do not permit the primary surgeon to leave the OR prior to

7  the patient being established as stable."  (Compare Ex. 113 at 6; Ex. 505 at 12)  The CMS Report

8  was generally available to Yussif to utilize in completing the State Report, and there were

9  multiple ways that Yussif could have accessed this information at the office, such as a file

10  cabinet, and it is common in these types of investigations for one investigator on CMS side to

11  borrow from the State, or vice versa, such as in the case of an inability to interview a particular

12  individual.  Other than the CMS Report being available, Campbell as a supervisor did not direct

13  _____

14  Significantly however, despite her disagreement with the alleged misquotations regarding the closure of the sternum
bones, McComb testified she did not disagree with the statement in the CMS Report (Ex. 112 at 4), that Dr.
15  Chaudhry left the operating room prior to the "closure" of the chest.  This was based on McComb's belief the team
was finishing the last stitches and placing bandages, so Dr. Chaudhry's exit was right around the time of chest
16  "closure."  Thus, McComb affirmed in testimony that she had no disagreement with the portion of the CMS Report
that Dr. Chaudhry "left the operating room prior to closure."

17  Utecht testified that he never told Campbell Dr. Chaudhry left the operating room prior to stapling of the bones back
together.  When Utecht first reviewed the SOD, Utecht testified he saw the inaccurate quote, but didn't have a
18  chance to correct at that point, other than through McComb making a phone call explaining that it was incorrect.
Utecht testified he did not speak to Campbell or tell her that CDPH needed to make corrections to the findings, and
19  did not recall any conversation with Campbell where Campbell said something to the effect of "we are not changing
anything."

20  On the other hand, Campbell testified there is no doubt in her mind that she heard the term "stapling" by Utecht and
21  McComb; that McComb did not call her to tell Campbell that these statements were incorrect or that medical
professionals do not use such a term; that if somebody had called her, she would have double-checked her notes, and
22  worked with them; that if it was clear there was a mistake, there would a "long conversation" with CMS, because
they are the only agency that can alter the records at that point, and she would have to explain why it wasn't reported
23  accurately; and Campbell testified this has never happened in her entire career.

24  McComb also testified that she did not witness any animosity by Campbell toward the hospital or the staff involved,
and never experienced any personal bias by Campbell before July 2012 against anyone she was conducting surveys
25  concerning.

26  McComb did not recall telling anyone besides Campbell that the quotes were incorrect.  Lopez testified the first time
he was aware the hospital was objecting to statements attributed to employees McComb, Schreur, or Utecht, was
27  well after the POCs had been submitted.

28  The Court addresses the credibility of this testimony and ultimate relevance in the legal analysis section below.

1  Yussif to use any of the information in the CMS Report in the State Report.

2  **E.  CRMC's Internal Actions, the Medical Executive Committee's Investigation**
   **Supported by Outside Expert, & Process of Creating Plan of Correction**

3

4      As noted on the State 2567 and CMS 2567, on April 12, 2012, the Medical Executive

5  Committee for CRMC (the "MEC") "notified [Dr. Chaudhry] by letter to comply with the

6  medical staff bylaws requiring him to remain in the hospital and be available when patients are

7  still in the Operating Room or to arrange for appropriate coverage," and that the "President of the

8  Medical Staff telephoned the physician and informed [Dr. Chaudhry] of the same expectations

9  and admonished him that failure to adhere to this directive would result in an immediate

10 summary suspension."  (Exs. 112 at 2, 503 at 4, 505 at 2.)   The State 2567 and CMS 2567 also

11 state that on April 12, 2012, the MEC:

12         determined it would be in the best interest of both [Dr. Chaudhry] and the MEC if
           the case was reviewed by an outside expert.  It immediately took steps to send the
13         case in question out for an independent review by an experienced expert
           cardiovascular surgeon, even though it was recognized this would cause a time
14         delay in resolution of the matter.  On 7/18/2012 the practitioner and the assisting
           cardiovascular surgeon were directed by the President of the Medical Staff to
15         amend their documentation in the patient record to reflect what accurately
           happened on 4/2/12.  The amended documentation was entered into the record on
16         7/19/2012.

17 (Id.)  McComb received the information regarding the outside expert recommendation to enter

18 into the POC through working with the MEC.

19     During the federal CMS investigation in July of 2012, there were rumors discussed

20 within CRMC that Davis was making remarks concerning the ability of Davis or CDPH to shut

21 the hospital's program down.  McComb never directly heard Davis make comments regarding

22 shutting the hospital down, no witness in this trial testified that they directly heard these

23 statements, and Davis affirmed in testimony that CDPH does not comport themselves in this

24 alleged fashion.  Dr. Chaudhry claims Davis refused to meet with him despite Dr. Chaudhry's

25 desire to present information from his perspective of the Perez surgery as a cardiothoracic

26 surgeon.  Due to the schedule of the survey team, Davis affirmed that if another team member

27 interviewed Dr. Chaudhry, he would not have completed another interview.

28     On or around August 8, 2012, CRMC received a letter informing CRMC that it was being

placed under CMS survey jurisdiction.  The August 8, 2012 letter directed CRMC to submit evidence of correction to address the survey to the CMS office in San Francisco office and the CDPH Fresno District office.

McComb was generally aware of the ability of CMS to terminate CRMC's right to Medicare and Medicaid reimbursement.  Specifically, she was aware as of August 8, 2012 when CRMC received the letter placing CRMC under CDPH survey jurisdiction that because CRMC was "out of condition" with the CMS Conditions of Participation, that CRMC was on a termination track until they demonstrated compliance.  McComb was aware that loss of reimbursement would be devastating to the hospital, as more than 50% of CRMC's income was reimbursement.

On August 15, 2021, Dr. Chaudhry made a presentation at a meeting with the MEC and voiced concerns that the actions of the MEC would have a negative impact on Dr. Chaudhry.  Following Dr. Chaudhry's appearance before the MEC on August 15, 2012, Dr. Chaudhry was dispatched a letter dated August 21, 2012, from Dr. Thomas, President, Medical Staff, of Community Medical Centers.  (Ex. 123 at 1.)  The letter states Dr. Chaudhry's appearance was part of the MEC's ongoing investigation of "issues concerning medical care and [Dr. Chaudhry's] behavior." (Id.)  The letter also described the recommendations by unanimous vote of the MEC that were supported by the findings of an outside reviewer.  (Id.)  Under the heading "Medical Record Documentation," the letter states: "The investigation revealed that [Dr. Chaudhry's] medical record documentation [was] severely deficient," and the MEC recommended that Dr. Chaudhry be required to complete a University of California, San Diego Physician Assessment and Clinical Education (PACE) program in medical record documentation within six months.  (Id.)

The August 21, 2012 letter also informed Dr. Chaudhry that the MEC, after the investigation supported by the outside reviewer, made the following conclusions as to the April 2, 2012 surgery of Perez:

- There is evidence that the patient was unstable following the conclusion of surgery;

- As a result, the patient was not ready to leave the OR;

- The responsibility for the patient's care under these circumstances rested with you;

- In leaving the OR and the hospital, you failed to designate another physician qualified to provide the necessary coverage or care for this patient

- As a result of your failure, there was an untimely response to the patient's deteriorating condition;

- You have already been directed to either be present or to provide suitable coverage (presence of a privileged cardiothoracic surgeon) following cardiac surgery cases until the patient is stable in the intensive care unit ("ICU").  This requirement shall remain in place;

- You have already been directed to remain in the OR until the patient's chest is closed; and

- Therefore, a fourteen-day (14) day medical staff membership and clinical privileges suspension is imposed and shall be served within three (3) months of August 5, 2012.

(Ex. 123 at 1-2.)  As of August 21, 2012, Dr. Chaudhry aware of all these points raised in the letter.

At some point during the investigations, McComb contacted the Physician Assistant Board for the State of California ("PA Board"), and received materials and information clarifying and explaining the responsibility of the overseeing surgeon in working with a physician assistant when a patient is under general anesthesia.  After receiving the information, McComb discussed the information with some of the CRMC surgeons, including Dr. William Dominic ("Dominic"), and provided such information regarding how oversight worked and what the expectations of the PA Board were at that time.  Based on the information from the PA Board, McComb determined that the CMS SOD was accurate in that there was not proper oversight of the Perez surgery.  As for the requirements of supervision as it related to the operating room and the personal presence of a supervising physician, McComb confirmed the requirement was not on the privilege card of physician assistants at CRMC prior to the CDPH and CMS investigations.

Accordingly, McComb worked with the director of medical staff office at CRMC to review the privilege cards of the physician assistants, including Albakova's; worked to ensure

1  the cards were updated to include the required information; and included such fact in the POCs.[13]

2  Specifically, the POC for both the CMS 2567 and State 2567 note:

> The Allied Health Professional (Physician Assistant) privilege card was modified
> in accordance with Title 16 to state that the personal presence of an approved
> supervising physician is required when performing surgical procedures under
> general anesthesia.  The privilege card was approved at MEC on 5/10/2012 and
> Board of Trustees on 7/17/2012.
>
> After the event occurred, the Chair of the Department met individually with the
> practitioner and the Physician Assistant.  They were directed that the personal
> presence of an approved supervising physician is required when performing
> surgical procedures under general anesthesia at all times.

(Ex. 503 at 4; Ex. 505 at 2.)

On January 28, 2013, CDPH dispatched a letter to CRMC attaching the State 2567 SOD
and providing the following information regarding completion of a POC and appeals process:

> If you disagree with any deficiency, you may submit a written appeal to the
> district administrator/district manager of this office.  A formal appeal process will
> be afforded to you if and when an administrative penalty notice is issued to your
> facility for an immediate jeopardy deficiency.  Please do not request a formal
> appeal of any penalties until the notice of a penalty is issued.
> **The plan of correction must be returned within 15 calendar days of receipt of
> the statement of deficiencies.**

(Ex. 131 at 2.)  This letter was signed by Campbell, on behalf of Spence.

After receiving the SOD from CDPH in January of 2013, and as noted above, Utecht did
not directly contact Campbell or anybody at the CDPH to express concern or raise a dispute with
the SOD.  CRMC completed the process of submitting the POC, and the hospital did not submit
any formal appeal.

In her role of creating and overseeing the POCs for CRMC, McComb generally believed
the State SOD and the CMS SOD for the Perez matter were roughly identical, and the POC

---

[13] Dr.. Chaudhry claims he met with Thomas before his interview with Campbell, and they specifically discussed at
the time that physician assistants did not have privilege cards generally, but only specifically for the emergency
room.  Dr. Chaudhry claims the hospital was making cards while he was a director, and gave clinical input to the
hospital.  Dr. Chaudhry claims that when the survey team came to do interviews, the privilege card for the
emergency room stated that a PA could close the bone and skin, and the hospital was satisfied, but the State was not
satisfied in this regard.  The hospital then went on to specifically make the privilege cards for each PA.  Dr.
Chaudhry recalled every PA coming into the medical staff office, lined up getting their privilege cards and signing
applications, and avers this was a reason he was aware of the State investigating.  McComb doesn't remember
specifically, but affirmed it would be custom practice to give the modified privilege card to Campbell and believes
the card was modified in May of 2012, following the surgery.

1   created addressed both.  As for the above noted inaccuracies that McComb claims she brought to

2   the attention of Campbell, McComb depends on the fact the POC incorporates a general

3   disclaimer stating the facility does not agree with all things written in the SOD, and the focus of

4   the POC is on the deficiencies beyond the inaccuracies.  However, there is no ability of the

5   facility to enter a specific note of disagreement within the POC to address a specific error, if a

6   specific objection was placed in the POC, it was McComb's understanding the POC would not

7   be accepted.

8        McComb was involved in creating multiple drafts that of the POCs, but was never

9   requested by anyone at CDPH to specifically discipline Dr. Chaudhry.  Because CDPH's

10  jurisdiction only authorizes investigations of hospitals, not individual doctors, Dr. Chaudhry was

11  not directly permitted to complain to CDPH regarding the State 2567 or to CMS regarding the

12  CMS 2567.

13       **F.     Publication of the State and CMS Reports**

14  CDPH did not have a website in 2012, but had a sort of online directory to exchange

15  information between CDPH offices.  It is an undisputed fact that on or about October 10, 2013,

16  the CDPH published on its website the State 2567 regarding the events of April 2, 2012.  (UF

17  19.)

18       It is an undisputed fact that CDPH did not publish the CMS 2567.  (UF 20.)

19       **G.     Events After Publication Including Amending of the State Report**

20  Following the publication of the State 2567, the Medical Board of California began

21  investigating Dr. Chaudhry.  (UF 28.)   In June 2014, the handwritten notes of the CDPH

22  investigators were provided to Dr. Chaudhry's attorneys who were representing him in the Perez

23  Malpractice Case.  In early December 2014, the Medical Board of California determined that it

24  would take no action against Plaintiff Chaudhry, and it closed the case.  That information was

25  provided to CDPH on December 12, 2014.

26       It is undisputed that on November 25, 2014, the CDPH amended the State 2567

27  Statement of Deficiencies ("Amended State 2567") based on information from CRMC's hospital

28  risk manager interview and comparison with clinical hospital records that show Dr. Chaudhry

1    left the operating room at about 12:15 p.m.  It is also an undisputed fact that the Amended State

2    2567 still stated that when Dr. Chaudhry left the operating room, Perez was unstable and that Dr.

3    Chaudhry had an unsupervised and unqualified staff in charge in the operating room.   The

4    Amended State 2567 was published on the CDPH website.

5         Specifically, both the original and amended reports state in one section that: "Based on

6    staff interviews, clinical record and administrative document review, the hospital failed to

7    implement Cardiovascular Surgery Service policies and procedures and medical staff bylaws

8    when Cardiovascular Surgeon (CVS 1) left the Operating Room (OR) . . ." (Compare Ex. 503 at

9    4 to Ex. 504 at 2.)  The original State 2567 then continues: "and the hospital premises prior to the

10   closure of the chest for the open heart surgery on Patient 1."  (Ex. 503 at 4.)  In contrast, the

11   Amended State 2567 continues: ". . . before Patient 1 fully stabilized following the conclusion of

12   open heart surgery."  (Ex. 504 at 2.)  The original State 2567 then states: "CVS 1 directed

13   Physician Assistant (PA) 1 to be left in-charge, an individual not qualified to be left in-charge of

14   the CV surgery.  After CVS 1 left the OR, Patient 1 suffered massive blood loss, cardiac arrest

15   and loss of oxygen to the brain." (Ex. 503 at 4.)  This portion of the Amended State 2567 is

16   identical and only appears to add two words, specifically: adding the word "also" before the

17   word "directed," and added the word "cardiovascular" before the acronym "CV."  (Compare Ex.

18   503 at 4 to Ex. 504 at 2.)

19        Another change is where the original State 2567 states: "The clinical record for Patient 1

20   was reviewed on 4/17/12 . . . CVS 1 left the OR at 11:45 a.m.  PA 1 and MD 1 sutured the chest

21   closed with metallic wire at approximately 12:00 p.m. and then left the OR." (Ex. 503 at 5.)  The

22   Amended State 2567 states: "The clinical record for Patient 1 was reviewed on 4/17/12 . . .

23   Patient 1 came off bypass at 11:45 a.m.  PA 1 and MD 1 proceeded to complete the surgery by

24   closing Patient 1's chest.  The closing of Patient 1's chest consists of closing several layers.

25   CVS 1 left the OR shortly after 12:15 p.m.  PA 1 and MD 1 left the OR after completing the

26   surgery shortly thereafter."  (Ex. 504 at 3.)

27        The Amended State 2567 reports that Dr. Chaudhry stated during an interview that he

28   directed Albakova to finish the case, meaning closure of the chest with wires; and that Dr.

1   Chaudhry allowed Albakova to practice above her privilege card. (Ex. 504 at 7.)  The Amended

2   State 2567 also reports that Schreur stated during an interview that Dr. Chaudhry left the

3   operating room prior to the complete closure of the chest. (Ex. 504 at 6.)

4         As noted above, Lopez became aware CRMC was objecting to statements attributed to

5   employees including McComb, Schreur, and Utecht, well after the POCs had been submitted.

6   From the date of publication of the State 2567 on CDPH's website of October 10, 2013, until the

7   amended State 2567 issued on November 25, 2014, there was no additional investigation

8   completed by Lopez's department.  When Lopez became aware of the inconsistencies, Lopez

9   reported it up to his branch chief and to the office of legal services, it went through the process to

10  review, and the amendments were made to the State 2567.  Lopez's involvement in the

11  amendment was peripheral as it was the Sacramento headquarters office and the office of legal

12  services that looked at the specific sections of the State 2567 and recommended changes after the

13  issues came to their attention by the hospital.

14        Following the incorporation of the draft changes, Lopez reviewed the proposed Amended

15  State 2567 before approving and sending it to go through the same process with the branch chief,

16  office of legal services, and the Sacramento headquarters for final review before being

17  reprocessed and reposted.  The changes between the original and amended reports did not alter

18  Lopez's opinion regarding Yussif's conclusions that Dr. Chaudhry left the operating room before

19  completion of the closing of the chest, and Lopez still determined that the information contained

20  in the original State 2567 was "materially accurate."  Lopez did not report the changes or

21  reported inconsistencies to CMS.

22        Campbell retired on November 30, 2014, but was not aware at the time that the Amended

23  State Report was created around November 25, 2014.  Campbell was generally aware there was a

24  discussion to amend the State Report, but had no specific knowledge one of the changes was to

25  reflect that Dr. Chaudhry left at 12:15 p.m. and not 11:45 a.m.  Campbell did not participate in

26  the discussion to make the changes to the State 2567.

27  / / /

28  / / /

42

**H.    Dr. Chaudhry's Removal from Directorship, Non-Renewed Contracts, and Plaintiffs' Claimed Damages**

Dr. Chaudhry became Director of Cardiovascular Surgery at CRMC around 2009.  On or about July 27, 2012, Dr. Chaudhry received a letter removing him from the position.  (Ex. 122.) The letter stated in part:

> As you should be aware,  a full validation survey will be conducted at [CRMC] within the next several weeks . . . [as a] result of preliminary findings shared by [CMS] resulting from a recent review of an incident which occurred in the operating room with one of your patients.  In light of the findings and impeding survey, we are compelled to take action that demonstrates our commitment to meeting the CMS Conditions of Participation and to the care of our patients . . .It is hereby requested that you immediately step down as Medical Director of Cardiac Surgery and Thoracic Services at both CRMC and Fresno Heart & Surgical Hospital.

(Ex. 122.)

Dr. Chaudhry claims he received approximately $200,000 per year under the directorship contract, though the money technically flowed through Valley Cardiac.  The Court notes that one directorship contract introduced into evidence with an unspecified term, appears to state Valley Cardiac would receive compensation not to exceed $99,468 per year.  (Ex. 125 at 3-4.)  Another directorship contract for a term of January 1, 2012 to December 31, 2012, appears to state Valley Cardiac would receive compensation not to exceed $136,800 per year.  (Ex. 124 at 4.)  No other directorship contracts were introduced into evidence.

Dr. Chaudhry claims damages flowing from a Call Coverage Agreement.  (Ex. 126.)  that The contract paid $2,500 per 24 hour period on call, and the money flowed into Valley Cardiac, and a portion flowed into Dr. Chaudhry's medical income.  The term of this contract ended on November 30, 2013, and it was not renewed.

Dr. Chaudhry claims lost income that previously flowed from a Consultant Services Agreement.  (Ex. 127.)  Dr. Chaudhry was the direct signatory to this contract which provided compensation in the amount of $300 per hour, for total compensation not to exceed $200,000 per year.  (Ex. 127 at 1, 4.)  The term of this contract expired in June of 2013 and it was not renewed.

1     Dr. Chaudhry also received income from performing cardiovascular surgery. Dr.

2 Chaudhry claims that in the year 2012, his total medical income was approximately 2.06 million

3 dollars; in 2013 it was approximately 1.7 million dollars; in 2014 it was approximately 1.4

4 million dollars; in 2015 it was negative or net $53,000; in 2016 it was negative; in 2017, there

5 was no net income; and in 2018 it was negative.

6     Dr. Chaudhry claims that after the State Report was "published" to CRMC, the hospital

7 talked to "everybody" and the committees, it became the "word" that Dr. Chaudhry had

8 abandoned his patient with the chest open and his physician assistant to complete the surgery.

9 As a result, he became "stigmatized" resulting in CRMC backing off, and cardiologists wouldn't

10 call him. By 2014, Dr. Chaudhry claims he had no surgery referrals, and his practice was

11 essentially killed. Dr. Chaudhry claims that 2018 was the last year he performed a surgery, and

12 was doing one or two cases in the previous years.

13     Dr. Chaudhry claims he was unable to maintain or afford the rising costs of

14 medical malpractice insurance by February of 2018. The cost of insurance from NORCAL

15 insurance became unaffordable due to multiple pending medical malpractice cases that were

16 ongoing in the year 2018, including the Perez Malpractice Case. Specifically, on March 19 and

17 20, 2018, the jury in the Perez Malpractice Case awarded damages against the defendants in that

18 matter, Dr. Chaudhry and CRMC, in an amount in excess of 60 million dollars. The verdict

19 amount was ultimately reduced by settlement, to be paid by CRMC and Dr. Chaudhry's

20 insurance carrier.

21     Dr. Chaudhry claims he cannot obtain consultant work, which would not require

22 malpractice insurance, because the medical community has lost trust in him and he cannot

23 present as a credible witness now. In December of 2017, Dr. Chaudhry moved to Pakistan to

24 teach, and also performs occasional heart surgeries. Dr. Chaudhry claims he is now making

25 approximately $6,250 per month working in Pakistan, and that this is not enough to make "ends

26 meet," and that he regularly borrows from family.

27     In sum, Dr. Chaudhry claims that his income was on an upward trajectory with business

28 expanding into new areas in California prior to the investigations and reports concerning the

1    Perez surgery, and that he has lost income in excess of 14 million dollars over the seven year

2    period of 2015 until 2021.

3                                                    IV.

4                                    **CONCLUSIONS OF LAW**

5            Plaintiffs' operative complaint brings two causes of action, both for violation of civil

6    rights and due process pursuant to 42 U.S.C. § 1983.  The first cause of action proceeds against

7    Defendant Angell in her official capacity as Director of the CDPH, and seeks declaratory and

8    injunctive relief only.  Specifically, Plaintiffs seek a mandatory injunction ordering Defendant

9    Angell to withdraw the "previously false report of CDPH and issue a new report clearly

10   indicating that the original report [is] false, and vindicating Dr. Chaudhry and his medical

11   group." (FAC, ECF No. 6 at 21.)  Plaintiffs' second cause of action proceeds against Defendants

12   Lopez and Campbell in their personal capacities.  Following the withdrawal of Plaintiff Dr.

13   Chaudhry's claim for damages related to emotional distress, Plaintiffs seek monetary damages

14   for economic harm only.  (FAC ¶¶ 72-76, ECF No. 6 at 20, 21; ECF No. 103.)

15           The Court will first summarize the relevant statutes and regulations relating to the

16   government agencies involved in this action before proceeding to the discussion of the legal

17   standards applicable to Plaintiffs' due process claims under 42 U.S.C. 1983, specifically under

18   the stigma-plus standard.

19           A.       **The Relevant Law Generally Applicable to CDPH, CMS, and Hospital
20                     Providers such as CRMC**

21           "The Centers for Medicare and Medicaid Services ("CMS"), a component of the

22   Department of Health and Human Services, administers the Medicare program." Fox Ins. Co.,

23   715 F.3d at 1214–15.  "Under the Medicare statute, 42 U.S.C. §§ 1395–1395kkk–1, the

24   Department reimburses health care providers for services provided to Medicare patients . . .

25   Providers receive Medicare reimbursement for inpatient hospital services through the

26   Prospective Payment System." PAMC, Ltd. v. Sebelius, 747 F.3d 1214, 1217–18 (9th Cir.

27   2014).

28           State agencies make agreements with the federal government to conduct surveys of

                                                    45

1    hospitals participating in the Medicare and Medicaid programs to ensure compliance with

2    minimum health and safety standards.  42 C.F.R. §§ 488.10(a)(1), (c).  If there is an allegation of

3    substantial non-compliance, the state agency must conduct a series of escalating investigations.

4    See 42 C.F.R. §§ 488.9(a), (c)(2)-(3).  CDPH thus ensures hospital compliance through such

5    validation surveys.  When conducting surveys, CDPH surveyors record violations, otherwise

6    known as "deficiencies," and refer hospitals for various enforcement actions.  CDPH's official

7    findings of the hospital survey are presented on a 2567 report, also known as a statement of

8    deficiencies.  The 2567 report must be disclosed no later than 90 calendar days after the survey is

9    completed.  42 C.F.R. § 401.133(a).[14]

10          CDPH also issues administrative penalties to hospitals via the 2567 report under Cal.

11   Health & Safety Code § 1280, *et seq.*  Cal. Health & Safety Code § 1279.2(a) requires onsite

12   investigations if CDPH receives a written or oral complaint indicating an ongoing threat or

13   imminent danger of death or serious bodily harm.  Section 1279.3 provides that CDPH shall

14   make information regarding reports of substantiated adverse events and outcomes of inspections

15   and investigations readily accessible to consumers throughout California.  However, information

16   such as names of health care professionals shall not be included in the information released.  Cal.

17   Health & Safety Code § 1279.3(c).

18          "The state department shall notify the health facility of all deficiencies in its compliance

19   with this chapter and the rules and regulations adopted hereunder, and the health facility shall

20   —————————————————

     [14]  The regulation provides:

          (a) Statements of deficiencies and survey reports on providers of services prepared by State
          agencies. (1) Statements of deficiencies based upon official survey reports prepared after January
          31, 1973, by a State agency pursuant to its agreement entered into under section 1864 of the Social
          Security Act and furnished to CMS, which relate to a State agency's findings on the compliance of
          a health care institution or facility with the applicable provisions in section 1861 of the Act and
          with the regulations, promulgated pursuant to those provisions, dealing with health and safety of
          patients in those institutions and facilities; and (2) State agency survey reports. The statement of
          deficiencies or report and any pertinent written statements furnished by the institution or facility
          on the statement of deficiencies shall be disclosed within 90 days following the completion of the
          survey by the State agency, but not to exceed 30 days following the receipt of the report by CMS.
          (See § 401.130(b)(17) for places where statements of deficiencies, reports, and pertinent written
          statements will be available.)

     42 C.F.R. § 401.133(a).

agree with the state department upon a plan of correction that shall give the health facility a reasonable time to correct these deficiencies." Cal. Health & Safety Code § 1280(b).  If a facility and state department fail to agree on a POC, and it is determined the deficiency poses an immediate and substantial hazard to the safety of patients, the agency may order implementation of the POC.  Id. at § 1280(c)(1).  "If the facility does not agree that the deficiency poses an immediate and substantial hazard to the health or safety of patients or if the facility believes that the plan of correction will not correct the hazard, or if the facility proposes a more efficient or effective means of remedying the deficiency, the facility may, within 10 days of receiving the plan of correction from the department, appeal the order to the director.  Id.; see also Cal. Health & Safety Code § 1280.5 ("The state department shall accept, consider, and resolve written appeals by a licensee or health facility administrator of findings made upon the inspection of a health facility.").  Similarly, for federal surveys of deficiencies, a facility may dispute survey findings upon receipt of the official statement of deficiencies.  42 C.F.R. § 488.331(a)(2) ("For Federal surveys, CMS offers a facility an informal opportunity, at the facility's request, to dispute survey findings upon the facility's receipt of the official statement of deficiencies.").

Pursuant to the Defendants' request (ECF No. 171 at 1-2), the Court takes judicial notice of the following statutes and regulations applicable to the State 2567 and CMS/Federal 2567 processes that may have relevance to the facts underlying this action:

1. California Health & Safety Code § 1279.1[15];

2. California Health & Safety Code § 1279.2[16];

---

[15] The statute provides in part: "(a) A health facility licensed pursuant to subdivision (a), (b), or (f) of Section 1250 shall report an adverse event to the department no later than five days after the adverse event has been detected, or, if that event is an ongoing urgent or emergent threat to the welfare, health, or safety of patients, personnel, or visitors, not later than 24 hours after the adverse event has been detected."  Cal. Health & Safety Code § 1279.1.

[16] The statute provides in part: "(a)(1) In any case in which the department receives a report from a facility pursuant to Section 1279.1, or a written or oral complaint involving a health facility licensed pursuant to subdivision (a), (b), or (f) of Section 1250, that indicates an ongoing threat of imminent danger of death or serious bodily harm, the department shall make an onsite inspection or investigation within 48 hours or two business days, whichever is greater, of the receipt of the report or complaint and shall complete that investigation within 45 days."  Cal. Health & Safety Code § 1279.2.

3. California Health & Safety Code § 1279.3[17];

4. California Health & Safety Code § 1279.6[18];

5. California Health & Safety Code § 1280[19];

---

[17] The statute provides in part:

(a) By January 1, 2015, the department shall provide information regarding reports of substantiated adverse events pursuant to Section 1279.1 and the outcomes of inspections and investigations conducted pursuant to Section 1279.1, on the department's Internet Web site and in written form in a manner that is readily accessible to consumers in all parts of California, and that protects patient confidentiality.

(b) By January 1, 2009, and until January 1, 2015, the department shall make information regarding reports of substantiated adverse events pursuant to Section 1279.1, and outcomes of inspections and investigations conducted pursuant to Section 1279.1, readily accessible to consumers throughout California. The department shall also compile and make available, to entities deemed appropriate by the department, data regarding these reports of substantiated adverse events pursuant to Section 1279.1 and outcomes of inspections and investigations conducted pursuant to Section 1279.1, in order that these entities may post this data on their Internet Web sites. Entities deemed appropriate by the department shall enter into a memorandum of understanding with the department that requires the inclusion of all data and all hospital information provided by the department. These entities may include universities, consumer organizations, or health care quality organizations.

(c) The information required pursuant to this section shall include, but not be limited to, information regarding each substantiated adverse event, as defined in Section 1279.1, reported to the department, and may include compliance information history. The names of the health care professionals and health care workers shall not be included in the information released by the department to the public.

Cal. Health & Safety Code § 1279.3.

[18]  The statute provides in part: "(a) A health facility, as defined in subdivision (a), (b), (c), or (f) of Section 1250, shall develop, implement, and comply with a patient safety plan for the purpose of improving the health and safety of patients and reducing preventable patient safety events. The patient safety plan shall be developed by the facility, in consultation with the facility's various health care professionals."  Cal. Health & Safety Code § 1279.6.

[19]  The statute provides in part:

(b) The state department shall notify the health facility of all deficiencies in its compliance with this chapter and the rules and regulations adopted hereunder, and the health facility shall agree with the state department upon a plan of correction that shall give the health facility a reasonable time to correct these deficiencies. If at the end of the allotted time, as revealed by inspection, the health facility has failed to correct the deficiencies, the director may take action to revoke or suspend the license.

(c)(1) . . . [I]f the facility fails to implement a plan of correction that has been agreed upon by both the facility and the state department within a reasonable time, the state department may order implementation of the plan of correction previously agreed upon by the facility and the state department. If the facility and the state department fail to agree upon a plan of correction within a reasonable time and if the deficiency poses an immediate and substantial hazard to the health or safety of patients, then the director may take action to order implementation of a plan of correction devised by the state department. The order shall be in writing and shall contain a statement of the reasons for the order. If the facility does not agree that the deficiency poses an immediate and substantial hazard to the health or safety of patients or if the facility believes that the plan of correction will not correct the hazard, or if the facility proposes a more efficient or effective means of remedying the deficiency, the facility may, within 10 days of receiving the plan of correction from the department, appeal the order to the director. The director shall review information provided by the facility, the department, and other affected parties and within a reasonable time render a decision in writing that shall include a statement of reasons for the order. During the period which the director is reviewing the appeal, the order to implement the plan of correction shall be stayed.

48

6. California Health & Safety Code § 1280.1[20];

7. California Health & Safety Code § 1280.3[21];

8. California Health & Safety Code § 1280.5[22];

9. California Code of Regulations, Title 22, § 70101[23];

---

The opportunity for appeal provided pursuant to this subdivision shall not be deemed to be an adjudicative hearing and is not required to comply with Section 100171.

. . . (d) Reports on the results of each inspection of a health facility shall be prepared by the inspector or inspector team and shall be kept on file in the state department along with the plan of correction and health facility comments. The inspection report may include a recommendation for reinspection . . .

. . . (e) All inspection reports and lists of deficiencies shall be open to public inspection when the state department has received verification that the health facility has received the report from the state department. All plans of correction shall be open to public inspection upon receipt by the state department.

Cal. Health & Safety Code § 1280.

[20] Defendant erroneously cited to "§ 12801.1," however it appears 1280.1 is the correct citation, which provides in part:

(a) Subject to subdivision (d), prior to the effective date of regulations adopted to implement Section 1280.3, if a licensee of a health facility licensed under subdivision (a), (b), or (f) of Section 1250 receives a notice of deficiency constituting an immediate jeopardy to the health or safety of a patient and is required to submit a plan of correction, the department may assess the licensee an administrative penalty in an amount not to exceed twenty-five thousand dollars ($25,000) per violation.

(b) If the licensee disputes a determination by the department regarding the alleged deficiency or the alleged failure to correct a deficiency, or regarding the reasonableness of the proposed deadline for correction or the amount of the penalty, the licensee may, within 10 days, request a hearing pursuant to Section 131071. Penalties shall be paid when appeals have been exhausted and the department's position has been upheld . . .

. . . (g) In enforcing this section, the department shall take into consideration the special circumstances of small and rural hospitals, as defined in Section 124840, in order to protect access to quality care in those hospitals.

Cal. Health & Safety Code § 1280.1.

[21] It appears Defendants erroneously § 128.3, however it appears § 1280.3 is the correct section and pertains to administrative penalties for immediately jeopardy violations: "(a) Commencing on the effective date of the regulations adopted pursuant to this section, the director may assess an administrative penalty against a licensee of a health facility licensed under subdivision (a), (b), or (f) of Section 1250 for a deficiency constituting an immediate jeopardy violation as determined by the department." Cal. Health & Safety Code § 1280.3.

[22] The statute provides: "The state department shall accept, consider, and resolve written appeals by a licensee or health facility administrator of findings made upon the inspection of a health facility." Cal. Health & Safety Code § 1280.5.

[23] The regulation provides in part:

(a) The Department shall inspect and license hospitals.

49

10. California Code of Regulations, Title 22, § 70433[24];

11. 42 C.F.R. § 482[25];

12. 42 C.F.R. § 482.22[26]

---

(b) Any officer, employee or agent of the Department may, upon presentation of proper identification, enter and inspect any building or premises at any reasonable time to secure compliance with, or to prevent a violation of, any provision of these regulations . . .

. . .(e) The Department shall notify the hospital of all deficiencies of compliance with these regulations and the hospital shall agree with the Department upon a plan of corrections which shall give the hospital a reasonable time to correct such deficiencies. If at the end of the allotted time, as revealed by repeat inspection, the hospital has failed to correct the deficiencies, the Director may take action to revoke or suspend the license.

(f) Reports on the results of each inspection of a hospital shall be prepared by the inspector or inspection team and shall be kept on file in the Department along with the plan of correction and hospital comments. The inspection report may include a recommendation for reinspection. All inspection reports, lists of deficiencies and plans of correction shall be open to public inspection without regard to which body performs the inspection.

Cal. Code Regs. tit. 22, § 70101.

[24] The regulation is entitled "Cardiovascular Surgery Service General Requirements," and provides in part:

(a) Written policies and procedures shall be developed and maintained by the person responsible for the service in consultation with other appropriate health professionals and administration. Policies shall be approved by the governing body. Procedures shall be approved by the administration and medical staff where such is appropriate. These policies and procedures shall include provision for at least:

(1) Definitions of qualifications of physicians for privileges to perform cardiovascular laboratory catheterization procedures and/or surgery.

(2) Regular review of case management, both preoperatively and postoperatively.

(3) Collection, processing and retrieval of data on all patients to include at least: diagnosis, procedure performed, pathophysiologic, angiographic, morbidity and mortality data.

(4) Recommendations regarding equipment used, procedures performed and staffing patterns in the catheterization laboratory and cardiovascular surgery units.

Cal. Code Regs. tit. 22, § 70433.

[25] The regulation provides:

(a) Statutory basis.
(1) Section 1861(e) of the Act provides that—
(i) Hospitals participating in Medicare must meet certain specified requirements; and
(ii) The Secretary may impose additional requirements if they are found necessary in the interest of the health and safety of the individuals who are furnished services in hospitals.

42 C.F.R. § 482.1

[26] The regulation provides in part:

The hospital must have an organized medical staff that operates under bylaws approved by the governing body, and which is responsible for the quality of medical care provided to patients by the hospital . . .

13. 42 C.F.R. § 482.51[27];

14. 42 C.F.R. § 488.2[28];

15. 42 C.F.R. § 488.5[29];

16. 42 C.F.R. § 488.7[30]; and

17. 42 C.F.R. § 488.9[31].

---

. . . (b)Standard: Medical staff organization and accountability. The medical staff must be well organized and accountable to the governing body for the quality of the medical care provided to patients . . .

. . . (c)Standard: Medical staff bylaws. The medical staff must adopt and enforce bylaws to carry out its responsibilities.

42 C.F.R. § 482.22

[27] The regulation is entitled "Condition of participation: Surgical services," and provides in part:

If the hospital provides surgical services, the services must be well organized and provided in accordance with acceptable standards of practice. If outpatient surgical services are offered the services must be consistent in quality with inpatient care in accordance with the complexity of services offered.

(a) Standard: Organization and staffing. The organization of the surgical services must be appropriate to the scope of the services offered . . .

(b) Standard: Delivery of service. Surgical services must be consistent with needs and resources. Policies governing surgical care must be designed to assure the achievement and maintenance of high standards of medical practice and patient care.

42 C.F.R. § 482.51.

[28] This regulation simply introduces the statutory basis for this group of regulations: "This part is based on the indicated provisions of the following sections of the Act." 42 C.F.R. § 488.2.

[29] This regulation provides "[a]pplication and re-application procedures for national accrediting organizations." 42 C.F.R. § 488.5.

[30] This regulation is entitled "[r]elease and use of accreditation surveys," and provides in part:

A Medicare participating provider or supplier deemed to meet program requirements in accordance with § 488.4 must authorize its accrediting organization to release to CMS a copy of its most current accreditation survey and any information related to the survey that CMS may require (including, but not limited to, corrective action plans).
(a) CMS may determine that a provider or supplier does not meet the applicable Medicare conditions or requirements on the basis of its own investigation of the accreditation survey or any other information related to the survey.
(b) With the exception of home health agency surveys, general disclosure of an accrediting organization's survey information is prohibited under section 1865(b) of the Act. CMS may publically disclose an accreditation survey and information related to the survey, upon written request, to the extent that the accreditation survey and survey information are related to an enforcement action taken by CMS.

42 C.F.R. § 488.7

[31] This regulation is entitled "[v]alidation surveys," and provides in part:

1    The Court now turns to the standards for a stigma-plus claim.

2    **B.      The Legal Standards for 42 U.S.C. § 1983 Stigma-Plus Claims**

3    Section 1983 provides a cause of action for the violation of a plaintiff's constitutional or

4    other federal rights by persons acting under color of state law.  Nurre v. Whitehead, 580 F.3d

5    1087, 1092 (9th Cir 2009); Long v. County of Los Angeles, 442 F.3d 1178, 1185 (9th Cir. 2006);

6    Jones v. Williams, 297 F.3d 930, 934 (9th Cir. 2002).  To state a claim under section 1983, a

7    plaintiff is required to show that: (1) each defendant acted under color of state law; and (2) each

8    defendant deprived her of rights secured by the Constitution or federal law.  Long, 442 F.3d at

9    1185 (9th Cir. 2006).   There is no *respondeat superior* liability under Section 1983, and

10   therefore, each defendant is only liable for his or her own misconduct.  Iqbal, 556 U.S. at 677.

11   To state a claim, Plaintiff must demonstrate that each defendant personally participated in the

12   deprivation of his rights.  Jones, 297 F.3d at 934.[32]

13

14       (a) Basis for survey. CMS may require a survey of an accredited provider or supplier to validate the accrediting
15   organization's CMS–approved accreditation process. These surveys are conducted on a representative sample
     basis, or in response to substantial allegations of non-compliance.

16       (1) For a representative sample, the survey may be comprehensive and address all Medicare conditions or
17   requirements, or it may be focused on a specific condition(s) as determined by CMS.

         (2) For a substantial allegation of noncompliance, the
18   SA surveys for any condition(s) or requirement(s) that CMS determines is related to the allegations . . .
     . . .(c) Consequences of a finding of non-compliance.

19
         (1) If a CMS validation survey results in a finding that the provider or supplier is out of compliance with one or
20   more Medicare conditions or requirements, the provider or supplier will no longer be deemed to meet the
     Medicare conditions or requirements and will be subject to ongoing review by the SA in accordance with §
21   488.10(a) until the provider or supplier demonstrates compliance.

22       (2) CMS may take actions for the deficiencies identified in the state validation survey in accordance with §
     488.24, or may first direct the SA to conduct another survey of the provider's or supplier's compliance with
23   specified Medicare conditions or requirements before taking the enforcement actions provided for at § 488.24.

24       (3) If CMS determines that a provider or supplier is not in compliance with applicable Medicare conditions or
     requirements, the provider or supplier may be subject to termination of the provider or supplier agreement under
25   § 489.53 of this chapter or of the supplier agreement in accordance with the applicable supplier conditions and
     any other applicable intermediate sanctions and remedies.

26   42 C.F.R. § 488.9.

27   [32]  As Plaintiffs highlight in the amended joint pretrial statement (ECF No. 87 at 18), the Ninth Circuit has
28   "recognized that '[t]he requisite causal connection can be established not only by some kind of direct personal
     participation in the deprivation but also by setting in motion a series of acts by others which the actor knows or

1    "The procedural due process rights of the Fourteenth Amendment apply only when there

2    is a deprivation of a constitutionally protected liberty or property interest."  WMX Techs., Inc. v.

3    Miller ("WMX II"), 197 F.3d 367, 373 (9th Cir. 1999) (citing Bd. of Regents of State Colleges v.

4    Roth, 408 U.S. 564, 569–70 (1972)).  "The requirements of procedural due process apply only to

5    the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty

6    and property.  When protected interests are implicated, the right to some kind of prior hearing is

7    paramount.  But the range of interests protected by procedural due process is not infinite."  Bd.

8    of Regents, 408 U.S. at 569–70.

9        The Supreme Court has made it clear that reputation alone is not an interest protected by

---

reasonably should know would cause others to inflict the constitutional injury.' "  Gini v. Las Vegas Metro. Police Dep't, 40 F.3d 1041, 1044 (9th Cir. 1994) (quoting Merritt v. Mackey, 827 F.2d 1368, 1371 (9th Cir.1987)).

The undersigned found the following when adjudicating the motions *in limine*:

> Circuits are split and the Ninth Circuit has not directly decided whether the "stigma" and "plus" must be committed by the same government actor.  Eberhard v. California Highway Patrol, 73 F.Supp.3d 1122, 1130 (N.D. Cal. 2014).  But District Judge O'Neill found that "the Ninth Circuit has recognized that in the context of § 1983 claims, '[t]he requisite causal connection can be established not only by some kind of direct personal participation in the deprivation but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury.' "  (Memo. Decision and Order Re Defs.' Mot. to Dismiss 12, ECF No. 12.)  Therefore, Judge O'Neill found that the allegation that Plaintiff was removed from his position at CRMC due to the publication of the State 2567 report was sufficient to state a stigma-plus claim. [footnote omitted and copied below]  (Id.)  Under the "law of the case" doctrine, "a court is generally precluded from reconsidering an issue that has already been decided by the same court, or a higher court in the identical case."  United States v. Alexander, 106 F.3d 874, 876 (9th Cir. 1997) (quoting Thomas v. Bible, 983 F.2d 152, 154 (9th Cir.) (cert. denied 508 U.S. 951 (1993).)  Accordingly, evidence that would tend to prove or disprove that CRMC removed Plaintiff from his position because of the State 2567 report is relevant in this matter.

(ECF No. 97 at 11-12.)  The undersigned also noted:

> In dicta in Cooper, the Ninth Circuit stated that the position that the stigma and plus must be committed by the same actor makes better law and is truer to Paul. 924 F.2d at 1534.  See also Ebergard, 73 F.Supp.3d at 1131-32 (the court determined "that the 'stigma' and 'plus' must be committed by the same state actor to state a due process claim with respect to claims against individual government officials.  Permitting a 'stigma-plus' claim solely where (as the Second Circuit would allow) the 'stigma' and the 'plus' merely appear to a reasonable observer to be connected to an injury would result in a government actor being liable under Section 1983 solely because of the actions of other government actors, even when she did not herself participate in those actions.  That casts too broad a net.  Requiring a closer degree of coincidence is also more consistent with Iqbal's teaching that "'a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.  Iqbal, 556 U.S. at 676, 129 S.Ct. 1937.").

(ECF No. 97 at 11-12 n. 6.)

the Constitution.  WMX II, 197 F.3d at 373; see Paul v. Davis, 424 U.S. 693, 706 (1976) ("the Court has never held that the mere defamation of an individual, whether by branding him disloyal or otherwise, was sufficient to invoke the guarantees of procedural due process absent an accompanying loss of government employment"); Siegert v. Gilley, 500 U.S. 226, 233–34, (1991); see also Miller v. California, 355 F.3d 1172, 1178 (9th Cir. 2004) ("[R]eputational harm alone does not suffice for a constitutional claim.").

"[T]here exists a variety of interests which are difficult of definition but are nevertheless comprehended within the meaning of either 'liberty' or 'property' as meant in the Due Process Clause." Paul, 424 U.S. at 710. "These interests attain this constitutional status by virtue of the fact that they have been initially recognized and protected by state law . . . [and] the procedural guarantees of the Fourteenth Amendment apply whenever the State seeks to remove or significantly alter that protected status." Paul, 424 U.S. at 711 (footnote omitted). "It was this alteration, officially removing the interest from the recognition and protection previously afforded by the State, which we found sufficient to invoke the procedural guarantees contained in the Due Process Clause of the Fourteenth Amendment." Id.  Absent a change in status, "any harm or injury to that interest . . . inflicted by an officer of the State, does not result in a deprivation of any 'liberty' or 'property' recognized by state or federal law." Id. at 712. However, "[t]he words 'liberty and property,' as used in the Fourteenth Amendment do not in terms single-out reputation as a candidate for special protection over and above other interests that may be protected by state law." WMX II, 197 F.3d at 373 (quoting Paul, 424 U.S. at 701). The Ninth Circuit summarized the Supreme Court's course of development in this area:

> In Wisconsin v. Constantineau, the Supreme Court held that a liberty interest may be implicated "where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him." 400 U.S. 433, 437, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971). The following year the Court stated that a government employee's liberty interest would be implicated if he were dismissed based on charges that "imposed on him a stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities." Board of Regents v. Roth, 408 U.S. 564, 573, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). In Paul v. Davis, the Supreme Court clarified that procedural due process protections apply to reputational harm only when a plaintiff suffers stigma from governmental action plus alteration or extinguishment of "a right or status previously recognized by state law." 424 U.S. 693, 711, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976). This holding has come to be known as the "stigma-plus

test." See Hart v. Parks, 450 F.3d 1059, 1070 (9th Cir. 2006).

Humphries v. Cty. of Los Angeles, 554 F.3d 1170, 1185 (9th Cir. 2009), as amended (Jan. 30, 2009), rev'd and remanded sub nom. on other grounds by Los Angeles Cty., Cal. v. Humphries, 562 U.S. 29 (2010).  In Hart, the Ninth Circuit noted the "stigma-plus" test could be satisfied in two ways:

> First, the plaintiff must show that the injury to his reputation was inflicted *in connection with* the deprivation of a federally protected right. *See, e.g., Gobel v. Maricopa County,* 867 F.2d 1201, 1205 (9th Cir.1989). Because police had probable cause to arrest him, Hart cannot show an injury to his reputation in connection with the deprivation of a federally protected right. Second, the plaintiff must show that the injury to reputation *caused* the denial of a federally protected right: "The procedural protections of due process apply if the accuracy of the charge is contested, there is some public disclosure of the charge, and it is made in connection with the termination of employment...." *Vanelli v. Reynolds School Dist.,* 667 F.2d 773, 777–78 (9th Cir.1982). Here, even assuming that the accuracy of the charge is contested, *and* assuming that the statements were defamatory (which they were not, as the police had a basis to make them), Hart has not proffered any evidence that he lost his job *because of* the defamatory statements. It appears quite clearly from Roadway's termination letter to Hart, that he was fired for stealing the Oscar statuettes, not because of Parks's remarks.

Hart v. Parks, 450 F.3d 1059, 1070 (9th Cir. 2006) (emphasis in original).

Under the stigma-plus test, "a plaintiff must show the public disclosure of a stigmatizing statement by the government, the accuracy of which is contested, *plus* the denial of 'some more tangible interest[ ] such as employment,' or the alteration of a right or status recognized by state law." Ulrich v. City & Cty. of San Francisco, 308 F.3d 968, 982 (9th Cir. 2002) (quoting Paul, 424 U.S. at 701, 711) (emphasis and alteration in original); see also Wenger v. Monroe, 282 F.3d 1068, 1074 (9th Cir. 2002), as amended on denial of reh'g and reh'g en banc (Apr. 17, 2002) ("due process protections apply only if a plaintiff is subjected to 'stigma plus'; i.e., if the state makes a charge against [a plaintiff] that might seriously damage his standing and associations in the community,' and '1) the accuracy of the charge is contested, 2) there is some public disclosure of the charge, and 3) it is made in connection with the termination of employment or the alteration of some right or status recognized by state law.' ") (quoting Llamas v. Butte Community College Dist., 238 F.3d 1123, 1129 (9th Cir.2001)).

"Where these elements exist, the plaintiff is 'entitled to notice and a hearing to clear his

name.' " Ulrich, 308 F.3d at 982 (quoting Bollow v. Federal Reserve Bank, 650 F.2d 1093, 1100 (9th Cir. 1981)).

       1.     Stigma

In order to prevail on the stigma-plus claim, a plaintiff must show that the statement was stigmatizing. Plaintiffs must also prove that the defendant's statements were substantially false. Campanelli v. Bockrath, 100 F.3d 1476, 1484 (9th Cir. 1996) ("In order to state a due process claim, Campanelli also must allege that the defendants' statements were substantially false."); Murphy v. Goss, 103 F. Supp. 3d 1234, 1240–41 (D. Or. 2015) (citing Siegert, 500 U.S. at 234, aff'd, 693 F. App'x 636 (9th Cir. 2017).[33]

As elaborated below, in the context of claims involving loss of employment, the caselaw largely involves situations where the government stigmatizes a government employee in the course of or in close temporal proximity to terminating a *government* employee. The district court in Moody succinctly describes the law regarding the second theory of demonstrating a stigma-plus claim in relation to termination of government employment:

> In the Ninth Circuit, a plaintiff can satisfy the "stigma plus" test under either of two theories: First, a plaintiff may assert that the injury to their reputation "caused the denial of a federally protected right," for example, where accusations made in the press by a prosecutor result in the denial of an impartial jury when the Sixth Amendment. *Id* . Or second, a plaintiff may allege that the injury to their reputation was "inflicted in connection with a federally protected right," such as "defamation in the course of termination of public employment by the state." . . .

> . . .Under the second theory, "[a] defendant's remarks in connection with discharge from employment must contain egregious accusations such as 'charges of immorality, or dishonesty that can cripple an individual's ability to earn a living.' " *Turner v. City & Cty. of San Francisco*, No. C-11-1427 EMC, 2012 WL 6631490, at \*6 (N.D. Cal. Dec. 19, 2012), *aff'd sub nom. Turner v. City & Cty. of San Francisco*, 788 F.3d 1206 (9th Cir. 2015), and *aff'd sub nom. Turner v. City & Cty. of San Francisco*, 617 Fed.Appx. 674 (9th Cir. 2015) (quoting *Hyland v. Wonder*, 972 F.2d 1129, 1142 (9th Cir. 1992)).

> To rise to the level of egregiousness required for a stigma plus claim, a defendant's remarks generally must go beyond mere accusations of incompetence. *See Gray v. Union Cnty. Intermediate Educ. Dist.*, 520 F.2d 803, 806 (9th Cir. 1975) (finding that the defendant's accusations of "insubordination, incompetence, hostility toward authority, and aggressive behavior"—while unflattering—did not "import serious character defects such as dishonesty or

---

[33] The Siegert court did not utilize the precise term "substantially false." Siegert, 500 U.S. at 234.

immorality," and thus were not sufficient to state a due process claim); *Wheaton v. Webb-Petett*, 931 F.2d 613, 617 (9th Cir. 1991) (holding that "charges of incompetence or inability to get along with others do not" implicate a liberty interest); *Turner*, 2012 WL 6631490, at *6 (concluding that allegations of illegal hiring practices were "not sufficiently damning to create a stigma-plus claim."); *see also Stretten v. Wadsworth Veterans Hosp.*, 537 F.2d 361, 366 (9th Cir. 1976) (explaining that the need for constitutional Due Process protections is not particularly strong for general disputes over an employee's workplace performance).

Additionally, to be actionable, an allegedly stigmatizing statement must be "substantially false" and "must occur in conjunction with the termination of employment." *Turner*, 2012 WL 6631490, at *6 (citing *Campanelli v. Bockrath*, 100 F.3d 1476, 1482 (9th Cir. 1996) and *Siegert v. Gilley*, 500 U.S. 226, 234 (1991)); *see also Hyland*, 972 F.2d at 1142 ("The federal Constitution is not concerned with every insult hurled in the heat of an employment dispute.").

Moody v. Cty. of Santa Clara, No. 5:15-CV-04378-EJD, 2018 WL 646686, at *4 (N.D. Cal. Jan. 30, 2018); see also Murphy, 103 F. Supp. 3d at 1240–41 ("The Fourteenth Amendment's protection against deprivation of liberty encompasses the right of persons to engage in any of the common occupations of life . . . when terminating an employee, the government engages in conduct that so severely stigmatize[s] the employee that she cannot avail herself of other employment opportunities, a claim for deprivation of liberty will stand [and the] stigma required must be severe and genuinely debilitating such that it essentially forecloses the employee's freedom to take advantage of other employment opportunities.") (citations and quotation marks omitted).

Being falsely named as a suspect on a government website has been found to be "unquestionably stigmatizing." Humphries, 554 F.3d at 1186; see also Tarhuni v. Holder, 8 F. Supp. 3d 1253, 1274 (D. Or. 2014) ("[T]here is unquestionably a significant stigma attached to placement on the No–Fly List.  Indeed, it is difficult to conceive of a more stigmatizing status than being suspected of involvement with terrorist activity.").  The Ninth Circuit has noted that there is "[n]o doubt ... that being falsely named as a suspected child abuser on an official government index is defamatory." Id. (quoting Miller, 355 F.3d t 1178 and citing Valmonte v. Bane, 18 F.3d 992, 1000 (2d Cir. 1994) (finding no dispute that inclusion on a child abuse registry damages the reputation by "branding" an individual as a child abuser).  Imputing criminal behavior to an individual is generally considered "defamatory per se".  Humphries, 554

1 F.3d at 1186 (quoting Constantineau, 400 U.S. at 434–35).  In Constanineau, the plaintiff's name
2 was posted on a list that precluded her from purchasing alcohol pursuant to a state statute
3 forbidding the sale of alcoholic beverages to persons who had become hazardous by reasons of
4 their "excessive drinking," and in Paul, the plaintiff's picture appeared on a flyer of individuals
5 who were suspected of shoplifting.   Humphries, 554 F.3d at 1186 (citing Constantineau, 400
6 U.S. at 434–35; Paul, 424 U.S. at 697, 701).  In both instances, the Supreme Court found stigma.
7 Id.

8          2.      The Plus

9          To prove a stigma-plus claim under § 1983, the plaintiff "must show that the stigma was
10 accompanied by some additional deprivation of liberty or property."   Miller, 355 F.3d at 1178.
11 Under the "stigma-plus" test, Plaintiffs must demonstrate the loss of a recognizable property or
12 liberty interest in conjunction with the allegation that they suffered injury to reputation.   Miller,
13 355 F.3d at 1179; Cooper v. Dupnik, 924 F.2d 1520, 1532 (9th Cir. 1991), rev'd on other
14 grounds, 963 F.2d 1220, 1235 n.6 (9th Cir. 1992)).  As noted above, a plaintiff can meet this test
15 by showing that "injury to reputation was inflicted in connection with a federally protected right"
16 or that "injury to reputation caused the denial of a federally protected right."   Herb Hallman
17 Chevrolet, Inc. v. Nash–Holmes, 169 F.3d 636, 645 (9th Cir. 1999); Cooper, 924 F.2d at 1532-
18 33.  As summarized by the Second Circuit, the "[b]urdens that can satisfy this 'plus' prong under
19 the doctrine include the deprivation of a plaintiff's property, [citation] and the termination of a
20 plaintiff's **government** employment, [citation] [, or as stated in the Ninth Circuit,] direct
21 interference with a plaintiff's business . . . WMX Techs., Inc. v. Miller, 197 F.3d 367, 375 (9th
22 Cir. 1999)."  Sadallah, 383 F.3d at 38 (emphasis and alteration added).  "However, 'deleterious
23 effects [flowing] directly from a sullied reputation,' standing alone, do not constitute a 'plus'
24 under the 'stigma plus' doctrine."   Id. (quoting Valmonte v. Bane, 18 F.3d 992, 1001 (2d Cir.
25 1994).

26          The Ninth Circuit has held in unpublished cases that the stigma-plus test requires that the
27 defamation be accompanied by an injury directly caused by the state, rather than an injury caused
28 by the act of some third party in reaction to the state's defamatory statements.   Douglas v.

58

1    <u>Oregonian Pub. Co.</u>, 465 F.App'x 714, 715 (9th Cir. 2012) (unpublished) (holding "[a]lthough

2    the district court overlooked Douglas's claims against the state defendants, all but one fail

3    because Douglas did not sufficiently allege a cognizable constitutional harm from being falsely

4    labeled an informant," citing <u>Paul</u>, 424 U.S. at 698, and noting <u>WMX Techs., Inc. v. Miller</u>, 80

5    F.3d 1315, 1320 (9th Cir.1996) ("<u>WMX I</u>"), stood for the principle that "defamation and further

6    constitutional injury must be directly caused by state, not third party reacting to state's

7    defamatory comment."); <u>Ooley v. Citrus Heights Police Dep't</u>, 603 F.App'x 628, 629 (9th Cir.

8    2015) (unpublished) ("Nevertheless, the reactions of third parties to remarks made by the

9    government do not constitute state action.") (citing <u>WMX I</u>; <u>Cooper</u>, 924 F.2d at 1533–34; <u>see</u>

10   <u>also</u> <u>Mazzeo v. Gibbons</u>, 649 F.Supp.2d 1182, 1197 (D. Nev. 2009) ("Mazzeo fails to state a

11   stigma-plus claim under the Fourteenth Amendment. Mazzeo attempts to state her claim on the

12   basis that she lost her employment and was blacklisted as a result of Defendant's defamatory

13   statements.   In other words, Defendants' defamatory statements caused the loss of her

14   employment.   The problem with Mazzeo's claim is that Defendants neither fired her nor

15   blacklisted her.  Mazzeo makes clear that she worked as a cocktail waitress for a casino and that

16   after the incident, she was blacklisted from working at any Nevada casino, allegedly because

17   Defendants' defamatory statements had tarnished her reputation.  This is fatal to her stigma-plus

18   claim because the casinos are not defendants, are not state actors, and are not alleged to have

19   acted in agreement with the named Defendants.").

20       "In short, a *sine qua non* of a 'stigma-plus' suit is that the 'plus' must be the result of

21   state action directly affecting the plaintiff's rights or status under the law."  <u>Cooper</u>, 924 F.2d at

22   1533 (quoting <u>Sullivan v. State of New Jersey</u>, 602 F.Supp. 1216, 1222 (D.N.J.1985), <u>aff'd</u> 853

23   F.2d 921 (3d Cir. 1988)).[34]

24   [34]  As acknowledged above, the law of the case in this action dictates that evidence that would tend to prove or

25   disprove that CRMC removed Plaintiff from his position because of the State 2567 report is relevant in this matter.
     <u>See</u> (ECF No. 97 at 11-12); <u>Gini</u>, 40 F.3d at 1044.  Also as noted above, in dicta in <u>Cooper</u>, the Ninth Circuit stated

26   that the position that the stigma and plus must be committed by the same actor makes better law and is truer to <u>Paul</u>.
     924 F.2d at 1534.  By happenstance, the <u>Cooper</u> court relied on a case where the plaintiff also had the last name

27   Chaudhry and who was a physician involved in cardiology, and was claiming he was stigmatized resulting in the
     loss of patients and referrals.  Specifically, the <u>Cooper</u> court noted:

28

### a.      Liberty Interest

"The liberty interest protected by the due process clause 'encompasses an individual's freedom to work and earn a living.' " <u>Portman v. Cty. of Santa Clara</u>, 995 F.2d 898, 907 (9th

---

Thus even under *Marrero,* Cooper probably has no property interest to be deprived of, and thus fails to meet the stigma-plus test necessary to state a section 1983 claim. *See Chaudhry v. Prince George's County, Md.,* 626 F.Supp. 448 (D.Md.1985), where plaintiff alleged that because of the defamation, he suffered a decrease in the number of his patients, and that this was sufficient to satisfy the stigma-plus test and allow him to bring a section 1983 action. The court rejected this claim, finding that "[p]laintiff's contention that he has lost income because of a decrease in the number of patient referrals is no more than a claim for consequential damages resulting from an injury to his reputation. Plaintiff has not alleged and cannot allege on this record that any decrease in referrals was caused by the loss or alteration of a legal status recognized and protected by state law." *Id.* at 454 . . .

. . . in *Green v. DeCamp,* 612 F.2d 368, 370, 371 (8th Cir.1980) the court ruled that collateral consequences of the defamation, such as loss of business, public scorn, and potential loss of employment, did not create a cause of action for the defamation under *Paul* since such consequences would not be the result of any affirmative conduct by the parties making the defamation.

It seems to us that the result in *Sullivan* makes better law and is truer to *Paul* than the result in *Marrero.* However, regardless of which way we come out on this issue Ronstadt does not lose his qualified immunity because his statement regarding Cooper, even if defamatory, did not violate clearly established federal statutory or constitutional rights. The contradictory conclusions of Green, Chaudhry, and Sullivan, the latter of which acknowledges its conflict with Marrero, destroy any inference that Marrero constitutes clearly established law.

<u>Cooper</u>, 924 F.2d at 1533-34 n.24.

The Court notes the following facts from the other Chaudhry case out of Maryland:

Dr. M. Hafeez Chaudhry, plaintiff herein, is a physician engaged in the private practice of cardiology. Among the hospitals where he practices is Greater Laurel Beltsville Hospital (hereinafter "the Hospital"), which is located in Laurel, Prince George's County, Maryland. The Hospital is owned by Price George's County (hereinafter "the County"). In July of 1981, plaintiff Chaudhry became Chairman of the Hospital's Department of Internal Medicine (hereinafter the "Department"). Later in January of 1982, he became a member of the Hospital's Board of Directors. While serving in these positions, plaintiff became embroiled in a controversy which touched the Hospital, its Board of Directors, its administrators, its professional staff and the rules under which members of that staff secure privileges to practice at the Hospital.

As a result of certain actions, including his testimony before the Prince George's County Council, plaintiff was censured by the Board of Directors at a meeting held on February 4, 1983. In this suit, plaintiff asserts that this censure was stigmatizing and improper and that he was thereby deprived of his constitutional right to due process of law. In his amended complaint, plaintiff has sued under 42 U.S.C. § 1983 and under the Fifth and Fourteenth Amendments to the Constitution of the United States.

<u>Chaudhry v. Prince George's Cty., Md.,</u> 626 F. Supp. 448, 450 (D. Md. 1985).

1   Cir. 1993) (quoting <u>Bollow v. Federal Reserve Bank of San Francisco</u>, 650 F.2d 1093, 1100 (9th

2   Cir. 1981), <u>cert. denied</u>, 455 U.S. 948 (1982)).  "The Supreme Court has recognized 'some

3   generalized due process right to choose one's field of private employment[,]' [h]owever, a

4   liberty interest in pursuing one's chosen profession has only been recognized 'in cases where (1)

5   a plaintiff challenges the rationality of government regulations on entry into a particular

6   profession, or (2) a state seeks permanently to bar an individual from public employment.' "

7   <u>Magassa v. Wolf</u>, 487 F. Supp.3d 994, 1016 (W.D. Wash. 2020) (first quoting <u>Conn v. Gabbert</u>,

8   526 U.S. 286 (1999); then quoting <u>Guzman v. Shewry</u>, 552 F.3d 941, 954 (9th Cir. 2009)).

9        The Ninth Circuit has "consistently held that people do not have liberty interests in a

10  specific employer." <u>Llamas v. Butte Cmty. Coll. Dist.</u>, 238 F.3d 1123, 1128 (9th Cir. 2001), <u>as</u>

11  <u>amended</u> (Mar. 14, 2001).  The Ninth Circuit elaborated:

12        For example, a federal employee "does not possess a liberty interest in her civil
          service career." <u>Clemente v. United States</u>, 766 F.2d 1358, 1365 (9th. Cir. 1985).
13        The Supreme Court has recognized that an employment decision to bar a cook
          from working at a specific military base did not violate the employee's due
14        process right because the plaintiff "remained free to obtain employment ... with
          any other employer." <u>Cafeteria & Restaurant Workers Union, Local 473 v.</u>
15        <u>McElroy</u>, 367 U.S. 886, 896, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961).

16  <u>Llamas</u>, 238 F.3d at 1128.

17       The general rule is that an employee does not have a liberty interest in continued

18  employment "when his position is 'held at the will and pleasure of his superiors and when he has

19  not been promised that he will only be terminated for good cause.' " <u>Jackson v. Heh</u>, 215 F.3d

20  1326 (6th Cir. 2000).  "[T]o achieve a sufficient 'plus' in a loss-of-job context, words spoken

21  must be 'uttered incident to the termination.' " <u>Pendleton v. City of Haverhill</u>, 156 F.3d 57, 63

22  (1st Cir. 1998) (quoting <u>Siegert</u>, 500 U.S. at 234).  The stigmatizing statements must be made in

23  connection with the termination of the employee.  <u>Brady v. Gebbie</u>, 859 F.2d 1543, 1553 (9th

24  Cir. 1988); <u>see also</u> <u>Hyland v. Wonder</u>, 972 F.2d 1129, 1141 (9th Cir. 1992) ("If, in the course of

25  dismissing an employee, the government takes steps or makes charges that so severely stigmatize

26  the employee that she cannot avail herself of other employment opportunities, a claim for

27  deprivation of liberty will stand.")  Further, a "violation of constitutional proportions under a

28  'stigma plus' theory exists only if, and to the extent that, the opportunities lost are government

1  benefices denied as a result of governmental action." Pendleton, 156 F.3d at 63 (finding no

2  claim where the plaintiff "worked for a non-governmental employer and lost a private (not a

3  public) position."); Mead v. Indep. Ass'n, 684 F.3d 226, 234 (1st Cir. 2012) ("[T]he 'plus' in this

4  case cannot be the loss of Mead's IA job with a private employer [and] [a]lthough it is regulated

5  by, and receives funding from, [the Maine Department of Health and Human Services], IA is a

6  private employer.").

7          A liberty interest has been found to exist in continuing public employment, and depriving

8  an individual from all other public employment would implicate the Due Process Clause. Roth,

9  408 U.S. at 573.  Even where it is the government that has terminated the plaintiff's public

10 employment, "to implicate constitutional liberty interests, the reasons for dismissal must be

11 sufficiently serious to 'stigmatize' or otherwise burden the individual so that he is not able to

12 take advantage of other employment opportunities." Portman, 995 F.2d at 907 (quoting Bollow,

13 650 F.2d at 1101).  " 'Charges that carry the stigma of moral turpitude' such as dishonesty or

14 immorality 'may implicate a liberty interest, but charges of incompetence or inability to get

15 along with others do not.' " Portman, 995 F.2d at 907 (quoting Wheaton v. Webb–Petett, 931

16 F.2d 613, 617 (9th Cir. 1991)).

17         **b.      Alteration or extinguishment of right**

18         To satisfy the "plus" element, the Plaintiffs must show that, as the result of the

19 defamatory statement "a right or status previously recognized by state law was distinctly altered

20 or extinguished." Humphries, 554 F.3d at 1186 (quoting Paul, 424 U.S. at 711; and citing

21 Siegert, 500 U.S. at 233 (reaffirming that an injury to reputation by itself is not a protected

22 liberty interest under the Fourteenth Amendment).  It is the "alteration of legal status which,

23 combined with the injury resulting from the defamation" that justifies "the invocation of

24 procedural safeguards." Humphries, 554 F.3d at 1186 (quoting Constantineau, 400 U.S. at 708-

25 09).

26         In Humphries, parents were included on a list of child abusers.  554 F.3d at 1180.  A

27 criminal case was filed against the parents that was dismissed. Id. at 1181.  Although the statute

28 provides that an individual who was originally listed in the database pursuant to an "inconclusive

1    or unsubstantiated report" will be deleted after ten years, as long as no subsequent report

2    containing his or her name is received within that time period, there is no provision for removing

3    an individual who was originally listed in the pursuant to a "substantiated report"; such a person

4    apparently remains listed in the CACI permanently. Humphries, 554 F.3d at 1179. The Ninth

5    Circuit found that being included on the list altered the parents' right in two ways. Humphries,

6    554 F.3d at 1187. First, a number of statutes require that the licensing agencies search CACI and

7    conduct an investigation prior to granting a number of licenses such as to care for children in a

8    day care center or home, among others. Id. Second, by being included in CACI, the plaintiffs'

9    legal rights had been altered in a variety of ways from Californians who were not on the list,

10   such as "applying for custody of a relative's child, becoming guardians or adoptive parents

11   (inside or outside of California), obtaining a license for child care, becoming licensed or

12   employed in a position dealing with children, obtaining employment as a peace-officer, and

13   involvement in adoption and child placement." Id. Further, the parents presented evidence that

14   renewal of a teaching credential was being affected. Id.

15        Stigma-plus applies when a right or status is "altered or extinguished," and the Ninth

16   Circuit found a tangible burden existed in this context because the state law effectively requires

17   agencies to check the stigmatizing list and investigate any adverse information prior to

18   conferring a legal right or benefit, and explicitly requires agencies to consult CACI and perform

19   an independent investigation before granting a number of licenses and benefits. Id. The

20   Humphries had identified a sufficient liberty interest under the stigma-plus test that could not be

21   denied without due process of law. Id. at 1189. However, the Ninth Circuit emphasized that "an

22   injury that results merely from simple defamation is not a constitutional liberty interest under the

23   'stigma-plus' test. Id. at 1190 (quoting Siegert, 500 U.S. at 233–34). "Employment, licensing,

24   custody, or other legal rights under California law are not refused merely because of the

25   deleterious effect of a bad reputation." Humphries, 554 F.3d at 1190. Rather, by operation of

26   law, California agencies were required to consult CACI and conduct an investigation to

27   determine if the Humphries were eligible for the benefit and those agencies would be more

28   hesitant to issue the benefit because the plaintiffs were listed in CACI. Id. at 1190-91.

The Ninth Circuit considered a case somewhat analogous to this action in <u>Castaneda v.</u> <u>U.S. Dep't of Agric.</u>, 807 F.2d 1478, 1479 (9th Cir. 1987).  Castaneda was a manager at a liquor store, and an agent of the United States Department of Agriculture ("USDA") investigated his participation in the federal food stamp program.  <u>Castaneda</u>, 807 F.2d at 1749.  The investigator used food stamps to purchase ineligible items from Castaneda and the USDA instituted proceedings to terminate the store's participation in the federal food stamp program.  <u>Id.</u>  The store terminated Castaneda's employment allegedly due to his unlawful redemption of food stamps.  <u>Id.</u>  Castaneda brought suit against various officials and the USDA arguing that he was required to be provided with advance notice and a hearing and his due process rights had been violated.  (<u>Id.</u>)

The Ninth Circuit held that Castaneda had no direct relationship with the government.  Rather, the government dealt directly with the Circle K store, and Castaneda complained only of the indirect adverse consequences he suffered as a result of the government-store interaction.  <u>Castaneda</u>, 807 F.2d at 1479.  The Ninth Circuit found the action similar to <u>O'Bannon v. Town</u> <u>Court Nursing Center</u>, 447 U.S. 773 (1980), summarizing:

> In <u>O'Bannon v. Town Court Nursing Center</u>, 447 U.S. 773, 100 S.Ct. 2467, 65 L.Ed.2d 506 (1980), the Supreme Court faced a similar situation where government action adversely affected the plaintiff only indirectly, and the Court found a "simple distinction between government action that directly affects a citizen's legal rights, or imposes a direct restraint on his liberty, and action that is directed against a third party and affects the citizen only indirectly or incidentally...."  <u>Id.</u> at 788, 100 S.Ct. at 2476–77.  In <u>O'Bannon</u>, patients of a nursing home asserted a due process right to notice and a hearing before the government could decide to disqualify the nursing home from continuing to receive Medicaid and Medicare payments to cover its patients' bills.  The Court held that the patients had no statutory right to receive public funding for residing in nursing homes which were determined to be unqualified; instead, the patients simply enjoyed indirect benefits from the government's regulatory relationship with their nursing home.  Termination of those benefits granted directly to the nursing home thus did not deprive the patients of any "enforceable expectation of continued benefits.  <u>Id.</u> at 786, 100 S.Ct. at 2476.  While the government had to provide the nursing home with the opportunity to be heard concerning its disqualification from the program, it was not constitutionally required to provide the same opportunity to the patients.
>
> Similarly, Castaneda was only an indirect beneficiary of the government's statutory relationship with The Circle K Corporation allowing it to participate in the food stamp program.  We agree with the USDA that its order prohibits the "retail food store" and its owner/operator, not employee Castaneda individually,

from accepting food stamps, see United States v. Smith, 572 F.2d 1089, 1095 (5th Cir. 1978), and hence Castaneda is not a direct target of the government's disqualification decision.

Moreover, he as an individual enjoys no legally cognizable interest in working for a store which can accept food stamps, nor does he claim that he has a property interest enforceable against the government in maintaining his private employment with The Circle K Corporation. He thus cannot satisfy the "stigma-plus" standard for direct injury established in Paul v. Davis, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976) (defamation alone is insufficient to work a due process violation absent accompanying loss of government employment or change in legal status under state law). Instead, he is simply the indirect "victim" of the government's decision to terminate Circle K's statutory benefits and hence is in the same position as the nursing home patients in O'Bannon; unlike the store for which he worked, he has no due process right to be heard before the store is temporarily disqualified from program participation. He thus fails to state a claim upon which relief could be granted.

Castaneda, 807 F.2d at 1479–80.

In a footnote, the Court recognized that O'Bannon left open the possibility that a third party could assert a claim if the Government acted with the purpose of punishing or restraining another.

O'Bannon explicitly left open the possibility that where the government indirectly yet intentionally injures or affects the legal status of a person by action taken directly against a private third party, the injured person can maintain a due process challenge against the government. See 447 U.S. at 789–90 n. 22, 100 S.Ct. at 2477 n. 22 ("[I]f the Government were acting against one person for the purpose of punishing or restraining another, the indirectly affected individual might have a constitutional right to some sort of hearing."). Here, however, Castaneda has not alleged that in issuing its order the USDA intended to injure him personally by getting him fired. He alleges only that he lost his job as a result of the order.

Castaneda, 807 F.2d at 1480 n.4.

c.    **Adequacy of Procedural Safeguards**

Plaintiffs must prove that they did not receive due process. Ulrich, 308 F.3d at 982; Constantineau, 400 U.S. at 436. Plaintiffs must also "show that the procedural safeguards of their liberty interest established by the state are constitutionally insufficient to protect their rights." Humphries, 554 F.3d at 1192.

C.    **Plaintiffs' Stigma-Plus Claims Fail**

In consideration of the findings of fact and the above outlined legal standards pertaining to stigma-plus claims, the Court concludes that Plaintiffs have failed to establish any Defendants

are liable for a violation of Plaintiffs' due process rights, and Plaintiffs' claims fail for all of the below explained reasons.

1.   Plaintiffs have Failed to Demonstrate any Alleged Stigmatizing Statements were Substantially Untrue

The Court finds that Plaintiffs have not demonstrated that the statements and findings that were ultimately material to the conclusions of violations by Dr. Chaudhry of the CRMC bylaws, and rules and regulations, contained in any of the reports, CMS or State, amended or original, were substantially false.  See Campanelli, 100 F.3d at 1484; Murphy, 103 F. Supp. 3d at 1240-41.

The Court finds Dr. Chaudhry's testimony at trial that the surgery was completed and that the skin was closed when he left the operating room not credible in the face of the totality of testimony and evidence in this matter.   The Court also finds Dr. Chaudhry's testimony concerning his actions after leaving the operating room, including regarding his concern expressed with the phone calls he had with Albakova about Perez's condition before he returned to the operating room, and testimony that he was back to the hospital within nineteen (19) minutes and thus within the required thirty (30) minutes under the applicable rules and regulations, to be not credible in the face of other evidence and testimony.

The Court finds the contemporaneous notes, subsequent written dictation, and testimony of the perfusionist Schreur to be highly credible.  (Ex. 511 at 1-2; Ex. 512 at 1.)  Specifically, the Court is persuaded by Schreur's testimony regarding his notation that the chest was "still open," meant the sternal wires had not been closed putting the sternum back together; and notation that "as he frequently does," meant that Dr. Chaudhry's custom to allow his assistant surgeon and physician assistant Albakova to close in that manner, and that such custom would entail Dr. Chaudhry physically leaving the operating room during the closing of the chest.   The Court further relies on Schreur's written account stating that Dr. Chaudhry was called in at 12:58 p.m., and didn't return until 1:29 p.m., and finds such to be reliable particularly given the details concerning Albakova being hysterical when speaking to Dr. Chaudhry after 1:12 p.m., the notation that the anesthesiologist put on gloves to assist with cannulation at 1:15 p.m., and the

1  notation that Schreur commenced cardiopulmonary bypass at 1:24 p.m.  (Ex. 511 at 1; Ex. 512 at

2  1.)  The Court finds Plaintiffs aversion to a potential ulterior motive of Robillard and Schreur, or

3  alleged animosity toward Dr. Chaudhry as a motivating factor to dishonestly report this incident,

4  to not be credible, in consideration of the totality of the evidence and testimony.

5          The Court finds the totality of the testimony of Albakova,[35] in conjunction with the

6  testimony from Schreur, to be most persuasive.  However, the Court has reviewed designated

7  testimony from other people present in the operating room that did not testify in this trial, and

8  notes there are differing accounts of what precisely happened.[36]

---

[35]  The Court finds the designated testimony of Albakova, who was not a witness in this trial, to be compelling. Specifically, Albakova testified that she began working with Dr. Chaudhry on a limited basis in Santa Cruz, California, before working with him in Fresno, but never wired the sternum in Santa Cruz. (Albakova Dep. Vol. I at 18:9-19:17.)  Albakova began wiring the sternum about two to three months after her arrival in Fresno, under the training of Dr. Chaudhry at Valley Cardiac, and Albakova understood it was allowed because of Dr. Chaudhry's supervision.  (Id. at 31:14-34:17.)  About five (5) months after he began teaching her, Dr. Chaudhry began leaving the operating room before or during the wiring of the sternum, and Albakova would express concern.  (Id.)  This practice of leaving before or during the wiring of the sternum continued at CRMC.  (Id. at 36:32-37:1.)  Toward the end of 2011, for the first time Dr. Chaudhry left Albakova and did not return to check on her.  (Bella Albakova, Trial Tr. Perez Malpractice Case, Jan. 17, 2018, Vol. 11 ("Albakova Trial Vol. 11"), at 133:5-136:6.)  By the time of the Perez surgery, Dr. Chaudhry would stay in the operating room during the closing about sixty to sixty-five percent (60-65%) of the time, and would leave and not return to the operating room the other times.  (Id.)  At that time, Albakova was participating in approximately 250 to 270 surgeries per year, sometimes twice in one day.  (Id.)  On occasion, Dr. Chaudhry would leave the operating room on the first surgery and go start the second surgery before the chest of the first patient was closed.  (Id.)

Albakova testified she did in fact complete the wiring of the sternum in the Perez surgery, and that she was second assist, and Dhillon was first assist.  (Albakova Dep. Vol. I at 51:9-10.)  Specifically, when Dr. Chaudhry was about to leave the operating room, Albakova asked him something like "you are not leaving right?," and was concerned about oozing blood and the fact that Perez had difficulty separating from bypass.  (Id. at 71:24-74:3.)  Albakova specifically testified that she saw him exit the operating room, that she then placed the chest tubes, then wired the sternum, then closed the skin layers.  (Id.)  Albakova stated that generally chest tubes take approximately five (5) minutes to place, that it takes about ten (10) minutes to wire the sternum, about seven (7) minutes to close the layers of skin, and thus a total of about twenty (20) to twenty-five (25) minutes to complete these steps.  (Id.; Id. at 236:20-238:8.)  Albakova stated she did not observe Dr. Chaudhry dictating at the dictation table during this time, that Dr. Chaudhry said he was leaving and told her to close the chest, and that while it was unlikely she would not have noticed him at the dictation table, it is possible he was there and that she did not notice him, as anything is possible.  (Id. at 178:13-181:20.)

[36]  Allen testified that she did not recall whether Dr. Chaudhry or Albakova placed the chest tubes, but recalled Albakova did wire the sternum, and Dhillon and Albakova closed the rest of the skin layers.  (Allen Dep. Vol I at 23:14-26:7.)  Allen recalled Dr. Chaudhry was sitting at the dictation desk when the wiring was being done, and although Allen was on the same side as Albakova, she knew Dr. Chaudhry was there because she heard him at the dictation table, however, did not recall how long he was there or when he actually left the operating room.  (Id.)  Allen testified she did not recall telling investigators that Dhillon and Albakova were closing the chest when Dr. Chaudhry left the room, and did not recall telling investigators a different version where Dr. Chaudhry closed the sternum.  (Martha Allen Trial Tr. Perez Malpractice Case Vol. 13 Jan. 29, 2018 ("Allen Trial Vol. 13"), at 556:16-557:21.)  Allen again confirmed at trial in the Perez Malpractice Case that she had no memory of when Dr. Chaudhry left the operating room.  (Id. at 558:20-24.)  The Court notes that Allen's testimony of hearing Dr. Chaudhry dictating is consistent with Dr. Chaudhry's testimony that he can be heard on the dictation recording

1    By applying the credibility findings to Schreur, and to a lesser extent Albakova due to her

2    not directly testifying at this trial, to the requirement that Plaintiffs must establish stigmatizing

3    statements as substantially untrue, and viewing the totality of the other evidence, including but

4    not limited to other trial testimony, the MEC independent investigation, the designated testimony

5    of other witnesses that were present in the operating room but did not testify at this trial, and the

6    notes reflecting the substance of the various interviews completed by the surveyor investigators,

7    the Court finds that the material conclusions reached by investigators, including Defendant

8    Campbell, and placed in the CMS Report, and State Reports reviewed by Defendant Lopez, were

9    not substantially false.

10    Plaintiffs submit there is no evidence to support a finding that Dr. Chaudhry left

11    Albakova to wire the sternum shut without a qualified physician present.  The Court disagrees,

12    finds Plaintiffs have failed to establish otherwise, and the Court is not convinced by testimony or

13    arguments that it may have been sufficient to leave Dr. Dhillon or Dr. Bhatt with Albakova

14    rather than Dr. Chaudhry.  Plaintiffs failed to present by a preponderance of the evidence that

15    such was sufficient under any construction of the hospital bylaws, or other policies and

16    procedures.

17    The findings and conclusions that were most material to the State 2567 and the CMS

18    2567, were supported by the MEC's own investigation based on an outside reviewer's

19

20

---

21    asking Schreur for data to input while dictating.  (See Id. at 581:2-582:23.)  Allen also testified that she recalled Dr.
      Chaudhry coming over to the operating table during the skin closing after dictating.  (Id. at 581:2-582:23.)

22
23    Breaux testified that Dr. Chaudhry put the wires in the sternum.  (Dep. Geri Breaux Dec. 8, 2014 ("Breaux Dep."),
      at 27:6-10.)  Breaux testified that prior to Perez, Dr. Chaudhry never left Albakova to close the sternum with wire,
      and would leave the operating room after the wires were put in.  (Id. at 28:13-29:16.)  Breaux recalled that with
24    Perez, Dr. Chaudhry completed the wiring with the assistance of Albakova and Dhillon, and then Albakova and
      Dhillon completed the closing of the subcutaneous and skin layers.  (Id.)  Breaux did not recall Dr. Chaudhry
25    dictating on the day of the Perez surgery.  (Id. at 34:18-35:19.)  Breaux testified that Albakova was closing the
      second skin layer when Dr. Chaudhry left the operating room.  (Id. at 37:5-39:2.)

26    Bhatt testified that he did not recall who completed the chest tubes; did not recall Dr. Chaudhry wiring but it was
      standard practice for Dr. Chaudhry to do the wiring; that he could not recall who completed the suturing of the skin
27    layers, and did not recall if Dr. Chaudhry asked how things were going before leaving the operating room.  (Dep.
      Ashwin Bhatt Vol I July 14, 2014 ("Bhatt Dep. Vol I"), at 31:14-23; 33:9-34:13, 35:5-36:7, 37:9-37:17.)

28

1    investigation and report.[37]   Again, as of August 21, 2012, the Medical Executive Committee's

2    investigation, supported by the outside reviewer's findings, concluded the following as to the

3    April 2, 2012 surgery of Perez: (1) "There is evidence that the patient was unstable following the

4    conclusion of surgery;" (2) "As a result, the patient was not ready to leave the OR;" (3) "The

5    responsibility for the patient's care under these circumstances rested with [Dr. Chaudhry];" (4)

6    "In leaving the OR and the hospital, [Dr. Chaudhry] failed to designate another physician

7    qualified to provide the necessary coverage or care for this patient;" (5) "As a result of [Dr.

8    Chaudhry's] failure, there was an untimely response to the patient's deteriorating condition;" (6)

9    "[Dr. Chaudhry] ha[d] already been directed to either be present or to provide suitable coverage

10   (presence of a privileged cardiothoracic surgeon) following cardiac surgery cases until the

11   patient is stable in the intensive care unit ("ICU") [and] [t]his requirement shall remain in place;"

12   (7) "[Dr. Chaudhry] ha[d] already been directed to remain in the OR until the patient's chest is

13   closed;" and (8) "Therefore, a fourteen-day (14) day medical staff membership and clinical

14   privileges suspension is imposed and shall be served within three (3) months of August 5, 2012."

15   (Ex. 123.)

16        The preponderance of the evidence shows that it is substantially true that Dr. Chaudhry

17   left the operating room before the chest was fully closed leaving Albakova and Dhillon to close

18   the chest, and doing so was the material violation of the bylaws and rules and regulations of the

19   hospital, and that was what was material to the ultimate conclusions and findings in the CMS

20   Report and State Report, given CDPH's duty to investigate and conduct surveys concerning the

21   violation of the hospital's bylaws, rules and regulations, as well as the Conditions of

22   Participation for CMS.

23        While Dr. Chaudhry averred in testimony that physician assistants did not have general

24   privilege cards, but did have privileges to close the chest when working in the emergency room,

25   the Court finds the testimony of McComb and Campbell and other evidence clearly supports the

---

[37]  The outside reviewer's underlying report is not in evidence, but that is not necessary for the Court to utilize the
MEC letter and fact of investigation as additional support for the finding the material conclusions were not
substantially false, and more directly for the fact that the CRMC's decisions to take adverse actions against Dr.
Chaudhry were not caused by CDPH's investigation or reports but because of Dr. Chaudhry's violations of the
hospital's bylaws and rules and regulations, as the Court elaborates when discussing causation below.

1   findings that Campbell received and viewed the privilege cards, and that Albakova did not have

2   the privilege to close the chest without the supervision of Dr. Chaudhry.  McComb's testimony

3   described above concerning her contacts with the Physician Assistant Board for the State of

4   California, and subsequent action within CRMC concerning such privilege cards, is particularly

5   illustrative.  Further, the relevant bylaws for CRMC provided that that: "A practitioner shall be

6   entitled to exercise only those clinical privileges or practice prerogatives **specifically granted.**"

7   (Ex. 521 at 48 (emphasis added).)[38]

8        Campbell also utilized CRMC's rules of regulations which provide in relevant part,

9   within Section D entitled "COVERAGE ARRANGEMENT," that: "Each attending physician

10  shall personally provide or otherwise arrange for continuous care and coverage for each of his or

11  her patients who present to the hospital for clinical care or who are currently hospital inpatients

12  or who have been seen on consultative basis.  If a physician is unable to provide care for his or

13  her patients, then the physician must provide coverage through another appropriately

14  credentialed physician."  (Ex. 520 at 12.)  Campbell appropriately used this provision to

15  conclude that Dr. Chaudhry did not appoint a qualified medical professional in Dr. Chaudhry's

16  absence.

17       Campbell based her finding that Albakova was not qualified to close the chest without the

18  presence of Dr. Chaudhry on the peer review file of Albakova, the bylaws, and by reviewing

19  Albakova's privilege card.  The Court finds the conclusion is not substantially false, and that

20  ─────────────────

[38]   Additionally, in designated deposition testimony, Albakova stated that before she was allowed to work at CRMC,

21  she was required to go through a credentialing process and was specifically given privileges for things such as
    seeing patients, being present in the operating room, being a first or second assist in surgery, and for post-operative

22  care, among others.  (Albakova Dep. Vol. I at 45:14-47:24.)  Albakova stated she did not expressly ask Dr.
    Chaudhry if it was okay to wire the sternum under the privileges, but would ask generally if it was "alright," and Dr.

23  Chaudhry said it was okay because she was training and under supervision.  (Id.)  When Albakova would ask when
    he left the operating room if it was okay, Dr. Chaudhry would state he was "here."  (Id.)  Albakova testified that she

24  was thinking of taking a cardiovascular board test that may require a certain number of sternal closures, and that
    while she discussed such with Dr. Chaudhry, she had not actually official registered for the test by that time.

25  (Albakova Vol I at 101:3-102:14.)

26  At trial, Dr. Chaudhry testified that he was not training Albakova at the time of the Perez surgery, as he had been
    training her since 2005, and training for heart surgery is only two (2) years.  While Dr. Chaudhry testified he did not

27  recall Albakova's previous testimony during the Perez Malpractice Case regarding Dr. Chaudhry leaving the
    operating room while Albakova was still wiring the chest, Dr. Chaudhry did confirm that he allowed Albakova to

28  wire the sternum for his patients and complete surgeries for at least four (4) years.  Dr. Chaudhry claimed he trusted
    her and still trusts her to do such work as she has impeccable work ethics and impeccable hands.

1   there was sufficient evidence to conclude Albakova was not privileged to close the chest, and

2   that Dr. Chaudhry left the operating room before the chest was closed, whether during the wiring

3   as Schreur's testimony and reports reflect (as well as Albakova's testimony), or whether the

4   Court relies on other testimony that reflects Dr. Chaudhry left at some other point before the

5   final skin layers were closed, such as McComb's trial testimony that it was her belief that

6   regardless of whether the term "stapling of the bones" was used, the conclusion that Dr.

7   Chaudhry left before the *skin* was closed *was* true, and *that* was a violation of the applicable

8   bylaws, and rules and regulations.

9        Campbell also relied on the portion of the rules and regulations that provides: "The

10  operative report shall include . . . [t]he specific procedures performed and a description of

11  significant surgical tasks that were conducted by practitioners other than the primary LIP

12  (significant surgical procedures include: opening and closing . . . "[c]omplication, if any . . .

13  [and] [p]ostoperative diagnosis." (Ex. 520 at 30-31.) Campbell's conclusion that the operative

14  report did not show Albakova's involvement nor indicated the critical condition of the patient

15  after the surgery, is supported by the evidence and is not substantially untrue, and Campbell's

16  reliance on this portion of the rules and regulations was proper.

17       The Court will accept, and Defense counsel appears to concede, that Campbell used

18  incorrect information regarding the time Dr. Chaudhry left the operating room, despite

19  Campbell's testimony that this is what Dr. Chaudhry had stated to her in the interview. It is now

20  an undisputed fact that Dr. Chaudhry did not leave the operating room before 12:15 p.m. The

21  Defense also concedes that the use of the term stapling in some portions of the reports, is

22  inaccurate, but argue the use of the term is not in of itself the stigmatizing aspect of the material

23  conclusions of the reports. The Court agrees and finds that whether the reports incorrectly used

24  or incorporated the term stapling is not material in a determinative aspect as to the totality of the

25  facts and applicable legal standards here, and the material violations established through the

26  investigations and reflected in the reports.[39] The incorrect reporting of a precise time does not

27  ──────────

28  [39] However, the Court will note that McComb's testimony regarding the conversations with Campbell regarding the inaccuracy of quoting McComb and Utecht in this regard seemed more credible and plausible, however, it did not appear to the Court that Campbell was being intentionally dishonest.

71

have any stigmatizing effect – it is the fact that Dr. Chaudhry left before the chest was sutured and violated the bylaws and rules and regulations.  The time is inconsequential to such violation if there is adequate support to show the violations occurred and the reporting of such violations were not substantially untrue.  Thus the reporting of an incorrect time was not material and was thus not stigmatizing.  It is the fact Dr. Chaudhry left Perez with Albakova and the general surgeon Dhillon to complete the surgery that is the potentially stigmatizing aspect.

The Court finds additional support in the notes of interviews conducted by Yussif.  Specifically, Yussif's notes reflect that during interviews with Yussif: (1) Breaux stated Dr. Chaudhry's usual practice was to leave the physician assistant and general surgeon to close the chest, and that when Dr. Chaudhry left the operating room, the chest was not closed; (2) Kroes stated that once the chest tubes were out, Dr. Chaudhry left the room; (3) Schreur stated the patient was assessed and Dr. Chaudhry stepped away and Albakova and Dhillon closed up the chest, and that was normal; and (4) Allen stated Dr. Chaudhry was sitting in the room doing orders, then left the room and Dhillon and Albakova were closing the chest.[40]   Additionally, Kappmeyer's notes of her July 13, 2012 interview with Breaux reflect that Breaux stated the operation went well; "Dr. Chaudhry left.  Both Dr. Dhillon and Bella performed closure.  (They start @ separate ends)  Dr. Dhillon is a general surgeon.  [Dr. Chaudhry [d]id not sit at desk to do orders . . . or operative report.  This was his practice.  He rarely stayed in OR to orders/operative report."  (Ex. 509 at 6.)[41]

It is true that the CDPH subsequently amended the State 2567 based on information provided to it by CRMC.  The conclusion that Perez was not stable and that the closure of the chest was not completed when Dr. Chaudhry left the operating room never changed between the original State 2567 and amended State 2567.  Specifically, the Amended State 2567 still

---

[40]  As noted above, Campbell's notes seem to indicate Allen later told Campbell that Dr. Chaudhry was still there to the end of skin closing.  (Ex. 104 at 16.)  While this is in line with Allen's designated testimony, Allen's testimony and the notes of this later interview do not sway the Court's conclusions given the totality of the evidence and testimony.  Further, the notes in regards to Breaux are consistent with her designated testimony that Albakova was closing the second layer of skin when Dr. Chaudhry left the operating room.  (Breaux Dep. at 37:5-39:2.)

[41]  This is consistent with Breaux's designated testimony noted above.  (Breaux Dep. at 34:18-35:19.)

1   concludes that Dr. Chaudhry left "prior to complete closure of the chest and before [Perez] fully

2   stabilized"; and that Dr. Chaudhry "violated the hospital medical staff rules and regulations when

3   [he] failed to arrange appropriate coverage for [Perez] by leaving in-charge individuals not

4   qualified to assume responsibility for [Perez]."  (Ex. 504 at 9.)  Again, the August 21, 2012 letter

5   from the MEC reflects that Dr. Chaudhry was aware that CRMC's investigation with an outside

6   reviewer reached a similar if not identical conclusion regarding the Perez's stability, and

7   Plaintiffs have not established by a preponderance of the evidence that the conclusion that Perez

8   was not stable is not substantially untrue, based on the Court's review of the testimony and

9   evidence.

10       Further, the evidence and testimony does not demonstrate that Campbell or Lopez had a

11  direct role in the specific changes between the original and amended 2567, aside from Lopez's

12  general review before being sent up the chain of command for final review and posting of the

13  amended state report.  There is no evidence showing Defendants Campbell or Lopez issued these

14  changes because they thought these were mistakes, and the Court agrees that it cannot attribute

15  these changes to these Defendants sued in their individual capacity.  The Court outlined the

16  relevant changes made between the original and amended State 2567 above in the factual

17  findings.  That the State subsequently amended based on information provided by hospital, does

18  not change the fact the amended report still states Dr. Chaudhry left the operating room before

19  the surgery was completed, before the chest was closed, and while the patient was not stabilized.

20       Finally, even if the conceded inaccurate statement regarding the time Dr. Chaudhry left

21  the operating room, or the incorrect statement that staples were used instead of wiring or other

22  method of closing the chest, or the dispute regarding the precise use of the word "stable" at a

23  certain point of time,[42] were material in making the ultimate findings and conclusions regarding

---

[42]  The Court finds there is sufficient evidence to support the finding the patient was unstable, despite, for example, the testimony concerning contemporaneous observations of stability while the operation was ongoing, including Schreur noting Perez was stable prior to Dr. Chaudhry leaving the operating room; Albakova's testimony that after Perez came off of bypass, he was "hemodynamically stable," and while there was oozing, there was not a concern about excessive bleeding (Albakova Vol I at 66:5-23, 69:1-70:2, 182:16-183:19; Albakova Vol. 11 at 191:26-192:13); Bhatt's testimony that Perez was stable in a "broad sense" at certain times such as 12:00 p.m., and hemodynamically stable at 12:51 p.m. because of Bhatt transfusing him and by supporting him with resuscitation (Bhatt Vol I at 49:7-50:15, 52:25-53:3, 59:10-62:3).  Further, as noted above, this conclusion never changed between original and amended State 2567.

1    violations of CRMC's bylaws, and rules and regulations, the Court would find these statements

2    to not rise to the level of a stigma under the test for defamation in relation to termination of

3    employment.  See Moody, 2018 WL 646686, at *4 ("remarks in connection with discharge from

4    employment must contain egregious accusations such as 'charges of immorality, or dishonesty

5    that can cripple an individual's ability to earn a living.' ") (quoting Turner, 2012 WL 6631490, at

6    *6); Wheaton, 931 F.2d at 617 ("Charges that carry the stigma of moral turpitude may implicate

7    a liberty interest, but charges of incompetence or inability to get along with others do not . . . We

8    must also distinguish charges that simply reduce economic rewards and diminish prestige from

9    those with more serious consequences, such as a protracted hiatus in employment or a permanent

10   exclusion from a profession or trade."); Gray v. Union Cty. Intermediate Educ. Dist., 520 F.2d

11   803, 806 (9th Cir. 1975) ("A letter from a former director of special education charging the

12   appellant with insubordination, incompetence, hostility toward authority, and aggressive

13   behavior was also presented at the hearing.  These allegations certainly are not complimentary

14   and suggest that Mrs. Gray may have problems in relating to some people, but they do not import

15   serious character defects such as dishonesty or immorality.").

16        The Court concedes charges of leaving a patient on the operating table before an

17   operation is completed may rise above those of simply being incompetent and to the point of

18   being untrustworthy, but not the fact that the wiring was done with staples as opposed to wires,

19   or that the time was 12:15 rather than 11:30 or 11:45 a.m.  These specific inaccuracies were not

20   sufficiently egregious to be considered stigmatizing.

21        The other and ultimate material conclusions and findings about Dr. Chaudhry may have

22   been stigmatizing, but they have not been shown to be substantially untrue.  However, on the

23   other hand, the Court considers the fact that Dr. Chaudhry testified he thought Albakova was

24   impeccably skilled at the work they did together while performing surgery, and thus based on Dr.

25   Chaudhry's testimony, he may not have had an immoral motive in leaving Perez in the hands of

26   Albakova to perform the closing.  Thus, the fact that Dr. Chaudhry violated the bylaws, and rules

27   and regulations, by leaving Albakova to do the closing *may* very well simply amount to an

28   oversight of the rules or a lack of judgment, rather than an act of moral turpitude.  See Murphy,

103 F. Supp. 3d at 1240–41. These findings and conclusions certainly do not rise to the level of being placed on a government list equating a person to suspicion of terrorist activity or branding the person as a child abuser, or other criminal activity. See Humphrey, 554 F.3d at 1186; Tarhuni, 8 F. Supp. 3d at 1274. The inaccurate reporting on the operative report may be considered an act of dishonesty, or it could very well amount to incompetence or lack of judgment as well. However, that aspect the Court also finds to not have been shown to be substantially untrue.

The Court acknowledges that the difference between skin closure and an open chest does seem potentially a degree more potentially stigmatizing than the other, for example, if this information was publicly disseminated, a reasonable person in the general population would likely view a surgeon that left while the bones were being "stapled" differently than a surgeon leaving when the last stitches are placed on the skin; however, here the preponderance of the evidence shows that at least the investigators were reasonable in concluding that Dr. Chaudhry left while the chest was open and left the physician assistant and general surgeon to close the chest in violation of hospital policies.

In sum, for all of the above reasons, Plaintiffs' claims fail because they have failed to establish any material statements made by Defendants were stigmatizing and substantially untrue. As explained below, and perhaps more significantly, Plaintiffs have also failed to establish publication or causation.

2.   Plaintiffs Have Failed to Establish the Element of Causation

The Court utilizes the following summary of the causation standards applicable to a Section 1983 action:

> "In a § 1983 action, the plaintiff must ... demonstrate that the defendant's conduct was the actionable cause of the claimed injury." Harper v. City of Los Angeles, 533 F.3d 1010, 1026 (9th Cir.2008) (citing Arnold v. IBM Corp., 637 F.2d 1350, 1355 (9th Cir.1981)). To meet this causation requirement, the plaintiff must establish both causation-in-fact (which is sometimes also known as actual causation), and proximate causation (which is sometimes also known as legal causation). Id. (citing Van Ort v. Estate of Stanewich, 92 F.3d 831, 837 (9th Cir.1996); Arnold, 637 F.2d at 1355).

> A defendant's conduct is a cause-in-fact or actual cause of a plaintiff's injury if it is a "but-for" cause of the injury. See White v. Roper, 901 F.2d 1501, 1505–06

(9th Cir.1990) ("Sergeant Roper s conduct is an actual cause of White's injury only if the injury would not have occurred 'but for' that conduct.") (citing W. Prosser & W. Keeton, The Law of Torts § 41, at 266 (5th ed.1984)); *Estate of Macias v. Lopez,* 42 F.Supp.2d 957, 963 (N.D.Cal.1999), *overruled on other grounds,* 219 F.3d 1018 (9th Cir.2000) ("In order to establish actual causation, a plaintiff must first show that defendant was a 'but for' cause of her injury.") (citing *City of Canton, Ohio v. Harris,* 489 U.S. 378, 391 (1989); *Van Ort,* 92 F.3d at 837). And a defendant's conduct is a proximate or legal cause of a plaintiff's injury if there is "a sufficient causal link between the act or omission of a defendant and any injury suffered by the plaintiff to justify the imposition of liability." *Estate of Macias,* 42 F.Supp.2d at 964.

Proximate or legal causation "frequently is equated with the concept of 'foreseeability,' " and "[u]nder most circumstances, legal causation does not extend beyond the scope of 'foreseeable risks.' " *Id.* (citing *Van Ort,* 92 F.3d at 837 (applying foreseeability test to question of proximate cause in section 1983 action); *Hines v. United States,* 60 F.3d 1442, 1450 (9th Cir.1995) ("The question of proximate cause is usually defined with reference to the scope of the foreseeable risks of the actor's conduct"); *Sundance Land v. Community First Fed. Sav. & Loan,* 840 F.2d 653, 663 (9th Cir.1988) ("The scope of liability should ordinarily extend to but not beyond the scope of the " 'forseeable risks.' ")).

Foreseeability, however, is not the only aspect of proximate or legal causation. "Whether or not legal causation exists may also be determined by the existence of intervening or superseding actual causes." *Id.* "The doctrine of intervening or superseding cause has been applied to 42 U.S.C. § 1983 actions," and "[t]he presence of such causes have been held to prevent the direct causal connection required for liability" in such actions. *Id.* at 965 (citing *Van Ort,* 92 F.3d at 837 (in section 1983 actions, the Ninth Circuit has looked to "[t]raditional tort law" to determine whether "intervening causes ... break the chain of proximate causation"); *White,* 901 F.2d at 1506 (defendant's "conduct is not the proximate cause of [plaintiff's] alleged injuries if another cause supersedes his liability for the subsequent events"); *Gutierrez–Rodriguez v. Cartagena,* 882 F.2d 553, 561 (1st Cir.1989) ("An unforeseen and abnormal intervention breaks the chain of causality, thus shielding the defendant from section 1983 liability")).

Smith v. Harrington, No. C 12-03533 LB, 2015 WL 1407292, at *24–25 (N.D. Cal. Mar. 27, 2015), aff'd sub nom. Smith v. Liddell, 682 F. App'x 630 (9th Cir. 2017).

The Court finds that Plaintiffs have not demonstrated by a preponderance of the evidence that any of the Defendants have caused any constitutional injury, nor have they demonstrated any Defendants set in "motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury." Gini, 40 F.3d at 1044 (quoting Merritt, 827 F.2d at 1371.) First, there can be no constitutional injury flowing directly or indirectly when the basis of the State's investigation and material conclusions, and the CMS investigation completed by Campbell and its material conclusions, were not shown to be

1   substantially untrue.

2          However, even assuming the conceded time inaccuracy, and disputed alleged

3   inaccuracies discussed above were material in a manner even in the face of and despite the other

4   conclusions regarding violations of the hospital's policies, patient stability, and leaving the

5   operating room before the closure of the chest, Plaintiffs have failed to demonstrate that Dr.

6   Chaudhry's reputation, or standing in the hospital, or positions with the hospital or the medical

7   community at large would not have been effected but for the State and CMS investigations and

8   reports.   Would Perez's family and/or estate not have pursued legal action but for the

9   investigation and report?[43]   Would Schreur and Robillard not have reported the facts underlying

10  the surgery to the hospital?  Would CRMC not have conducted its own investigation following

11  the events of the surgery, or if the Perez lawsuit moved forward without the fact of the CDPH

12  investigation?

13         Perhaps most significantly, even if the reports contained material inaccuracies, it appears

14  CRMC's own internal investigation conducted by the MEC and aided by an outside reviewer

15  reached the same material conclusions concerning stability and violation of the bylaws and rules

16  and regulations.  CDPH had a duty to investigate based upon the filing of the complaint.  By the

17  time the reports were published, CRMC had already determined by that time through the MEC

18  that Dr. Chaudhry was to be disciplined – it is certainly plausible that these same findings and

19  conclusions would have led to further discipline, including removal of the directorship, and

20  declining to renew contracts, particularly if the Perez litigation got underway subsequently.

21  Certainly the substantial verdict reached in the Perez medical malpractice action would have had

22  a detrimental impact on Dr. Chaudhry's career and relationship with CRMC.  And certainly it

23  appears that the stream of other malpractice cases would have had the same impact, and

24  Plaintiffs have not demonstrated that these cases only stemmed from the reports, or even that the

25  Perez lawsuit only stemmed from the issuance of the reports.

26         The Court notes that the order on summary judgment in this action stated the following:

27  ───────────────

28  [43]  In fact, the parties stipulated that it is undisputed that the family of Perez learned of what happened in the
    operating room from Robillard, and not from the State Report or CMS Report.

First, as further described below, there are genuine disputes as to whether CDPH published a report with false statements including that Dr. Chaudhry left the operating room during surgery, which would constitute a "stigmatizing statement" given, as described immediately below, it is undisputed the investigation and report led to Dr. Chaudhry's removal from his position at CRMC and substantial damage to his reputation.

(ECF No. 56 at 13.)

The Court does not proceed on the assumption that the statement made on summary judgment rules the more intricate facts developed at trial, as applied to the applicable legal standards.  See Dennison v. James, 356 F. App'x 68, 69–70 (9th Cir. 2009) ("Dennison contends that during summary judgment proceedings, former defense counsel made certain oral stipulations that should have been admitted as undisputed facts at trial.  The district court refused, reasoning the alleged stipulations were not reduced to writing as required by a local rule and that facts 'presumed for purposes of the summary judgment are not binding as stipulated facts for purposes of the trial even if they were assumed true for purposes of the summary judgment.'  We agree and conclude the trial court did not abuse its discretion.") (unpublished).  Whether it may have been undisputed for purposes of summary judgment, the Court does not accept that it is undisputed that the investigation and report led to Dr. Chaudhry's removal from his position at CRMC, *at least not as far as being the but for cause* of such removal and damage to his reputation.

While under the law of the case, evidence that would tend to prove or disprove that CRMC removed Dr. Chaudhry from his position because of the State 2567 report is relevant in this matter (ECF No. 97 at 11-12), Plaintiffs have not demonstrated by a preponderance of the evidence that Dr. Chaudhry was removed from his position or that either of the Plaintiffs lost contracts or business but for the publication of the State or CMS 2567, nor but for alleged communications between Campbell and/or CDPH and CRMC pressuring the hospital to punish Dr. Chaudhry in the POC, nor even but for the fact of the underlying investigation.  Rather, the preponderance of the evidence shows that while there were indeed investigatory surveys, and 2567s issued relating to the events of the surgery, and CRMC may have taken actions to remain

in compliance, the fact remains that the tragic events surrounding Perez's surgery occurred, that Dr. Chaudhry violated the hospital's policies that were in place to protect patients such as Perez, and that was the cause of the subsequent events, at least in as much as to eliminate "but for" causation.

As a result of the investigations, CDPH prepared the State 2567 dated February 14, 2013, and the CMS 2567 dated August 23, 2012.  It is an undisputed fact that "[o]n or about October 10, 2013, the CDPH published on its website the State 2567 regarding the events of April 2, 2012," and that "CDPH did not publish the CMS 2567."  (UF 19, 20.)

On or around July 27, 2012, Dr. Chaudhry received a letter removing him as Director of Cardiovascular Surgery.  (Ex. 122; 5/7 8)  The letter stated:

> As you should be aware,  a full validation survey will be conducted at [CRMC] within the next several weeks . . . [as a] result of preliminary findings shared by [CMS] resulting from a recent review of an incident which occurred in the operating room with one of your patients.  In light of the findings and impeding survey, we are compelled to take action that demonstrates our commitment to meeting the CMS Conditions of Participation and to the care of our patients . . .It is hereby requested that you immediately step down as Medical Director of Cardiac Surgery and Thoracic Services at both CRMC and Fresno Heart & Surgical Hospital.

(Ex. 122.)  The Court finds this is evidence relevant to the allegation that the investigation led to Dr. Chaudhry's removal from his position as Medical Director.  However, most significant is the fact that CRMC decided to take this action simply based on the shared preliminary findings. Additionally, this is more than one year before the stipulated publication date of the State 2567. It is undisputed CDPH did not publish the CMS 2567, and Plaintiffs have not proven by a preponderance of the evidence that Defendants Campbell nor Lopez were sufficiently acting on behalf of the federal entity CMS to be said to have published the CMS 2567.  Further, as noted multiple times above, as of August 21, 2012, the MEC and outside reviewer already made conclusions from their own investigation that they used to support further disciplinary action against Dr. Chaudhry.  (Ex. 123.)  Notably, the communication contains no mention of the investigation or forthcoming SOD and POC relating to CDPH or CMS.  Rather, the letter indicates the MEC reached its conclusions and decision to discipline Dr. Chaudhry based only on

1  the expressed basis of the MEC's "ongoing investigation," and the "outside reviewer's findings."

2  (Ex. 123 at 1.)  The findings and conclusions that were most material to the hospital's decision,

3  and specifically, the main basis for CRMC's initial decision to impose a disciplinary action as of

4  August 21, 2012, were supported by the MEC's own investigation based on an outside

5  reviewer's investigation and report.  (Ex. 123.)[44]

6         Even if the material conclusions were substantially false, and were considered published

7  to the hospital under some interpretation of the law prior to the stipulated date of publication of

8  the State 2567 of October 10, 2013, and despite the stipulated fact that CDPH did not publish the

9  CMS 2567, the defamation must be accompanied by an injury directly caused by the

10 government, not injury caused by a third party that is reacting to the government's defamatory

11 statement.  As for Plaintiff's arguments that CRMC was pressured by Campbell and/or CDPH to

12 punish Dr. Chaudhry in the POC, Plaintiffs have failed to show by a preponderance of the

13 evidence that this occurred.[45]  Even if there were discussions about strengthening the POC to

14 address Dr. Chaudhry as one of the main subjects of the POC, it appears this would have been a

15 valid exercise of the duties by the involved parties, both on the CRMC side, and on the CDPH

16 side.[46]  Plaintiffs have not demonstrated that this would have been the cause of any constitutional

17

18 [44]  The Court further highlights that Jack Chubb ("Chubb"), CEO of CRMC, in testimony designated in this action
from a different malpractice action, stated that he was ultimately responsible for contracts at CRMC being executed;
19 that it was his understanding that Valley Cardiac could pick a director as replacement for Dr. Chaudhry; and that
when deciding to remove Dr. Chaudhry as director, Chubb was told by Tim Joslin that it was simply time for a
20 change in leadership as a reason to terminate Dr. Chaudhry as director.  (Dep. Jack Chubb, February 3, 2017, at
18:3-16, 79:2-7, 79:19-22, 86:7-87:4.)  Chubb also testified that while there may have been concerns about signing
off on the POC due to concern of retaliation at CRMC, Chubb did not have such concern.

21
[45]  McComb testified she believes there were three (3) other drafts that were prepared; does not remember anyone
22 who told her the earlier drafts were not acceptable; does not remember Campbell telling her she wanted it clearly
laid out that the suspension would apply to Dr. Chaudhry in the POC; and specifically does not remember CDPH
23 telling her to discipline Dr. Chaudhry.  Campbell testified she was not aware there were earlier versions of the POC
other than the one ultimately accepted by CDPH; and that she doesn't recall or believe she had a conversation with
24 McComb regarding the acceptability of the POC.  Campbell affirmed she does not recall rejecting any POC, federal
or State, pertaining to these surveys or subject of Dr. Chaudhry, and like McComb, does not recall any conversation
25 with McComb where she told McComb that any form of the POC did not discipline sufficiently or was not specific
enough to Dr. Chaudhry.  Further, Lopez absolutely disputes the allegation that the State or his office was pressuring
26 the hospital to deal with Dr. Chaudhry's conduct by way of the investigation, and the Court find all of this testimony
to be credible.

27 [46]  Campbell testified that she would have had the authority to tell the facility the POC would not be acceptable, but
the final decision to accept POC is left to CMS, and Campbell does not recall doing so.
28

1  injury caused by the Defendants.

2      Again, it is undisputed that "[o]n or about October 10, 2013, the CDPH published on its

3  website the State 2567 regarding the events of April 2, 2012," and that "CDPH did not publish

4  the CMS 2567." (UF 19, 20.)   The Court notes Dr. Chaudhry claims contracts, including a Call

5  Coverage Agreement that ended on November 30, 2013, was not renewed because of the CDPH

6  investigation.   This contract was with Plaintiff Valley Cardiac, however, Valley Cardiac

7  continued to provide services under the contract, and there is no evidence that Valley Cardiac

8  could not fulfill its contract with the removal of Dr. Chaudhry.  Dr. Chaudhry testified that he

9  lost income that previously flowed from a Consultant Services Agreement.  (Ex. 127.)  Dr.

10 Chaudhry was the direct signatory to this contract which provided compensation in the amount

11 of $300 per hour, for total compensation not to exceed $200,000 per year.  However, the term of

12 this contract expired in June of 2013, before the stipulated date of publication of the State 2567.

13 In addition to all of the above reasons why "but for" causation has not been established, there is

14 no direct evidence to connect Campbell to the State 2567, as Campbell testified she did not do

15 anything in an individual capacity to publish the CMS Report or to put her statements or notes

16 into the State 2567 prepared by Yussif.  Further, Lopez reviewed the 2567s but his review was

17 merely for completeness and general accuracy, but his role was not, and practically cannot be, to

18 check each interview and record to ensure each minute detail and reported fact is 100% accurate.

19     Plaintiffs argue "[t]here is no genuine dispute that Plaintiff Chaudhry lost his

20 employment and business and cannot obtain affordable malpractice insurance as a result of

21 Defendants Lopez and Campbell's investigation and report."  (Pretrial Order, ECF No. 88 at 18.)

22 However, Dr. Chaudhry testified that the insurer NORCAL dropped his insurance because it was

23 costing the insurance company too much, referring to the at least five (5) malpractice lawsuits

24 pending against him by the year 2018.  Additionally, on March 19 and 20, 2018, the jury in the

25 Perez Case awarded damages against the defendants in that matter, Dr. Chaudhry and CRMC, in

26 excess of 60 million dollars.  The verdict amount was ultimately reduced by settlement, to be

27 paid by CRMC and Dr. Chaudhry's insurance carrier.

28     Like Hart, the Court finds Plaintiffs have failed to show by a preponderance of the

81

1    evidence that, even assuming the statements were defamatory (which the Court finds they are not

2    because the investigators had ample evidence and basis under CRMC's policies to find

3    violations, and had a regulatory and statutory duty to make such findings), Plaintiffs have not

4    demonstrated that Dr. Chaudhry lost these positions or contracts *because* or *but for* the

5    statements in the reports, CMS or State, amended or original.  Hart, 450 F.3d at 1070 ("Here,

6    even assuming that the accuracy of the charge is contested, *and* assuming that the statements

7    were defamatory (which they were not, as the police had a basis to make them), Hart has not

8    proffered any evidence that he lost his job *because of* the defamatory statements [and] [i]t

9    appears quite clearly from Roadway's termination letter to Hart, that he was fired for stealing the

10   Oscar statuettes, not because of Parks's remarks.").

11          For all of the above reasons, Plaintiffs have failed to demonstrate that Defendants caused

12   any constitutional injuries under the applicable legal standards, and under all of the facts and

13   evidence presented at the trial of this action.   As related to causation and discussed in the

14   following section, Plaintiffs failed to demonstrate any publication of stigmatizing statements

15   prior to the stipulated dates of publication, under any legal theory.

16          3.    Publication

17          Plaintiffs have not proven publication of the State Report prior to any stipulated date, nor

18   shown the CMS report was published by any Defendant, under any applicable legal theory.

19          As the undersigned found in light of the District Judge's decision on the motion to

20   dismiss in this matter, evidence that tends to prove or disprove CRMC removed Dr. Chaudhry

21   from his positions due to the publication of the State 2567 may be relevant in this matter.  See

22   n.33, supra.

23          As stated throughout this order, "[o]n or about October 10, 2013, the CDPH published on

24   its website the State 2567 regarding the events of April 2, 2012," and that "CDPH did not

25   publish the CMS 2567."  (UF 19, 20.)  As explained in the previous section relating to causation,

26   one of the many reasons Plaintiffs claims fail is due to the date of publication of the State 2567,

27   and due to the fact that CDPH did not publish the CMS 2567.  Out of an abundance of caution

28

1     and despite the parties' stipulations regarding publication,[47] the Court explores the question of

2     alternate theories, or other issues surrounding potential of publication to the hospital outside of

3     the stipulated date of the State 2567, or publication of the CMS 2567, as discussed below.  As

4     averred to above, there is also insufficient evidence to connect Defendants Lopez or Campbell to

5     the publication of the CMS 2567 as further discussed below.

6         Plaintiffs must show publication of the stigmatizing statements caused a loss of liberty

7     interest.  They have failed to do so by a preponderance of the evidence.  The Court finds

8     Plaintiffs have failed to show publication in the sense that it caused Dr. Chaudhry to be directly

9     stigmatized and lose a liberty interest, because the communications or actions discussed in the

10    previous section pertaining to actions that CRMC may have taken due to their awareness or

11    knowledge of the preliminary findings of CMS's or CDPH's investigation are not publication,

12    and thus the removal of Dr. Chaudhry's directorship in July of 2012[48], was before any

13    publication under the relevant legal standards.  See Reyes v. City of Pico Rivera, 370 F. App'x

14    844 (9th Cir. 2010) ("Grayson's dissemination of an allegedly stigmatizing report to two City

15    decision-makers did not, on its own, constitute publication, because there was no *public*

16    disclosure.") (emphasis in original) (unpublished).  As the district court in Reyes found:

17
        In this lawsuit, which centers on Defendant City of Pico Rivera's ("City" or "Pico
        Rivera") termination of Plaintiff Daniel Reyes's employment in 2003, Plaintiff
18

---

19   [47] As the Court reminded Plaintiffs during trial concerning stepping outside the bounds of their stipulated facts
    concerning publication, the Court treats stipulations seriously and the thought and consideration that counsel puts
20   into arriving at stipulated facts.  Nonetheless, publication issues may be worth exploring given, for example, the fact
    that CDPH published on its website on a certain date, does not necessarily mean there is a complete foreclosure to
21   argue there was also a publication to the hospital on another date.  Similarly, the stipulation that CDPH did not
    publish the CMS report, does not mean there is a potential argument that Defendant Campbell or Lopez published
22   the report in some sense under some legal theory.  However, it appears Defense counsel would argue any stepping
    outside the bounds of this stipulated fact goes beyond the intent and meaning of the parties in coming to these
23   agreements, and the Court would tend to agree with Defense given the tenor of the discussion at trial and the
    statements made by each side.  Further, aside from incorrectly challenging whether it was present counsel that
24   stipulated to such facts concerning publication at the time of the joint pretrial statement, Plaintiffs failed to move to
    amend the stipulated facts or seek other relief.  See Jauregui v. City of Glendale, 852 F.2d 1128, 1134 (9th Cir.
25   1988) ("Thus with the exercise of appropriate diligence, the City could have challenged the findings in a more
    timely fashion by refusing to agree to the contested fact, or by proceeding through available and more appropriate
26   means to be relieved of the order's binding effect.").

27   [48] As noted above, the July 27, 2012 letter stated that: "In light of the findings and impeding survey, we are
    compelled to take action that demonstrates our commitment to meeting the CMS Conditions of Participation and to
28   the care of our patients . . .It is hereby requested that you immediately step down as Medical Director of Cardiac
    Surgery and Thoracic Services at both CRMC and Fresno Heart & Surgical Hospital."  (Ex. 122.)

asserts a "stigma-plus" due process claim based on the disclosure of an investigative report to Pico Rivera's city manager and city attorney in connection with Plaintiff's termination. Plaintiff does not, and indeed, cannot complain that members of the general public learned of the report or its contents, because the document was so deeply buried in City's records that even Plaintiff claims to have been unaware of its existence for three years following his termination . . .

. . . These facts do not establish public disclosure for a number of reasons. Although none of the cases expressly addresses and defines the meaning of the word "public" in requiring evidence of **public** disclosure as an element of the claim, the absence of such discussion suggests that the word is being used in its commonly understood sense. "Public" in ordinary sense means "open to the judgment or knowledge of all." Webster's II New Riverside University Dictionary 1984. "Publication" means "communication of information to the public." Id. Thus, "public disclosure" ordinarily would not encompass disclosure to a small number of private individuals, but rather community-wide dissemination of the disclosed information.

This conclusion finds support in the case law, which precludes a claim based on the internal disclosure of Grayson's report to Courtemarche and Adams, and the later disclosure to Plaintiff and Acevedo in discovery. E.g., Bishop v. Wood, 426 U.S. 341 (1976). In Bishop, the police chief of Marion, North Carolina, recommended to the city manager that the plaintiff, a probationary officer, be terminated due to his alleged failure to follow orders, poor attendance at training classes, and contributions to the low morale among other police officers. The city manager accepted the recommendation and terminated the plaintiff without a hearing, and the plaintiff brought suit in district court alleging a violation of his due process right to a hearing on the allegations made against him. The district court granted summary judgment for the defendants; the Fourth Circuit and the Supreme Court affirmed. The Supreme Court assumed that the termination was based on erroneous information, but noted that neither the private communications within the department nor the disclosure of the information in response to a discovery request were not "public disclosures" and therefore did not put at risk plaintiff's good name, reputation, or integrity. Id. at 348. The Court observed that a communication made in the course of a judicial proceeding that commences after an employee's termination "surely cannot provide retroactive support" for a due process liberty claim. Id. "A contrary evaluation of either explanation would penalize forthright and truthful communication between employer and employee in the former instance, and between litigants in the latter." Id. at 348–49. Thus, Bishop indicates that neither private communications within the employing agency (police chief to city manager; city manager to plaintiff) nor truthful communications during litigation will support a due process stigma-plus claim.

Reyes v. City of Pico Rivera, No. CV0703767GAFJWJX, 2008 WL 11336166, at *1, 9 (C.D. Cal. Oct. 24, 2008), aff'd, 370 F. App'x 844 (9th Cir. 2010). Although Reyes involved intra-governmental communications, and while CRMC is not a government employer, they are essentially the decision-making employer here and the preliminary communications were between CRMC and the agency responsible for regulating CRMC as a hospital provider. Further, as noted in the opinion, public disclosure "ordinarily would not encompass disclosure to

1  a small number of private individuals, but rather community-wide dissemination of the disclosed

2  information." Id.

3       Any involvement of Defendants Lopez or Campbell in sending the CMS Report from

4  CDPH to CMS, or between various offices within CDPH, would not amount to a publication

5  given it is an intra-governmental transfer, and both the CMS Report and State Report were not

6  issued in conjunction with Dr. Chaudhry's termination of employment or alteration of a right

7  recognized by state law.   See Id.; Wenger v. Monroe, 282 F.3d 1068, 1075 (9th Cir. 2002)

8  ("First, there was no 'charge' made against him.   Second, there was no 'public disclosure'—as

9  the district court recognized, both of these disclosures were made to other branches of the

10  military, not to the public.   And third, neither was made in connection with termination of

11  Wenger's employment, or the alteration of some right recognized by state law, by the Guard.

12  Indeed, although Wenger was not asked to continue teaching at the Army War College, there is

13  no evidence that the College published reasons for his nonrenewal—and even if it did, no one

14  from the College has been made a party to this lawsuit."); see also Millman v. Inglish, 461 F.

15  App'x 627, 628 (9th Cir. 2011) ("Appellants' stigma-plus claim fails because notification of the

16  alleged fraud to other public agencies is not a public disclosure.") (citing Wenger, 282 F.3d at

17  1075 n.5) (unpublished opinion).   The district court in Denning recently explained and applied

18  the holding of Wenger:

19        Sheriff Rodriguez's report to POST presents a more difficult issue. The Ninth
20        Circuit has not addressed the "publication" element of a stigma-plus claim in the
          context of a county sheriff's office reporting alleged ethical violations to a state
21        standards and training council. But it has more generally held that intra-
          governmental dissemination does not satisfy the "public disclosure" element of a
22        stigma-plus claim. In Wenger v. Monroe, 282 F.3d 1068, 1074 n.5 (9th Cir. 2002),
          for example, the court held that there was no public disclosure when the
23        California Army National Guard informed other branches of the military (the
          Army War College and the Department of the Army Inspector General's office) of
24        a pending investigation into plaintiff's alleged misconduct. And in Millman v.
          Inglish, 461 F. App'x 627, 628 (9th Cir. 2011) (unpublished disposition), the
25        court held that California state department employees did not "publicly disclose"
          stigmatizing information when they informed other public agencies of plaintiff's
26        alleged fraud. Id. (citing Wenger, 282 F.3d at 1074 n.5); see also Palka v. Shelton,
          623 F.3d 447, 454 (7th Cir. 2010) (public disclosure requires that the defendant
27        "actually disseminate the stigmatizing comments in a way that would reach
          potential future employers or the community at large"); Reyes v. City of Pico
28        Rivera, 370 F. App'x 844, 844 (9th Cir. 2010) (unpublished disposition)
          (dissemination of an allegedly stigmatizing report to "two City decision-makers"

did not, on its own, constitute publication, because there was no public disclosure). Given this authority, the Court concludes that a county sheriff's report to a state-created training and standards council does not, on its own, satisfy the "publication" element of a stigma-plus claim.

Denning v. Lincoln Cty. Sheriff's Off., No. 1:18-CV-00473-BLW, 2020 WL 355209, at *10 (D. Idaho Jan. 21, 2020).

In addition to the investigation and SOD being generally known in the hospital, testimony and applicable law confirm that the SOD and POC *should* have been posted at the hospital through placement in a hospital binder or some other form.  However, Plaintiffs never presented testimony or evidence clearly establishing the date or how it was made available specifically at CRMC.  *If* Plaintiffs had presented such evidence, the Court notes a potential argument could be presented that such posting or making available by request, as required by law, constitutes publication sufficient for a stigma-plus claim.  See Cox v. Roskelley, 359 F.3d 1105, 1111–12 (9th Cir. 2004) ("We now hold explicitly that placement of the stigmatizing information in Cox's personnel file, in the face of a state statute mandating release upon request, constituted publication sufficient to trigger Cox's liberty interest under the Fourteenth Amendment.").  Even if the Court were to consider such argument, Plaintiffs would still be unable to demonstrate publication under the facts of this case.  In Cox, the plaintiffs were public county employees, and the action involved the government employer's publication of the stigmatizing statement by placement in a personnel file, in the course of termination by such government employer, with such personnel file being subject to a public records request.  Here, Dr. Chaudhry did not hold government employment and the alleged stigmatizing statements were not made by the government as an employer of Dr. Chaudhry in the course of termination.  Additionally, the direct subject of the investigations was CRMC, not Dr. Chaudhry.  Further, even without a clear establishment of when the documents may have been made available at the hospital facility, CRMC took adverse actions against Dr. Chaudhry based on their receipt of preliminary findings following the investigations, as early as July 27, 2012.  Even outside the publication dates, and absent evidence of a potential "posting date" by Plaintiffs, the CMS Report was not issued until August 23, 2012, and the State Report wasn't issued until February 14, 2013.

1    Further, Yussif, the primary investigator and author of the State Report, is not a party to

2    this lawsuit.  The evidence shows McComb and other actors in the hospital knew they were

3    dealing with Yussif conducting the initial investigation on behalf of the State, and knew in July

4    that Campbell was conducting the CMS survey investigation.  The CMS Report was issued by

5    CMS, not directly by Campbell or CDPH, and the Plaintiffs were required to show public

6    disclosure of a substantially untrue stigmatizing statement by one of the Defendants as acting on

7    behalf of the government.

8    While evidence tending to prove or disprove CRMC removed Dr. Chaudhry from his

9    directorship because of the State Report is relevant, it is an undisputed stipulated fact that CDPH

10   did not publish the State Report until October 10, 2013, and that CDPH did not publish the CMS

11   Report.  The Ninth Circuit's holding in Tibbets, is instructive as to the requirement of temporal

12   proximity between the publication of the stigmatizing statement and the adverse employment

13   action:

> The 2006 Release was issued sixteen months after the Plaintiffs were terminated, and after this lawsuit was initiated. *Campanelli* held "that there must be some temporal nexus between the employer's statement and the termination" and that the stigmatizing statements cannot be too remote to be considered "in the course" of the plaintiff's termination. *Id.* We also note the holdings of *Martz v. Incorporated Village of Valley Stream,* 22 F.3d 26, 32 (2d Cir.1994) (holding that a statement published five months after the plaintiff's termination was not made in the course of dismissal); *Hadley v. Du Page County,* 715 F.2d 1238, 1247 (7th Cir.1983) (holding that a statement to the press six days after the plaintiff's termination was "at the time of" termination, but that a statement published two years later "was too remote in time to meet the stigma plus test"); and *Ray v. Tennessee Valley Auth.,* 677 F.2d 818, 824 (11th Cir.1982) (holding that a six year lapse is long enough to sever the temporal nexus of statements to termination of the plaintiff's employment). We are persuaded by the reasoning of these out-of-circuit cases, and hold that sixteen months is far too remote from the terminations to meet *Campanelli*'s "temporal nexus" test.
>
> The 2005 Release presents a more difficult question. The 2005 Release was issued nineteen days after Plaintiffs' terminations. This time frame falls between the week that *Campanelli* found to satisfy the required "temporal nexus" and the months and years that *Martz, Hadley*, and *Ray* found temporally insufficient. Governor Kulongoski argues that the "time interval of several weeks—which is over twice as long as the period in *Campanelli*—eliminated any nexus between the statements and the discharges." Plaintiffs argue that the terminations, the media coverage afterwards, and the Governor's press release afterwards can be seen as "so closely related" that "the discharge itself may become stigmatizing in the public eye."

1    Tibbetts v. Kulongoski, 567 F.3d 529, 538 (9th Cir. 2009).  Further, here, the statements were

2    not published by the entity that was the employer that executed the termination of employment.

3          Thus, for these reasons, Plaintiffs have not established the act of publication of

4    stigmatizing statements by any of the Defendants that satisfies the applicable legal standards for

5    publication in a stigma-plus action to establish a constitutional violation.

6          4.    Liberty Interest

7          While trying to not outstep the contours of the law of the case, the Court would find

8    Plaintiffs have not presented sufficient evidence to satisfy the "plus" requirement of their stigma-

9    plus claim.

10         "[A] liberty interest in pursuing one's chosen profession has only been recognized 'in

11   cases where (1) a plaintiff challenges the rationality of government regulations on entry into a

12   particular profession, or (2) a state seeks permanently to bar an individual from public

13   employment.' "  Magassa v. Wolf, 487 F. Supp.3d 994, 1016 (W.D. Wash. 2020) (quoting

14   Guzman v. Shewry, 552 F.3d 941, 954 (9th Cir. 2009)).

15         Plaintiffs have not demonstrated either here.  Plaintiffs are not challenging the laws and

16   regulations pertaining to the CDPH's required oversight of the hospital provider, but rather only

17   argue stigmatizing mistakes were made when exercising its regulatory duties.  Additionally, the

18   State did not seek to permanently bar Chaudhry from public employment here.  Nor did the State

19   or any Defendants directly terminate Dr. Chaudhry's employment, nor did Plaintiffs prove by a

20   preponderance of the evidence that any of the Defendants required the hospital to terminate Dr.

21   Chaudhry's employment through the issued SODs or different versions of the POCs.

22   Defendants' involvement was limited to participation in CDPH's requirement, as demonstrated

23   in the statutes and regulations outlined above, to investigate the hospital provider and ensure the

24   hospital was in compliance with the applicable laws and regulations.

25         "Although the precise contours of that liberty interest remain largely undefined, the

26   Supreme Court observed recently that the line of authorities establishing the liberty interest 'all

27   deal[t] with a complete prohibition of the right to engage in a calling,' and not merely a 'brief

28   interruption' in one's ability to pursue an occupation or profession."  Dittman v. California, 191

1  F.3d 1020, 1029 (9th Cir. 1999).  "Thus, a liberty interest deprivation occurs only when there is

2  stigmatizing governmental action that so negatively affects a person's professional reputation

3  that it effectively forecloses his or her opportunity to practice a chosen profession." Guzman v.

4  Shewry, No. CV0800769MMMRZX, 2008 WL 11441901, at *9 (C.D. Cal. Mar. 4, 2008)

5  ("Guzman has neither alleged nor proffered evidence that he has been barred forever from the

6  practice of medicine . . . .  DHS seeks only to bar him temporarily from seeking reimbursement

7  for services provided to a single group of patients – Medi-Cal beneficiaries.  This type of

8  temporary bar from reimbursement does not give rise to a liberty interest.") (comparing to

9  Schware v. Bd. of Bar Exam. of State of N.M., 353 U.S. 232, 246 (1957) (refusing an applicant

10 the right to qualify for the practice of law implicates a liberty interest)).

11          In contrast to Schware, Dr. Chaudhry was not barred from practicing medicine in

12 California, and indeed, the California Medical Board declined to revoke his license.  The adverse

13 reaction was only that of a third party, not the governmental entity that made the alleged

14 stigmatizing statement.  Further, while Dr. Chaudhry argues a more permanent stigma attached

15 to him in pursuing the practice of medicine, the evidence has not demonstrated that he will be

16 forever barred from the practice of medicine, despite an argument of irreparable harm.  Indeed,

17 Dr. Chaudhry is still performing surgery in another country, and while Dr. Chaudhry testified no

18 one will take him on as a surgeon, he has presented no direct evidence of attempts or rejections

19 in trying to work for another medical practice, or establish another practice of his own in

20 California; and the Court has already addressed the claims relating to the inability to obtain

21 medical malpractice insurance.  See Guzman, 2008 WL 11441901, at *11 ("Guzman attempts to

22 overcome this fact by asserting that he will have to disclose his temporary suspension to, *inter*

23 *alia*, patients, hospitals, private third-party insurance companies, and malpractice carriers

24 [asserting that], if he is unable to affiliate or contract with hospitals, insurers and other payor

25 organizations, his ability to practice medicine will be "implicated."  [however,] [w]hile this

26 assertion may support Guzman's argument that he will be irreparably harmed by the suspension,

27 it does not demonstrate that he will be forever barred from practicing medicine as a result of

28 DHS's temporary suspension."); see also Cooper, 924 F.2d at 1533-34 n.24 (The "contention

that he has lost income because of a decrease in the number of patient referrals is no more than a claim for consequential damages resulting from an injury to his reputation.  Plaintiff has not alleged and cannot allege on this record that any decrease in referrals was caused by the loss or alteration of a legal status recognized and protected by state law.") (quoting Chaudhry, 626 F. Supp. At 454).

The decision in Guzman appears rightfully applicable here, and the Court finds further affirmance in utilizing the decision given the discussion by the Ninth Circuit in affirming the denial of the preliminary injunction in Guzman:

> Guzman next argues that his temporary suspension denies him his liberty interest in pursuing the occupation of his choice. The Supreme Court has not defined the boundaries of an individual's right to pursue his chosen profession, but it has stated that there is "some generalized due process right to choose one's field of private employment." Conn v. Gabbert, 526 U.S. 286, 291–92, 119 S.Ct. 1292, 143 L.Ed.2d 399 (1999). The Court has emphasized, however, that all cases recognizing such a right have "deal[t] with a *complete prohibition* on the right to engage in a calling, and not [a] sort of brief interruption." *Id.* at 292, 119 S.Ct. 1292 (emphasis added). Indeed, the liberty interest in pursuing one's chosen profession has been recognized only in cases where (1) a plaintiff challenges the rationality of government regulations on entry into a particular profession, *see, e.g., Schware v. Bd. of Bar Exam'rs,* 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957), or (2) a state seeks permanently to bar an individual from public employment, *see, e.g., Roth,* 408 U.S. at 573, 92 S.Ct. 2701.
>
> Guzman's claim does not fall into either of these two recognized categories. With respect to the first, DHCS has temporarily suspended Guzman from Medi–Cal, thereby preventing him from receiving reimbursement for treating MediCal patients. DHCS has not, however, revoked or suspended his license to practice medicine. Thus, Guzman's case is distinguishable from those in which plaintiffs have challenged the rationality of a state-imposed barrier to entering a particular profession, such as a testing or licensing requirement. *See, e.g., Schware,* 353 U.S. at 247, 77 S.Ct. 752 (recognizing the liberty interest of an individual denied the right to sit for a state bar exam).
>
> As to the second category, Guzman is not a public employee, nor has DHCS's decision to suspend him deprived him of future public employment. Consequently, the suspension did not impose a complete bar on his ability to become a public employee. *See Cafeteria & Rest. Workers Union, Local 473 v. McElroy,* 367 U.S. 886, 895–96, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961) (concluding that an employment decision to bar a cook from working at a particular military base did not violate the cook's due process rights because she "remained entirely free to obtain employment ... with any other employer"); *Llamas v. Butte Cmty. Coll. Dist.,* 238 F.3d 1123, 1126, 1128 (9th Cir.2001) (concluding that a janitor fired from his job and "barred from all future employment with the District" was not deprived of his liberty interest in pursuing the occupation of his choice because he had "not been banned from pursuing a janitorial position [or other public employment] elsewhere").

> In sum, Guzman's temporary suspension from the Medi–Cal program does not exclude him from the medical profession, nor does it deprive him of, or prevent him from applying for, public employment. Accordingly, Guzman has not been deprived of a protected liberty interest in pursuing the occupation of his choice.

Guzman v. Shewry, 552 F.3d 941, 954–55 (9th Cir. 2009).   Again, CDPH nor any of the Defendants have "revoked or suspended his license to practice medicine." Id.   Further, Dr. Chaudhry was "not a public employee, nor ha[ve]," the actions of Defendants here "deprived him of future public employment," and thus, Defendants have not "impose[d] a complete bar on his ability to become a public employee."   "Accordingly, [Dr. Chaudhry] has not been deprived of a protected liberty interest in pursuing the occupation of his choice." Id. at 955.

Dr. Chaudhry was removed from his directorship, and argues certain contracts either between himself and CRMC or between Valley Cardiac and CRMC (a source of "medical income" as argued by Dr. Chaudhry) were not renewed, but the Ninth Circuit has "consistently held that people do not have liberty interests in a specific employer." Llamas, 238 F.3d at 1128 (9th Cir. 2001); Clemente, 766 F.2d at 1365 (A person "does not possess a liberty interest [in] her Civil Service career . . . [t]he mere fact of dismissal does not cause a deprivation of liberty . . . . [and] the reasons for dismissal must be sufficiently serious to stigmatize or otherwise burden the individual so that he is not able to take advantage of other employment opportunities . . . (quotation and citations omitted) (alteration in original); Cafeteria & Rest. Workers, 367 U.S. 886, 895–96 ("[T]he private interest affected . . . in the present case . . . most assuredly was not the right to follow a chosen trade or profession. . . [as plaintiff] remained entirely free to obtain employment as a short-order cook or to get any other job, either with M & M or with any other employer [and] [a]ll that was denied her was the opportunity to work at one isolated and specific military installation.") (comparing to, e.g., Dent v. State of W.Va., 129 U.S. 114 (1889); Schware, 353 U.S. at 233.)

The Court recognizes the Supreme Court's noting of the unique facts of federal power in the context of a military position, and the distinction here.   Cafeteria, 367 U.S. at 896 ("Moreover, the governmental function operating here was not the power to regulate or license, as lawmaker, an entire trade or profession, or to control an entire branch of private business, but,

1   rather, as proprietor, to manage the internal operation of an important federal military

2   establishment . . . [and] [i]n that proprietary military capacity, the Federal Government, as has

3   been pointed out, has traditionally exercised unfettered control.").   The Court notes that <u>Dent</u>

4   "involve[d] the validity of the statute of that state which requires every practitioner of medicine

5   in it to obtain a certificate from the state board of health that he is a graduate of a reputable

6   medical college in the school of medicine to which he belongs," or otherwise meet certain

7   requirements.  <u>Dent</u>, 129 U.S. 114.  In <u>Schware</u>, the question presented was whether the plaintiff

8   had "been denied a license to practice law in New Mexico in violation of the Due Process Clause

9   of the Fourteenth Amendment to the United States Constitution."   <u>Schware</u>, 353 U.S. at 233.

10  Again here, Plaintiffs were not the direct subject of the applicable regulations governing the

11  Defendants and their exercise of regulatory oversight over the hospital provider, and nor are

12  Plaintiffs challenging a decision from the state to directly foreclose Dr. Chaudhry's right to

13  practice a chosen trade or profession.  When Dr. Chaudhry in fact was the direct subject of an

14  investigation and oversight by the state of California, he indeed did receive the process he was

15  due under the regulatory and licensing scheme overseeing his medical license and ability to

16  follow his trade in the state, as undisputed here: "Following the publication of the State 2567, the

17  Medical Board of California began investigating Plaintiff Chaudhry . . .  [i]n early December

18  2014, the Medical Board of California determined that it would take no action against Plaintiff

19  Chaudhry, and it closed the case."  (UF 28, 29.)

20        Further, as noted above, the Ninth Circuit has held in unpublished cases that the "stigma-

21  plus" test requires that the defamation be accompanied by an injury directly caused by the state,

22  rather than an injury caused by the act of some third party in reaction to the State's defamatory

23  statements.  <u>Douglas</u>, 465 F.App'x at 715; <u>Ooley</u>, 603 F.App'x at 629; <u>see also</u> <u>Mazzeo</u>, 649

24  F.Supp.2d at 1197 ("Defendants neither fired her nor blacklisted her . . . she worked as a cocktail

25  waitress for a casino and that after the incident, she was blacklisted from working at any Nevada

26  casino, allegedly because Defendants' defamatory statements had tarnished her reputation. This

27  is fatal to her stigma-plus claim because the casinos are not defendants, are not state actors, and

28  are not alleged to have acted in agreement with the named Defendants.").

1    To satisfy the "plus" element, the Plaintiffs must show that, as the result of the

2 defamatory statement "a right or status previously recognized by state law was distinctly altered

3 or extinguished." Humphries, 554 F.3d at 1186 (quoting Paul, 424 U.S. at 711.)  This is not like

4 Humphries, where The Ninth Circuit found that being included on a government list of child

5 abusers altered the parents' right due to statutes requiring licensing agencies search the database

6 and conduct an investigation prior to granting a number of licenses, and also affected the ability

7 of plaintiffs to apply for custody of a relative's child, become guardians or adoptive parents

8 (inside or outside of California), obtain employment as a peace-officer, among other things.

9 Humphries, 554 F.3d at 1187.  Here Dr. Chaudhry was cleared by the California Medical Board;

10 Dr. Chaudhry was not the direct subject of the investigation and was not placed on any

11 government list; there is no evidence of a requirement to cross-check these reports or that he was

12 put into a database of the state that impacts credentialing or licensing; or that the reports affected

13 an ability to obtain state approval for a job with a private or public employer.

14    Given Dr. Chaudhry was not the direct subject of the investigation and his medical

15 license was not targeted by CDPH, the circumstances here are more like Castaneda, supra, than

16 Humphries, where Castaneda was a manager at a liquor store, and an agent of the USDA

17 investigated his participation in the federal food stamp program.  Castaneda, 807 F.2d at 1749.

18 Thus, there the target of the government investigation was the store, not the employee, like here

19 the direct target of the investigational survey was CRMC.  The Ninth Circuit held that Castaneda

20 had no direct relationship with the government but rather the government dealt directly with the

21 Circle K store, and Castaneda complained of the indirect adverse consequences he suffered as a

22 result of the government-store interaction.  Castaneda, 807 F.2d at 1479 ("Castaneda was only an

23 indirect beneficiary of the government's statutory relationship with The Circle K Corporation

24 allowing it to participate in the food stamp program . . . hence Castaneda is not a direct target of

25 the government's disqualification decision.").  The Ninth Circuit further held that because

26 Castaneda as an individual "enjoy[ed] no legally cognizable interest in working for a store which

27 can accept food stamps, nor does he claim that he has a property interest enforceable against the

28 government in maintaining his private employment with The Circle K Corporation," he could not

1    "satisfy the "stigma-plus" standard for direct injury established in <u>Paul</u>."  <u>Id.</u> at 1480.

2          As noted above, the Ninth Circuit recognized that <u>O'Bannon</u> left open the possibility that

3    a third party could assert a claim if the Government acted with the purpose of punishing or

4    restraining another.    <u>Castaneda</u>, 807 F.2d at 1480 n.4 ("<u>O'Bannon</u> explicitly left open the

5    possibility that where the government indirectly yet intentionally injures or affects the legal

6    status of a person by action taken directly against a private third party, the injured person can

7    maintain a due process challenge against the government.").  However, given the testimony from

8    Campbell, McComb, and Lopez, concerning no direct intention by Defendants to punish Dr.

9    Chaudhry, the Court does not find Plaintiffs have established such circumstances here by a

10   preponderance of the evidence.

11         Plaintiffs cite <u>Ulrich</u>, arguing:

12         It is undisputed that investigator Yussif did not interview Plaintiff Chaudhry
13         during CDPH's initial investigation.   Similarly, Defendant Campbell did not
           interview at least three percipient witnesses that were in the surgery room during
14         the entire surgical procedure, and Plaintiffs will show that Defendant Campbell's
           interview with Plaintiff Chaudhry was inaccurately incorporated into the final
15         report, and specifically the stigmatizing statement where Defendant Campbell
           stated that Plaintiff Chaudhry admitted to her that he left before the surgery was
16         complete, when her own personal notes showed that he never said that.
           Especially where Plaintiff Chaudhry stated the exact opposite, that he did not
17         leave the surgery until it was completed and the patient was stable, and Defendant
           Campbell's hand-written notes showed that Plaintiff Chaudhry was correct.

18   (Pretrial Order, ECF No. 88 at 18-19.)

19         In <u>Ulrich</u>, the Ninth Circuit stated the following:

20         Although physicians are included in the category of San Francisco city and county
           employees who "serve at the pleasure of the appointing authority," the hospital's
21         bylaws forbid the discharge of physicians without extensive due process. The
           California Supreme Court has held that similar due process requirements
22         applicable to private hospitals by statute render "the essential nature of a qualified
           physician's right to use the facilities of a hospital ... a property interest which
23         directly relates to the pursuit of his livelihood."  *Anton v. San Antonio Cmty.
           Hosp.,* 19 Cal.3d 802, 140 Cal.Rptr. 442, 567 P.2d 1162, 1174 (1977) (quoting
24         *Edwards v. Fresno Cmty. Hosp.,* 38 Cal.App.3d 702, 113 Cal.Rptr. 579, 580
           (1974)); *see also Clements v. Airport Auth. of Washoe County,* 69 F.3d 321, 331
25         n.12 (9th Cir.1995) (explaining that at-will employment does not exist where an
           employee can "only be fired for cause or in accordance with specified policies or
26         procedures").

27

28   <u>Ulrich</u>, 308 F.3d at 975 n.4.  The Court notes that the Ninth Circuit therein analyzed the fact that

1   this was a city hospital, and "assume[d] for purposes of analysis that Dr. Ulrich had a property

2   interest in continued employment," given the hospital bylaws also forbid termination without due

3   process.  Id.  Even if Ulrich changed the analysis, here, the entity that removed Dr. Chaudhry

4   from the Directorship was CRMC, a private hospital, and Plaintiffs have not submitted evidence

5   or argued at trial that the hospital itself did not afford Dr. Chaudhry appropriate due process

6   under the hospital's bylaws and procedures.   In fact, the evidence at trial appeared to

7   demonstrate that Dr. Chaudhry was afforded process by the hospital, was allowed to make

8   presentations, by PowerPoint or otherwise, attended meetings with the MEC, the MEC supported

9   its findings by an independent investigation with an outside reviewer, and Dr. Chaudhry was

10  otherwise allowed to and did present his case to CRMC.  The Ninth Circuit's decision in Mustafa

11  is helpful, though it involved public employment.  As summarized by Moody:

> 12      There, a high school teacher was accused of sexual misconduct and recommended
> 13      for dismissal. *Id.* at 1172. After the accusation was reported, he was notified of
>         the charges in a January 19th meeting with the school's princip[al] and school
> 14      district's legal counsel, where he was handed a "Notice of Intended Disciplinary
>         Action: Immediate Suspension and Dismissal." *Id.* Five days later, on January
> 15      24th, he participated in a pre-termination hearing where he gave his version on the
>         events. *Id.* at 1172-73. Roughly two months after that, he participated in a binding
> 16      arbitration, where an arbitrator evaluated the charges against him. *Id.* at 1173. In
>         evaluating his "stigma-plus" due process claim, the Ninth Circuit determined that
> 17      he was afforded adequate process "by virtue of his arbitration hearing if not the
>         January 19th and 24th hearings, was afforded the opportunity to clear his name."

18

19  Moody, 2018 WL 646686, at *7 (citing Mustafa v. Clark Cty. Sch. Dist., 157 F.3d 1169, 1172–

20  73 (9th Cir. 1998)).  Thus, if there is an argument that Dr. Chaudhry had a liberty interest in his

21  position at CRMC and to not be fired without due process by CRMC (not the State), he was

22  afforded process by CRMC.   Further, CRMC, as the entity that *was* the subject of the

23  investigation, had certain processes available to it to appeal.  See, e.g., Cal. Health & Safety

24  Code § 1280.5 ("The state department shall accept, consider, and resolve written appeals by a

25  licensee or health facility administrator of findings made upon the inspection of a health

26  facility."); Cal. Health & Safety Code § 1280.1 ("If the licensee disputes a determination by the

27  department regarding the alleged deficiency or the alleged failure to correct a deficiency, or

28  regarding the reasonableness of the proposed deadline for correction or the amount of the

1    penalty, the licensee may, within 10 days, request a hearing pursuant to Section 131071."); 42

2    C.F..R § 488.331(a)(1)-(2) ("For non-Federal surveys, the State must offer a facility an informal

3    opportunity, at the facility's request, to dispute survey findings upon the facility's receipt of the

4    official statement of deficiencies . . . [f]or Federal surveys, CMS offers a facility an informal

5    opportunity, at the facility's request, to dispute survey findings upon the facility's receipt of the

6    official statement of deficiencies.").

7           **D.      Plaintiffs' Request for Declaratory and Injunctive Relief**

8           Plaintiffs' first cause of action is for declaratory and injunctive relief against Defendant

9    Angell in her official capacity as Director of the CDPH, for the same underlying claim of a

10   violation of civil rights pursuant to 42 U.S.C. § 1983 and violation of due process.  (FAC ¶¶ 62-

11   71, ECF No. 18-20.)

12          "The decision whether to grant declaratory relief is within the sound discretion of the

13   district court."  Olagues v. Russoniello, 770 F.2d 791, 803 (9th Cir. 1985).  "The central purpose

14   of the Declaratory Judgment Act . . . is to provide parties with a declaration of their rights prior

15   to incurring actual injury."  Id.  Pursuant to the Declaratory Judgment Act: "In a case of actual

16   controversy," the Court "may declare the rights and other legal relations of any interested party

17   seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. §

18   2201(a).  "This statute does not create new substantive rights, but merely expands the remedies

19   available in federal courts."  Shell Gulf of Mexico Inc. v. Ctr. for Biological Diversity, Inc., 771

20   F.3d 632, 635 (9th Cir. 2014).  "While the Declaratory Judgment Act therefore created a new

21   procedural mechanism for removing the threat of impending litigation, it did not expand the

22   jurisdiction of federal courts."  Id.

23          "The Declaratory Judgment Act does not grant litigants an absolute right to a legal

24   determination."  United States v. State of Wash., 759 F.2d 1353, 1356 (9th Cir. 1985).  "The

25   decision to grant declaratory relief is a matter of discretion [citations], even when the court is

26   presented with a justiciable controversy . . . [and] [i]n fact, the court may, after a full

27   consideration of the merits, exercise its discretion to refuse to grant declaratory relief because the

28   state of the record is inadequate to support the extent of relief sought."  Id. (citations omitted).

1    In comparing declaratory and injunctive relief, the Ninth Circuit observed "[t]here is a

2  considerable difference between *ordering* a government official to conduct his activities in a

3  certain manner, and simply *pronouncing* that his conduct is unlawful and *should* be corrected."

4  Olagues, 770 F.2d at 803.  A plaintiff seeking a permanent injunction must satisfy a four-factor

5  test before a court may grant such relief.  Thus, Plaintiffs must demonstrate: "(1) that it has

6  suffered an irreparable injury; (2) that remedies available at law are inadequate to compensate for

7  that injury; (3) that considering the balance of hardships between the plaintiff and defendant, a

8  remedy in equity is warranted; and (4) that the public interest would not be disserved by a

9  permanent injunction."  eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 388 (2006).

10    For all of the same reasons discussed above pertaining to why Plaintiffs second cause of

11  action has failed, and further because CDPH has already amended the State 2567 to correct the

12  conceded inaccuracy regarding the precise time that Dr. Chaudhry left the operating room,[49]

13  Plaintiffs have not demonstrated that they have suffered a constitutional injury, and have not

14  demonstrated by a preponderance of the evidence that any remedy in equity is warranted.

15  Accordingly, Plaintiffs' request for declaratory and injunctive relief shall be denied.

16         **E.      Plaintiffs' Claimed Damages**

17    Although Plaintiffs have not proven any of their claims and are not entitled to any

18  monetary damages, the Court shall make a brief statement concerning the alleged damages.

19    The Court's order on the motions in *limine* held that "[b]ased upon his partnership in the

20  surgical practice, Plaintiff Chaudhry [could] testify to the value of his business, losses and

21  projected losses that are within his personal knowledge," but limited the testimony in that it

22  could "not stray into an area that would require scientific, technical, or other specialized

23  knowledge that would fall within the scope of Rule 702."  (ECF No. 97 at 30-32.)

24    The Court finds the testimony provided by Dr. Chaudhry, was in large parts speculative

25  and vague, as elucidated by the testimony of Defense expert Kristoffer Hall, and is entitled to

26  very limited weight based on a lack of evidentiary basis and conflicting evidence, including the

27

28  [49]  Which the Court found immaterial to the claim of a constitutional violation.

1    testimony concerning the terms of the contracts introduced into evidence.  Plaintiffs initially

2    sought to introduce evidence of medical income through Dr. Chaudhry's tax returns, as discussed

3    by Plaintiffs' expert witness John Englebert, who prepared certain tax returns, however, those

4    exhibits were subsequently withdrawn and are not considered by the Court.  Accordingly, Dr.

5    Chaudhry's testimony regarding loss of medical income, and inability to maintain a certain level

6    of income currently, whether through work in Pakistan or by the inability to obtain medical

7    work, consulting work, teaching work, or otherwise, that would potentially offset the speculative

8    estimates of damages presented, is entitled to limited weight, if any.

9    ///

10   ///

11   ///

12   ///

13   ///

14   ///

15   ///

16   ///

17   ///

18   ///

19   ///

20   ///

21   ///

22   ///

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

**V.**

**CONCLUSION**

For the foregoing reasons, the Court finds Plaintiffs have failed to show by a preponderance of the evidence under the applicable legal standards that Defendants are liable under any cause of action.

Accordingly, IT IS HEREBY ORDERED that:

1.  Plaintiffs' motion to admit the testimony of Laura McComb (ECF No. 177) is DENIED;

2.  Plaintiffs' motion to amend the pretrial order and designate the deposition testimony of Adams Yussif (ECF No. 176) is DENIED;

3.  Defendants' objections to Plaintiffs' deposition designations of Berj Apkarian and Kalwant Dhillon (ECF No. 170) are SUSTAINED and the designations (ECF No. 160) are STRICKEN;

4.  Plaintiffs shall recover no form of relief on any of their causes of action;

5.  The action shall be dismissed, in its entirety, on the merits, with prejudice;

6.  Judgment shall be entered in favor of Defendants and against Plaintiffs; and

7.  The Clerk of the Court is directed to enter judgment for Defendants and against Plaintiffs and close this action.

IT IS SO ORDERED.

Dated:   **September 29, 2021**

UNITED STATES MAGISTRATE JUDGE